Robert S. Green (State Bar No. 136183)
James Robert Noblin (State Bar No. 114442)
Lesley E. Weaver (State Bar No. 191305)
**GREEN & NOBLIN, P.C.**
700 Larkspur Landing Circle, Suite 275
Larkspur, CA 94939
Telephone:  (415) 477-6700
Facsimile:  (415) 477-6710
Email:  gnecf@classcounsel.com

Attorneys for Plaintiff

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENT OLDHAM, Individually and On Behalf of All Others Similarly Situated, | Case No.:  2:14-cv-2130-MCE-KJN |
| Pl          aintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | |
| MARRONE BIO INNOVATIONS, INC., JAMES B. BOYD, DONALD J. GLIDEWELL, PAMELA G. MARRONE, ELIN MILLER, RANJEET BHATIA, TIM FOGARTY, LAWRENCE HOUGH, JOSEPH HUDSON, RICHARD ROMINGER, SEAN SCHICKEDANZ, SHAUGN STANLEY, PIPER JAFFRAY & CO., STIFEL, NICOLAUS & COMPANY, INCORPORATED, ROTH CAPITAL PARTNERS, LLC and JEFFERIES LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## I.   **INTRODUCTION**

1.     Plaintiff Kent Oldham ("Plaintiff"), by his undersigne d attorneys, alleges as follows upon personal knowledge as to his own act s, and upon inform ation and belief as to all other matters, based on the investigation condu cted by and through Plaintiff's counsel, which included, among other things, a rev iew of Defendants' public documents, filings made with the United States Secu rities and E xchange Commission ("SEC"), conference calls an d announcements issued by Marrone Bio Innovations , Inc. ("MBII" or th e "Company") (f/k/a Marrone Organics Innovations Inc.), wire a nd press releases publishe d by and regarding the Company and other information readily obtainable in the public domain.

## II.   **NATURE OF THE ACTION**

2.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired MBII s ecurities traded on the NASDAQ Ex change between August 2, 2013, and September 2, 2014, inclusive, including t hose investors who purchased shares in the Company's initial public offering ("IPO") co mmencing on August 2, 2013, pursuant to MBII's Form S-1 Registration Statem ent and its Prospect us (together, the "Registration Statem ent"). This action is brought on behalf of the Class for violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b- 5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

3.     MBII purports to provide effective, sustai nable pest m anagement solutions that are safe for people and protective of the environm ent. It claims to be a leading provider of bio-based pest m anagement and plant health product s for the agriculture, turf and orna mental and water treatment markets. The Company is incor porated in the state of Delaware an d maintains

its principle executive offices in Davis California. MBII trades on the NASDAQ exchange under the ticker symbol "MBII". The Company's securities began publicly trading on August 2, 2013.

4. MBII issued numerous untrue and misleading statements in its Registration Statement and related materials. The Registration Statement misrepresented that many products in its pipeline were near commercial viability when they were not. It misleadingly stated that its products had efficacy and applied indications which they did not. Finally, the Registration Statement contained revenue and sales projections which MBII knew, because of its fraudulent accounting practices, that it had no reasonable expectation of meeting.

5. The lock-up provision of the IPO, which prevented insiders from selling their stock for at least 180 days following the IPO, expired on January 29, 2014. On that day, with insider knowledge of the Company's misdeeds which were not yet shared with the market, MBII's Chief Operating Officer ("COO") Hector Absi ("Absi") sold *every* option for the Company's stock which he owned and was at the time was vested, and MBII's Chief Financial Officer ("CFO") at the time, Donald J. Glidewell ("Glidewell"), also sold the majority of his options and holdings the day the lock-up expired. In doing so, insiders turned a substantial profit through their participation in a scheme designed to artificially inflate MBII's stock price through the release of false and misleading information. Both Glidewell and Absi have since resigned their positions, Absi doing so on the first day he was able to without incurring a substantial liability for the disgorging of certain employee benefits he had received.

6. The Company continued to make misleading statements of the nature of those contained in the Registration Statement in press releases, public statements and filings with the SEC made or issued from the time of its IPO through at least September, 2014.

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

7.     On September 3, 2014, the Company issued a press release, simultaneously filed with the SEC, stating that the audit committee (the "Audit Committee") of its board of directors (the "Board") had commenced an internal investigation after management learned of documents calling into question the recognition of revenue of a transaction which occurred in the fourth quarter of 2013. MBII simultaneously announced that the Company's financial statements for the fiscal year ended December 31, 2013, the unaudited interim financial statements for the three month period ended March 31, 2014 and the three- and six- month periods ended June 30, 2014, should no longer be relied upon as being in compliance with generally accepted accounting principles.

8.     On the release of the news, the Company's share price fell from a close of $5.65 on September 2, 2014, to close at $3.15 on September 3, 2014.

9.     The price continued to fall in the days following the announcement, reaching an intraday low of $2.80 on September 5, 2014, closing that day at just $2.87. Thus, in less than three days, MBII's securities depreciated by approximately 50%, representing $68 million in losses to investors. Trading in the Company's securities reached its heaviest volume in its history on September 3, 2014, with 2,549,800 shares reportedly traded.

10.     As noted in more detail herein, MBII's previously released statements regarding, among other things, its financial performance, sales volume and product efficacy contained materially false information or omitted information necessary to make those statements not misleading. As a result, Plaintiff and other members of the Class purchased MBII securities at artificially inflated prices and thereby suffered significant losses and damages.

## III.     **JURISDICTION AND VENUE**

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, as well as Sections 11, 12(a)(2) and 15 of the Securities Act.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

13.     Venue is proper in this District pursuan t to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as m any of th e acts and practices com plained of herein occurred in substantial part in this District and the Company is headquartered in this District.

14.     In connection with the acts alleged herein, Defendants, directly or indirectly used the means and instrumentalities of interstate commerce, including, but not lim ited to, the m ails, interstate telephone communications and the facilities of the national securities markets.

## IV.     **PARTIES**

15.     Plaintiff  Kent Oldham, as set fort       h  in  the acco mpanying  certification incorporated  by reference here in, purchased MB II securities dur ing the Class Period and has been damaged thereby.

16.     Defendant MBII is a Delaware corporation  with its headquarters located at 2121 Second Street, Suite A-107, Davis, California 95618.

17.     Defendant James B. Boyd ("Boyd") is th e Company's CFO. He  has served as MBII's CFO since February 25,  2014. Boyd signe d Sarbanes-Oxley ("SOX") certification s during the Class Perio d attesting that MBII's financial statem ents were accu rate and that its systems of internal controls were adequate.

18.     Defendant Glidewell was form erly the Company's CFO. Glidewell signed the Registration  Statement as well as SOX certifica   tions during the Class Period attesting that MBII's  financial  statements  were a ccurate  and  that  its sy stems  of interna l controls were adequate.

19.     Defendant Pamela G. M arrone ("Marrone") is th e Company's Chief Executive Officer ("CEO"). Marrone signed the Registra   tion Statement as well as SOX certification s

during the Class Period attesting that MBII's financial statements were accurate and that its systems of internal controls were adequate.

20.     Defendant Ranjeet Bhatia ("Bhatia") is a member of the Board and signed the Registration Statement.

21.     Defendant Tim Fogarty ("Fogarty") is a member of the Board and signed the Registration Statement.

22.     Defendant Lawrence Hough ("Hough") is a member of the Board and signed the Registration Statement.

23.     Defendant Joseph Hudson ("Hudson") is a member of the Board and signed the Registration Statement.

24.     Defendant Elin Miller ("Miller") is chairperson of the Board and signed the Registration Statement.

25.     Defendant Richard Rominger ("Rominger") is a member of the Board and signed the Registration Statement.

26.     Defendant Sean Schickedanz ("Schickedanz") is a former member of the Board and signed the Registration Statement.

27.     Defendant Shaugn Stanley ("Stanley") is a member of the Board and signed the Registration Statement.

28.     Defendants Boyd, Glidewell, and Marrone are referred to as the Individual Defendants.

29.     Defendants Glidewell and Marrone are referred to as the IPO Individual Defendants.

30.     Defendants Marrone, Miller, Bhatia, Fogarty, Hough, Hudson, Rominger, Schickedanz and Stanley are referred to as the Director Defendants.

31.     Defendant Piper Jaffray & Co. ("Piper Jaffray") is a United States investment bank incorporated in Delaware and holding its principal place of business in Minneapolis, Minnesota.  It was an underwriter for the Company's IPO.

32.     Defendant Jefferies LLC ("Jefferies") is a United States investment bank headquartered in New York, New York.  It was an underwriter for the Company's IPO.

33.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") is a wholly owned financial services holding company Stifel Financial Corp., a Delaware corporation with its headquarters in St. Louis, Missouri.  It was an underwriter for the Company's IPO.

34.     Defendant Roth Capital Partners, LLC ("Roth") is an investment bank with its corporate headquarters in Newport Beach, California.  It was an underwriter for the Company's IPO.

35.     Defendants Piper Jaffray, Roth, Stifel and Jefferies are referred to as the Underwriter Defendants.

36.     Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about MBII's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

37.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the

collective actions of the narrowly defined group of defendants identified above. Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants collectively were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

38. As officers and directors of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the United States federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

39. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each of the Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability

and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained in those materials.

40.     Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MBII securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding MBII's business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other shareholders to purchase MBII securities at artificially inflated prices.

## V.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

41.     At all relevant times, the market for MBII's securities was an efficient market for the following reasons, among others:

(a)     MBII's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

(b)     During the Class Period, MBII's securities were actively traded, demonstrating a very strong presumption of an efficient market;

(c)     As a regulated issuer, MBII filed with the SEC periodic public reports during the Class Period;

(d)     MBII regularly communicated with public investors via established market communication mechanisms;

(e)     MBII was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. These analysts included, but were not necessarily

limited to:  Robert W. Baird and Stifel. E ach of these reports was publicly available and entered the public marketplace; and

(f)       Unexpected material news about  MBII was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

42.     As a result of the foregoing, the m arket for MBII's securities promptly digested current information regarding MBII from all public ly available sources and ref lected such information in MBII's securities price. Unde r these c ircumstances, all purchasers of MBII's securities during the C lass Period suffered sim ilar injury through th eir purchase of MBII's securities at artificially inflated prices, and a presumption of reliance applies.

## VI.    CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this acti on as a c lass action pursuant to Fe deral Rule of Civil Procedure 23(a) and 23(b)(3) on be half of all investors who pur chased or otherwise acquired MBII securities that traded between A ugust 2, 2013, and Septem ber 3, 2014, inclusive, including those investors who purchased securities in the Company's IPO which commenced on August 2, 2013, pursuant to     the Registration Statem ent and who were dam aged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal rep resentatives, heirs, succes sors or ass igns and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so     numerous that jo inder of all m embers is impracticable. Throughout the  Class Period, MBII securities   were actively traded on the NASDAQ. While the exact num ber of Class mem bers is unknown to Plaintiff at this tim e and can only be ascertained through appropriate disc overy, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by MBII or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.     Common questions of law and fact exist   as to all members of the Class and predominate over any questions solely affecting  individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of MBII; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of those damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

# VII.   SUBSTANTIVE ALLEGATIONS

## A.   Substantive Allegations Under the Securities Act

49.     On or about August 2, 2013, MBII (through the Underwriter Defendants) offered and sold approximately 4,750,000 shares for a public offering price of $12.00 per share. Total proceeds generated were approximately $57 million. The Underwriter Defendants purchased the shares from the Company and sold those securities to Plaintiff and the Class.

50.     The Registration Statement contained materially untrue statements when made. Among other materially untrue statements, the Registration Statement claimed that MBII: (1) did not release products for sale unless the quantity of the compounds met its desired efficacy specifications, allowing it to "produce products that are highly effective and of a consistent quality on a commercial scale"; (2) "our senior management's numerous years of experience in the development of commercial products and formulations have resulted in a highly efficient product development process, which allows us to rapidly commercialize new products"; (3) "we believe we can develop and commercialize novel and effective products faster and at a lower cost than many other developers of pest management products"; (4) "we expect total revenues for the quarter ended June 30, 2013 to be between $4.2 million and $4.5 million, compared to total revenues of $1.5 million for the quarter ended June 30, 2012. We also expect total revenues for the six months ended June 30, 2013 to be between $6.9 million and $7.2 million, compared to total revenues of $3.5 million for the six months ended June 30, 2012. These increases in total revenues are due primarily to the increased acceptance of our products"; and (5) "We have found over 25 candidates for commercial development from our proprietary discovery process, including Venerate, a new bacterial species and bioincecticide, MBI-011, a burndown bioherbicide, MBI-010, a non-selective bioherbicide, MBI-302 and MBI-303, bionematicides, MBI-110 biofungicide, as well as several bioalgaecides, additional

biofungicides, bioherbicides and bionematicides and plant growth enhancers".  These statements were untrue and misleading because they misstated the efficacy of products and substantially overstated revenue and sales projections.

51.     In addition, the Registration Statement contained the following materially untrue statements:

**Statements of Operations Data:**

| | FISCAL YEAR | | | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 2012 | 2011 | 2010 | 2013 | 2012 |
| | (In thousands, except per share data) | | | | |
| | | | | (Unaudited) | |
| Revenues: | | | | | |
| Product | $ 6,961 | $ 5,194 | $ 3,697 | $ 2,649 | $ 1,956 |
| License [1] | 179 | 57 | — | 81 | 43 |
| Total revenues | 7,140 | 5,251 | 3,697 | 2,730 | 1,999 |
| Cost of product revenues | 4,333 | 2,172 | 1,738 | 1,795 | 860 |
| Gross profit | 2,807 | 3,079 | 1,959 | 935 | 1,139 |
| Operating expenses: | | | | | |
| Research and development | 12,741 | 9,410 | 5,563 | 3,283 | 2,733 |
| Non-cash charge associated with a convertible note | 3,610 | | | | |
| Selling, general and administrative | 10,294 | 6,793 | 4,353 | 2,847 | 2,322 |
| Total operating expenses | 26,645 | 16,203 | 9,916 | 6,130 | 5,055 |
| Loss from operations | (23,838) | (13,124) | (7,957) | (5,195) | (3,916) |
| Other income (expense): | | | | | |
| Interest income | 16 | 22 | 22 | 1 | 2 |
| Interest expense | (2,466) | (88) | (102) | (1,985) | (56) |
| Change in estimated fair value of financial instruments [2] | (12,461) | 1 | — | (3,563) | (15) |
| Other income (expense) | (45) | 9 | 1 | (7) | 1 |
| Total other income (expense), net | (14,956) | (56) | (79) | (5,554) | (68) |
| Income taxes | — | — | — | — | — |
| Net loss | $(38,794) | $(13,180) | $(8,036) | $(10,749) | $(3,984) |
| Deemed dividend, convertible notes | (2,039) | — | — | — | (1,253) |
| Net loss attributable to common shareholders | $(40,833) | $(13,180) | $(8,036) | $(10,749) | $(5,237) |
| Net loss per common share [3]: | | | | | |
| Basic and diluted | $ (32.48) | $ (10.64) | $ (6.58) | $ (8.48) | $ (4.20) |
| Weighted-average shares outstanding in computing net loss per common share [3]: | | | | | |
| Basic and diluted | 1,257 | 1,239 | 1,221 | 1,268 | 1,247 |
| Pro forma net loss per common share [4]: | | | | | |
| Basic and diluted | $ (2.45) | | | $ (0.51) | |
| Weighted-average shares outstanding pro forma [4]: | | | | | |
| Basic and diluted | 11,162 | | | 12,756 | |

[1]  We receive payments under strategic collaboration and distribution agreements under which we provide third parties with exclusive development, marketing and distribution rights. These payments are initially classified as deferred revenues and recognized as revenues over the exclusivity period. Please see Note 2 to our audited consolidated financial statements for an explanation of the method used to calculate license revenues.

[2]  We account for the outstanding warrants exercisable into shares of our Series A, Series B and Series C convertible preferred stock and the outstanding warrants exercisable into a variable number of shares of common stock as liability instruments, as

## B.     Substantive Allegations Under the Exchange Act

52.     On September 12, 2013, the Company issued a press release, which was filed with the SEC simultaneously as an attachment to an 8-K, falsely  announcing its purported second quarter 2013 financial results.  The press release was entitled "Marrone Bio Innovations Reports Second Quarter 2013 Financial Results"  and falsely stated, in part, as follows:

Marrone Bio Innovations, Inc. (NASDAQ: MBII), a prov ider of bio-based pest management and plant health products, a nnounced today financial results for the second quarter ended June 30, 2013.

**Financial Highlights for the Second Quarter of 2013**

- Revenues totaled $4.5 million, an almost 200% increase over the second quarter of 2012.

- Net loss of $1.6 m illion, compared to net loss of $3.9 m illion in the second quarter of 2012.

- At June 30, 2013, cash and cash equivalen ts totaled $4.2 m illion. The Company subsequently received $56 m illion in n et proceeds in connection with its initial public offering, which closed on August 7, 2013. The impact of the initial public o ffering is not included in the Company's financial results for the period ended June 30, 2013.

"We are pleased with our second quarter results and the recent completion of our IPO," said Pa m Marrone, Chief Executiv e Officer of Marrone Bio Innovations. "During the quarter we saw ongoing r obust demand for our environm entally responsible, bio-based products. ***Going forward, the demonstration of our pipeline products' efficacy in the field, newly received patents and recent additions to our team position us favorably for continued growth in 2013 and beyond***.[1] With our proprietary discovery process and rapid developm ent platform, we believe we ar e well positio ned to add to ou r broad pipeline of innovative bio-based solutions."

**Recent Business Highlights**

- Completed an initial public o ffering of 5,462,500 shares of common stock at a public offering price of $12 per share.

- Received U.S. Patents for two bioherbicide active ingredients.

- Added key new staff members including Chief Science Officer Dr. Alison Stewart and Chief Patent Counsel Dr. Yuko Soneoka.

- Received EPA approval to allow Grandevo to b e sprayed when bees are actively flying.

- Signed lease for larger headquarters facility in Da vis, CA to accommodate future growth.

- Four pipeline product candidates showed positive field trial results.

---

[1] Unless otherwise noted, all emphasis has been added by counsel.

Commenting on the Company's financial results, Don Glidewell, Chief Financial Officer of Marrone Bio Innovations, added, "***Our revenue growth in the second quarter underscores the increased demand for our products among our growing customer base***. We will continue to seek to leverage our platform and products to penetrate new markets, segments and geographies."

**Business Outlook**

For the full year 2013, the Company expects revenues to approximately double compared to the full year 2012.

53.     Subsequent to the September 12, 2013,  press release, on September 13, 2013, MBII filed a Form 10-Q with the SEC reporting the same materially false and misleading second quarter 2013 results discussed above.      In addition, the Form 10-Q contained the following false and misleading statements regarding the Company's internal controls:

**ITEM 4. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our principal executive officer and principal financial officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on such evaluation, our principal executive officer and principal financial officer have concluded that as of such date, our disclosure controls and procedures were effective. The purpose of these controls and procedures is to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules, and that such information is accumulated and communicated to our management, including our CEO and our CFO, to allow timely decisions regarding required disclosures.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the period covered by this Quarterly Report on Form 10-Q that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

54.     The Company's September 13, 2013, Form 10-Q contained as attachment 31.1, the following false and misleading certifications by Defendant Marrone, wherein the CEO falsely stated:

1.      I have reviewed this Quarterly Report on Form 10-Q of Marrone Bio Innovations, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) for the registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably

likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

55.   The Company's September 13, 2013, Form 10-Q also contained in attachment 31.2 the following false and misleading certifications by Defendant Glidewell, wherein the CFO falsely stated:

1.   I have reviewed this Quarterly Report on Form 10-Q of Marrone Bio Innovations, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying offi cer(s) and I have disclosed, based on our most recent evaluation of intern al control o ver financial reporting , to th e registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All s ignificant deficiencies and material weaknesses in the desig n or operation of internal control over fina ncial reporting which are reason ably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not m aterial, that involves m anagement or other employees who have a significant role in the registrant's internal control over financial reporting.

56.     The Company's September 13, 2013, Form 10-Q also contained, attached to the filing as Exhibit 32.1, SOX certifications exec    uted by Defendants Marrone and Glidewell, wherein the CEO and CFO falsely stated:

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Pamela G. Marrone, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarban es-Oxley Act of 2002, that the Quarterly Report of Marrone Bio Innovations, Inc. on Form   10-Q for th e fiscal quarter ended June 30, 2013 fully complies with the requirements of Section 13(a) or 15(d) of the Secu rities Exchange Act of 1934 and that information contained in    such Quarterly Report on Form   10-Q fairly presents in all m aterial respects the fina ncial condition and results of operations of Marrone Bio Innovations, Inc.

Date: September 13, 2013

By:            /s/          Pamela G. Marrone
Name:                      Pamela G. Marrone
Title:          President and Chief Executive Officer

/////

/////

/////

/////

I, Donald J. Glidewell, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report of Marrone Bio Innovations, Inc. on Form 10-Q for the fiscal quarter ended June 30, 2013 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Quarterly Report on Form 10-Q fairly presents in all material respects the financial condition and results of operations of Marrone Bio Innovations, Inc.

Date: September 13, 2013

By:             /s/          Donald J. Glidewell
Name:                        Donald J. Glidewell
Title:                       Chief Financial Officer

This certification accompanies this Report on Form 10-Q pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not be deemed filed by the Company for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the Company specifically incorporates it by reference.

57.    On November 7, 2013, the Company issued a press release, which was filed simultaneously with the SEC as an attachment to an 8-K, entitled "Marrone Bio Innovations Reports Third Quarter 2013 Financial Results". The press release falsely stated, in part, as follows:

Marrone Bio Innovations, Inc. (NASDAQ: MBII), a provider of bio-based pest management and plant health products, announced today financial results for the third quarter ended September 30, 2013.

**Financial Highlights for the Third Quarter of 2013**

- Revenues totaled $1.3 million, representing growth of 82%, with growth year to date of 102%. Additional product sales of $770 thousand were delivered to customers with extended payment terms and recorded as deferred revenues.

- Net loss of $6.1 million, compared to net loss of $13.8 million in the third quarter of 2012.

- At September 30, 2013, cash and cash equivalents and short-term investments totaled $53.5 million.

"We made excellent progress in the third quarter expanding adoption and further commercializing our innovative bio-based products into the broader agricultural and water treatment markets," said Pam Marrone, Chief Executive Officer of Marrone Bio Innovations. "We signed MOUs with two new EU distributors and are working to formalize agreements that we believe would provide a solid foundation for international growth, and the positive results for our Regalia® Rx launch in the midwest combined with several other encouraging field trials during the quarter underscores the efficacy and wide-reaching applicability of both our commercial products as well as our pipeline candidates."

**Recent Business Highlights**

- Signed Memorandums of Understanding (MOU) with two European distributors including DeSangosse in France and CBC/Intrachem in Italy.

- Successfully demonstrated the value of Regalia Rx on corn and soybeans for enhanced plant health and increased yield.

- Demonstrated positive field results for existing and pipeline products against soybean cyst nematodes, corn rootworm and key pests in fruits and vegetables.

- Received California registration for Zequanox and also commenced commercial treatment programs with Ontario Power Generation and Oklahoma Gas & Electric. Also commenced a large-scale demo at Hoover Dam.

"*Our third quarter results are consistent with the typical seasonal trends for our third quarter,*" said Don Glidewell, Chief Financial Officer of Marrone Bio Innovations. "Additionally, our recent IPO has allowed us to begin offering extended payment terms which are typical in the agricultural industry. We sold $770 thousand dollars of products under these terms in the third quarter and will recognize the revenue from these sales during the appropriate future period."

**Business Outlook**

*For the full year 2013 the Company expects net revenues to more than double compared to the full year 2012, including expected deferred revenues.*

58.     Also on November 7, 2013, the Company announced that Glidewell had elected to retire from his position of CFO, although he agreed to remain at the Company for up to five months.

---

59.     Thereafter, on November 8, 2013, MBII filed a Form 10-Q with the SEC repeating its false and misleading financial results discussed above. In addition, the Form 10-Q also attached SOX certifications executed by Defendants Marrone and Glidewell substantially similar to the certifications referenced in paragraphs 53-56 *supra*.

60.     On November 8, 2013, the Company also conducted a conference call with investors. During the call, Marrone made materially false and misleading statements which provided deceptive statements regarding the efficacy and commercial viability of its products, including statements that:

> I'm excited to share with you data from our launch of Regalia Rx on corn and soybeans in the Midwest. These commercial applications showed very encouraging results with respect to yield increases and plant health. Regalia Rx was applied on top of the chemical treatments and resulted in 5 bushels per acre increase on average in corn and 4 bushels per acre increase in soybeans.
>
> In addition to yield results, we also received data from the growers that indicate increased corn test weight. This increase would provide additional value to the growers beyond bushels per acre which is very compelling to our grower customers. The pictures we are providing show visual evidence of the performance of Regalia Rx applications; greener color, healthier plants and increased ear and pod size. The success of this launch validates our expectations for penetration of Regalia Rx in the Midwest.
>
> In addition, our products and product candidates continue to perform well in field trials. In a trial with Auburn University, MBI-203 the microorganism in Grandevo showed excellent performance against soybean cyst nematode, increasing yield when applied in-furrow and as a [ph] treatment. Venerate also showed activity against this nematode as did MBI-302 which we mentioned during last quarter's call.

61.     During the November 8, 2013, conference call, Glidewell made materially false and misleading statements, including the following statements that:

> Turning to the quarterly results, we recognized $1.3 million of revenue and have deferred 770,000 of additional sales to future periods. This 770,000 is reflected as deferred revenue on our balance sheet. 1.3 million in revenue for the third quarter of 2013 compares to 740,000 for the same period in 2012 or an 82% increase for the quarter on a year-over-year basis.

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

For the first nine months of 2013, total revenues of 8.6 million which excludes the deferred revenue piece compares to $4.2 million for the same nine-month period in 2012 and represents a year-over-year growth of 102%. As mentioned in our last earnings call, third quarter has historically been our lowest quarter of our fiscal year as a result of seasonal trends.

I would like to discuss the deferred revenue piece I mentioned previously. $770,000 worth of product was delivered,        accepted and invoiced to our customers during the quarter in addition to the 1.3 million that was recognized.

In the ag industry, extended payment terms are a common place,  particularly in row crops and for large high volume orders. We are entering row crops as a new segment of our business and will be offering extended payment terms compared to what we have offered in the past.   We're deferring revenue on these invoices and will recognize this revenue in future periods.

There's three considerations to offering these extended payment terms. First, the proceeds from our initial public offering gave  us the working capital required to offer such terms.  Secondly, we entered the row crop market where extended terms are the norm. Third, extended payment terms help us drive larger order size which reduces logistical and other costs related to servicing these accounts.

Initially, we will be deferring the revenue on these extended term sales. After we build the history of offering and collecting on these longer term receivables, we can on a GAAP basis recognize these sales on a sell-in versus a sell-through model.  We will continue to provide detail on the recognized and deferred revenue pieces.

The gross margin for the third quarter was 20%. This compared to 24.5 in the second quarter of 2013 and 29 in the same quarter last year and was in line with our expectations.

62.     On January 29, 2014, the lock-up restrictions contained in the Registration Statement against insider sales of MBII securities ended.  According to filings made with the SEC, Glidewell liquidated a significant portion of his MBII holdings that very day.  He sold additional shares just days later, on February 3, 2014, bringing his total volume of shares sold in less than a week to over 100,000.  COO Absi also, according to filings made with the SEC, sold every share of MBII which he owned and was vested on January 29, 2014,  *the day the lock-up restrictions of the Registration Statement ended*.

63.     On March 6, 2014, MBII issued a m aterially false and m isleading press release, which was filed simultaneously with the SEC as an attachment to an 8-K, entitled "Marrone Bio Innovations Reports R ecord Fourth Quarter and  Fiscal Year Financial Results".  The press release falsely stated, in part, that:

> Marrone Bio Innovations, Inc. (NASDAQ: MBII), a prov ider of bio-based pest management and plant health products, a nnounced today financial results for the fourth quarter and full year ended December 31, 2013.
>
> **Financial Highlights for the Fourth Quarter of 2013**
>
> - Revenues  for the fourth quarter 2  013  totaled  $6 m illion,  representing growth of 106%. Revenue for the full year 2013 totaled $14.5 million, representing growth of 104%
>
> - Net  loss  of $10 m illion,  compared  to  net  loss  of $17.1 m illion  in the fourth quarter of 2012
>
> "Our robust fourth quarter results cappe d a transformative year for Marrone Bio Innovations," said Pam Marrone, Chie f Executive Officer of Marrone Bi o Innovations. "I am  extremely pleased with the progress w e have achieved in 2013.  We continued to broaden our sale  s into high value specialty crops, launched  into row crops in North A merica and also ex tended our commercial reach across the globe. Our commercial success in the fourth quarter as well as our  numerous  scientific and operationa l  milestones  in 2013 underscore our confidence  that we will con  tinue  to le ad  the shif t  to  biologically-based alternatives for pest management and plant health."
>
> **Recent Business Highlights**
>
> - Passed the 1 m illion  acres-treated m ilestone for biopesticide products in the United States
>
> - Achieved  substantial  build-out  including  installation of 2 twenty cubic meter  fermenters  and production comm  enced  at wholly-owned manufacturing facility in Michigan
>
> - Received  EPA  registration for Venerate™ in  secticide.  Demonstrated positive  field resu lts for upcomi ng 2014 produ ct Venerate including strong  efficacy against a wide va    riety  of insects in high value specialty crops such as citrus, stonefruit and strawberries
>
> - Submitted pipeline product MBI-302, a biological nematicide, to the EPA for registration

- Signed Letters of Intent (LOI) with Koppert Biological Systems for distribution of MBI insecticides in covered crops worldwide, excluding the United States, Canada and France, and with Nufarm for distribution for insecticides and fungicides in Australia and New Zealand

- Received international registration for Regalia MAXX in El Salvador, Guatemala and Honduras through distribution partner FMC. These countries add to existing registrations in Mexico and Panama.

- Received encouraging efficacy data on pipeline products – three nematicides, an antitranspirant, a new fungicide, two herbicides, a biofumigant and several plant health candidates

- Advanced six pipeline candidates successfully through toxicology

- Expanded patent portfolio with notice of allowances and issuance of patents on our major products

"We continue to see healthy demand for our innovative and effective products," commented Chief Operating Officer Hector Absi. "The strong sales in the fourth quarter, as well as our new distribution agreements and the milestones we achieved at our Michigan plant make us optimistic for our prospects as we look out to 2014 and beyond."

Commenting on his recent appointment to the position of Chief Financial Officer, Jim Boyd said, "I am excited about joining a dynamic and industry-changing company like Marrone Bio Innovations. The opportunity to leverage the Company's pipeline of new products in the high growth biopesticide market is very exciting and I look forward to helping build MBI into the industry leader."

**Business Outlook**

***For the full year 2014 the Company expects net revenues to continue to at least double compared to the full year 2013***. MBI also expects to gain new registrations for Regalia in Brazil and submit two more active ingredients to the EPA. The company also expects to launch at least 1-2 new products in addition to its upcoming insecticide Venerate.

64.     Thereafter, on March 25, 2014, MBII filed a Form 10-K with the SEC repeating its false and misleading financial results discussed above. In addition, the Form 10-K also attached SOX certifications executed by Defendants Marrone and Glidewell substantially similar to the certifications referenced in paragraphs 53-56 *supra*.

---

65.     On May 13, 2014, the Company issued a materially false and misleading press release, which was filed simultaneously with the SEC as an attachment to an 8-K, announcing its first quarter 2014 financial results.  The press release was entitled "Marrone Bio Innovations Reports First Quarter 2014 Financial Results" and falsely stated, in part, as follows:

> Marrone Bio Innovations, Inc. (NASDAQ: MBII), a provider of bio-based pest management and plant health products, today announced financial results for the first quarter March 31, 2014.
>
> Financial Highlights for the First Quarter of 2014
>
> - Revenues for the first quarter 2014 totaled $2.8 million, compared to $2.7 million for the first quarter of 2013, in-line with the company's expectations against the headwinds of severe weather in all of our growing regions
> - Net loss of $10.2 million, compared to net loss of $10.7 million in the first quarter of 2013
>
> "Our numerous achievements in the first quarter set the stage for our growth through the remainder of the year and beyond," said Pam Marrone, Chief Executive Officer of Marrone Bio Innovations. "We expanded our footprint both in North and South America, with Regalia® MAXX registered in six Latin American countries, and also submitted our biofumigant product MBI-601 for EPA registration. Marrone Bio Innovations is leading the shift toward sustainable and effective biological solutions as awareness and enthusiasm for the category continue to grow."
>
> **Recent Business Highlights**
>
> - Launched new product Venerate in the United States. Venerate controls a broad spectrum of pest insects and features multiple modes of action, a favorable environmental profile and holds an exemption from maximum residue level (MRL) tolerances.
>
> - Completed construction of Phases 1A and 1B of the Michigan manufacturing facility which includes two 20,000 liter fermentation tanks and produced initial runs of Grandevo and Regalia.
>
> - Increased penetration of Regalia and Grandevo® in California nut crops.
>
> - Regalia enhanced the disease control program in canola. Achieved good results of Regalia against soil and foliar potato diseases and MBI-110 against late blight.

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- Grandevo and Venerate field trials continue to show excellent control of a wide range of insect pests such as whiteflies, thrips, psyllids, aphids, fruit flies, stinkbugs and Lygus in fruits, nuts vegetables, and cotton in the U.S. and Europe.

- Haven™ protected yield by reducing sunburn on Merlot and table grapes in trials in Chile.

- Received registration for Regalia MAXX biofungicide in Peru. Peru is now the sixth country in Latin America to approve the use of Regalia MAXX for control of a wide variety of bacterial and fungal diseases in agricultural crops.

- Received a U.S. patent for Regalia biofungicide covering methods for increasing plant growth, root initiation and extension. The patent highlights MBI's capability to add unique intellectual property to in-licensed technology.

- Submitted Grandevo and Venerate for registration in Mexico. Our bioinsecticides together with Regalia MAXX biofungicide provide Mexican farmers a powerful crop protection tool that delivers the benefits of a bio-based product in an export-centric region.

- Submitted MBI-601 biofumigant pipeline product to the EPA for registration. MBI-601 controls parasitic nematodes and plant diseases in high value crops such as strawberries and tomatoes.

- Secured a license from Kao Corporation for use of an active ingredient in forthcoming MBI anti-transpirant product Haven and signed an agreement for access to several biopesticides from The New Zealand Institute for Plant & Food Research.

"Our commercial progress continued in the first quarter with expansion into new regions, the development of new customers and deeper penetration into our existing customer base," commented Chief Operating Officer Hector Absi. "Despite challenging weather conditions persisting across several different regions of the United States we are pleased with our progress and look forward to the upcoming planting season."

Chief Financial Officer, Jim Boyd commented, "After just two months with the company I am excited by the momentum of the company and the exciting growth opportunities that are in front of us. Everyone here is working tremendously hard to make this company the biological solutions leader in the agriculture industry."

**Business Outlook**

***For the full year 2014 the Company continues to expect net revenues to at least double compared to the full year 2013. The company also expects to launch at least 1-2 new products** in addition to its insecticide Venerate.*

66.     Thereafter, on May 15, 2014, MBII filed a Form 10-Q with the SEC repeating its false and misleading financial results discussed above.  The Form 10-Q contained the following statements regarding the Company's controls and procedures:

> Our management, with the participation of our chief executive officer (CEO) and chief financial officer (CFO), has eval uated the effectiveness of our disclosure controls and procedures (as defined in  Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as  amended (Exchange Act)), as of the end of the period covered by this  Quarterly Report on Form 10-Q. At the tim e that our Annual Report on form 10-K for the year ended December 31, 2013 was filed on March 25, 2014, our CEO and CFO concluded that our disclosure controls and procedures  were effective as of     December 31, 2013. Subsequent to these evaluations,  our CEO and CFO c    oncluded  that  our disclosure controls and procedures were not effectiv e as of  December 31, 2013 and continue to not be effective  as of March 31, 2014 because of    a  material weak ness in our internal control over financial reporting, as described below.

> ***Changes in Internal Control***

> In  connection with the preparation of     our  financial statem ents  for the three months ended March 31, 2014, we determ ined that we had a m aterial weakness in  our internal con trol over financial  reporting  because we did no  t maintain effective controls over our shipping process which resulted in the shipment of the wrong  product to a custom  er. We  discovered  that we did not have effective controls to prevent or detect an inst ance where the product shipped was not the same as the product ordered by a custom er. While the deficiency in this instance did not result in a material misstatement of our financial statements, it is possible that  there could be a m   aterial  misstatement  if the control deficiency is not remediated.  Accordingly, m anagement  determined  that th is  control  deficiency represents  a  material weakness in o ur internal controls over  financial reporting, and accordingly, our internal con trol was ineffective at both  December 31, 2013 and March 31, 2014.

> We  have developed, and are currently im   plementing,  a plan to rem  ediate this material  weakness, which includes, am  ong other things, training our personnel who handle customer shipments to compare product ordered to product selected in the inventory records pr ior to shipment and comparison of product ordered to product  removed  from inventory prior to invoicing, which would enhance our ability to prevent the wrong product from     being shipped and to detect if the wrong product has been shipped prior to invoicing.

As we continue to ev aluate and work to enhance internal controls over financial reporting, we may determine that additional measures should be taken to address this or other control deficiencies, and/or that we should m odify the remediation plan described above. Notwithstanding our material weakness, we have concluded that the financial statem ents and other financial inform ation included in this Quarterly Report on Form 10-Q, fairly present in all mater ial respects our financial condition, results of operations and cash flows as of, and for, the periods presented.

Except as d isclosed above, there were no ch anges in our internal con trol over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the period covered by this Quarterly Report on Form 10-Q that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

67.     In addition, the Form 10- Q also attached SOX certification s executed by Defendants Marrone and Boyd substantially sim ilar to the certifica tions referenced in paragraphs 54-56 *supra*.

68.     On May 16, 2014, MBII filed a Form S-1 (the "May Registration Statem ent") with the SE C containing false and m isleading information. The May Registration Statem ent was followed by a prospectus, filed on June 6, 2014 (the "June Prospectus"). The June Prospectus contained false and m isleading statements regarding the e fficacy and comm ercial viability of its products, including the following:

**Our Products**

The table below summarizes our current portfolio of biopesticide products that are commercially available or are in targeted placement with key customers.

| NAME | MARKET | TARGET | USE | STAGE |
|------|--------|--------|-----|-------|
| Regalia | Crop Protection, Home and Garden, Turf | Plant Disease/ Plant Health | Protects against fungal and bacterial diseases and enhances yields. | Commercially Available |
| Grandevo | Crop Protection, Home and Garden, Turf | Insects and Mites | Kills a broad range of sucking and chewing insects through feeding. | Commercially Available |
| Zequanox | Water Treatment | Invasive Mussels | Kills invasive mussels that restrict water flow in industrial and power facilities and harm recreational waters. | Commercially Available for In-Pipe; Submitted for EPA Registration for Open Water |

| Venerate | Crop Protection, Home and Garden, Turf, Animal Health | Insects and Mites | Kills sucking and chewing insects on contact. | Commercially Available |
| Opportune | Crop Protection, Home and Garden, Turf | Weeds | Controls weeds pre- andpost-emergence. | EPA Approved; Targeted Placement with Key Customers |

In addition to the above products, our pipeline consists of product candidates in various stages of development, including biostimulant and plant health products that do not require EPA registration, products submitted to the EPA for registration, and other promising product candidates under development, which are summarized in the table below, as well as other early-stage discoveries.

| NAME | MARKET | TARGET | USE | STAGE |
|---|---|---|---|---|
| Haven | Crop Protection, Turf, Ornamentals | Plant Health | Enhances yields and reduces plant stress. | EPA Exempt; Under Development |
| MBI-506, MBI-507 and MBI-508 | Crop Protection, Home and Garden, Turf | Plant Health | Enhance yields and reduce crop stress. | EPA Exempt; Under Development |
| MBI-304 and MBI-305 | Crop Protection, Home and Garden, Turf | Nematodes | Kill a broad range of nematodes. | EPA Approved; Under Development |
| MBI-011 | Crop Protection, Home and Garden, Turf | Weeds | Controls weeds; "burndown" herbicide (controls weed foliage). | Submitted for EPA Registration; Under Development |
| MBI-302 | Crop Protection, Turf | Nematodes/Plant Health | Controls plant-parasitic nematodes and improves plant health. | Submitted for EPA Registration; Under Development |

| NAME | MARKET | TARGET | USE | STAGE |
|---|---|---|---|---|
| MBI-601 | Crop Protection, Home and Garden, Industrial | Plant Disease/Nematodes/Insects | Biofumigant; controls post-harvest and soil-borne pests and diseases. | Submitted for EPA Registration; Under Development |
| MBI-010 | Crop Protection, Turf, Home and Garden | Weeds | Controls weeds; non-selective systematic herbicide. | Under Development |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| MBI-110 Crop Protection, Home and Garden | Plant Disease/Plant Health | Protects against fungal diseases and improves plant growth. | Under Development |
| MBI-303 Crop Protection, Turf | Nematodes/Plant Health | Controls plant-parasitic nematodes and improves plant health. | Under Development |

**The Value Proposition of Our Pest Management and Plant Health Products**

Our products are highly effective and generally designed to be compatible with existing equipment and infrastructure. This allows them to be used as substitutes for, or in connection with, conventional chemical pesticides and other products, as well as in markets for which there are no available conventional chemical pesticides or the use of conventional chemical products may not be desirable or permissible because of health and environmental concerns. We believe that compared with conventional chemical pesticides, our products:

- Are competitive in both price and efficacy;
- Provide viable alternatives where conventional chemical pesticides and genetically modified crops are subject to regulatory restrictions;
- Comply with market-imposed requirements for pest management programs by food processors and retailers;
- Are environmentally friendly;
- Meet stringent organic farming requirements;
- Improve worker productivity by shortening field re-entry times after spraying and allowing spraying up to the time of harvest;
- Are exempt from residue restrictions applicable to conventional chemical pesticides in both the agriculture and water markets; and
- Are less likely to result in the development of pest resistance.

In addition, our experience has shown that when our products are used in connection with conventional chemical pesticides, they can:

- Increase the effectiveness of conventional chemical pesticides while reducing their required application levels;
- Increase levels of pest control and consistency of control;
- Increase crop yields;
- Increase crop quality, including producing crops with higher levels of protein, better taste and color and more attractive flowers; and
- Delay the development of pest resistance to conventional chemical pesticides.

69. The June Prospectus also contained false and misleading financial information, including the following:

**Statements of Operations Data:**

| | YEAR ENDED DECEMBER 31, | | | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|
| | 2013 | 2012 | 2011 | 2014 | 2013 |
| | (In thousands, except per share data) | | | | |
| Revenues: | | | | | |
|    Product | $ 12,657 | $ 6,777 | $ 5,044 | $ 2,097 | $ 2,373 |
|    License [1] | 193 | 179 | 57 | 45 | 48 |
|    Related party | 1,693 | 184 | 150 | 648 | 309 |
| Total revenues | 14,543 | 7,140 | 5,251 | 2,790 | 2,730 |
| Cost of product revenues, including cost of product revenues to related parties of $984, $126 and $50 for the years ended December 31, 2013, 2012 and 2011, respectively, and $192 and $194 for the three months ended March 31, 2014 and 2013, respectively | 10,736 | 4,333 | 2,172 | 1,652 | 1,795 |
| Gross profit | 3,807 | 2,807 | 3,079 | 1,138 | 935 |
| Operating expenses: | | | | | |
|    Research, development and patent | 17,814 | 12,741 | 9,410 | 4,282 | 3,283 |
|    Non-cash charge associated with a convertible note | — | 3,610 | — | — | — |
|    Selling, general and administrative | 15,018 | 10,294 | 6,793 | 6,330 | 2,847 |
| Total operating expenses | 32,832 | 26,645 | 16,203 | 10,612 | 6,130 |
| Loss from operations | (29,025) | (23,838) | (13,124) | (9,474) | (5,195) |
| Other income (expense): | | | | | |
|    Interest income | 49 | 16 | 22 | 10 | 1 |
|    Interest expense [2] | (5,997) | (2,466) | (88) | (773) | (1,985) |
|    Change in estimated fair value of financial instruments [2] | 6,717 | (12,461) | 1 | — | (3,563) |
|    Gain on extinguishment of debt | 49 | — | — | — | — |
|    Other (expense) income, net | (282) | (45) | 9 | (9) | (7) |
| Total other income (expense), net | 536 | (14,956) | (56) | (772) | (5,554) |
| Loss before income taxes | (28,489) | (38,794) | (13,180) | (10,246) | (10,749) |
| Income taxes | — | — | — | — | — |
| Net loss | (28,489) | (38,794) | (13,180) | (10,246) | (10,749) |
| Deemed dividend on convertible notes | (1,378) | (2,039) | — | — | — |
| Net loss attributable to common stockholders | $(29,867) | $(40,833) | $(13,180) | $ (10,246) | $(10,749) |
| Net loss per common share [3]: | | | | | |
|    Basic | $ (3.42) | $ (32.48) | $ (10.64) | $ (0.52) | $ (8.48) |
|    Diluted | $ (3.94) | $ (32.48) | $ (10.64) | $ (0.52) | $ (8.48) |
| Weighted-average shares outstanding used in computing net loss per common share [3]: | | | | | |
|    Basic | 8,731 | 1,257 | 1,239 | 19,518 | 1,268 |
|    Diluted | 8,911 | 1,257 | 1,239 | 19,518 | 1,268 |

70.     On August 7, 2014, the Company issued a materially false and misleading press release, which was filed simultaneously with the SEC as an attachment to a Form 8-K, announcing its first quarter 2012 financial results. The release, entitled "Marrone Bio Innovations Reports Second Quarter 2014 Financial Results", stated, in part, as follows:

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Marrone Bio Innovations, Inc. (NASDAQ: MBII), a prov ider of bio-based pest management and plant health products, t oday announced financial results for the second quarter ended June 30, 2014.

**Financial Highlights for the Second Quarter of 2014**

- Revenues for the second quarter to taled $3.6 million, com pared to $4.5 million in the second quarter of 2013. As in the first quarter of 2014, this comparison primarily reflects the ongoing im pact of adverse weather across the Company's growi ng regions, partially offset by increased adoption rates for all of its products, including Venerate, which began shipm ents and sold ou t all av ailable inventory in the second quarter.

- Net loss for the second quarter was $10.4 m illion compared to $10.2 million in first quarter 2014.

Pam Marrone, Chief Executive Offi cer of Marrone Bio Innovations stated, " We believe our momentum will build in the second half as our bio-based agricultural products, capable of both supplem enting and substitu ting for m any traditional solutions, demonstrate excellent value due to their combination of effectiveness, environmental friendliness and wide application. Additionally, we have now focused our development efforts on a suite of our best opportunities to ensure we maximize our return on investm ent and, at the same time, deepen our leadership position in this developing and disruptive category."

As a result of the im pact of bad weat her on the year and the late Tuesday resignation of its COO, the Com pany is una ble to give annual guidance at this time, but may be able to provide annual guidance at a later date.
Ms. Marrone concluded, "We still expect to c lose the year with considerable momentum for Regalia Rx in row crops, as well as Regalia, Grandevo and Venerate in specialty cr ops, increases from our new product introductions and finally international expa nsion. Since the close of the second quarter, it has become evident that th e market conditions, particularly in the Southeas tern US, will be meaningful. Nonetheless, our fundamental view of our opportunity and of our ability to achieve our potential has not changed."

**Recent Business Highlights**

- Inaugurated the M3 Production Facilit y; completed construction of Phase 1C; now operating three 20,000 liter fermentation tanks; M3 now producing Regalia, Grandevo and Zequanox.

- Received $10 million loan guaran tee from USDA with Five Star Bank for M3 development funding.

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- Completed extensive pipeline review and prioritized a select group of development products with a combined addressable market of approximately $40 billion.

- Received EPA approval for open-water environment use of Zequanox molluscicide.

- Signed multi-year collaboration with Evogene, an Israeli plant biotechnology company, for joint discovery and commercialization of products with novel modes of biological action for insect control.

- Reached agreement with DSM Food Specialties to exchange microorganisms from respective libraries to advance research in respective areas of interest, food ingredients and crop protection/health.

- Entered into collaborative agreement with Valagro for biostimulant development and acceleration of international market penetration.

- Compelling results from field studies on effectiveness of Regalia on European wheat crops and for cotton crop enhancement.

- Secured two patents for Grandevo, covering a key insecticidal compound and root treatment for corn rootworm, a problematic and widespread corn pest.

- Brazil ANVISA published favorable registration decision for Regalia Maxx, now to be finalized by MAPA.

- Received Colombia registration for Regalia, triggering milestone payment from FMC.

- UK Data Assessment Report completed with recommendation to register Regalia in Europe, trigging milestone payment from Syngenta.

- Began regulatory approval process for Grandevo in Europe and Brazil; began product trials.

- Began European trials for MBI-110 on grape downy mildew, with favorable results.

Jim Boyd, Chief Financial Officer, commented, "We enjoy a strong balance sheet, reinforced by approximately $40 million in proceeds from our recent secondary offering. As we go forward, we will deploy capital in a disciplined manner to accelerate growth. We believe we are well positioned financially as well as strategically and with regard to our operating capabilities."

71.     Also on August 7, 2014, the Company announced the abrupt resignation of its COO Absi. This was the first day, in accordance with the terms of Absi's employment letter, whereby he could resign his employment without repaying to the Company his signing bonus and relocation expenses, which combined totaled nearly $60,000.

72.     On August 8, 2014, the Company also conducted a conference call with investors discussing its second quarter 2014 financial results. During the call, Marrone made materially false and misleading statements providing deceptive information regarding the efficacy and commercial viability of its products, including statements that:

> I would stress that the challenges we faced in the first half of the year, which were principally weather-related, do not alter our fundamental view of the company's prospects in the long term. Our company is on the right path.
>
> *     * *
>
> Finally, as our bio-fumigant MBI-601. This product is based on a fungus strain that produces a suite of gaseous compounds that control plant diseases, insects and nematode. They've already submitted it the EPA, and expect to launch in 2016 in high-value fruit and vegetable crops . Chemical fumigants, a more than $1 billion market, are generally toxic, heavily restricted, and require large buffer zones from populated areas when applied. We believe MBI-601 could be a much-needed tool in this category. I would also like to mention that we are working to develop applications based on our already launched and in-development products for the soil and seed-treatment markets.

73.     During the August 8, 2014, conference call, Boyd made materially false and misleading statements, including the following statements that:

> Total revenues for the quarter were $3.6 million, compared to $4.5 million last year. The tough environment in the first half of the year has caused us to come off our original revenue target of doubling. To clarify the environment, weather conditions adversely affected a number of sprays and the acreage planted in the first half of 2014, which thus reduced demand for our products.

74.     Thereafter, on August 13, 2014, MBII filed a Form 10-Q with the SEC repeating its false and misleading financial results discussed above.     The Form 10-Q contained the following statements regarding the Company's controls and procedures:

Our management, with the participation of our chief executive officer (CEO) and chief financial officer (CFO), has eval uated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (Exchange Act)), as of the end of the period covered by this Quarterl y Report on For m 10-Q. Based on such evaluation, our CEO and CFO have concluded that as of such date, our disclosure controls and procedures were effectiv e. The purpose of these controls and procedures is to ensure that information required to be disclosed in the reports we file or submit under the Ex change Act is recorded, processed, summ arized and reported within the time pe riods specified in the SEC's rules, and th at such information is accumulated and communicated to our management, including our CEO and our CFO, to allow timely decisions regarding required disclosures.

**_Changes in Internal Control_**

We had a m aterial weakness in our in ternal control over financial reporting because we did not m aintain effective controls over our sh ipping process, which resulted in the shipm ent of the wrong product to a custom er. In connection with the preparation of our financial statem ents for the three m onths ended March 31, 2014, we discovered that we di d not have effective contro ls to prevent or detect an instance where the product shipped was not the sam e as the product ordered by a customer. While the deficiency in th is instance did not resu lt in a material misstatement of our fin ancial statements, it is possible that there could be a material misstatement if the control deficiency was not remediated. Accordingly, management determined that this cont rol deficiency represented a m aterial weakness in our internal controls over financial reporting, and accord ingly, our internal control was ineffective at both December 31, 2013 and March 31, 2014. During the three m onths ended June 30, 2014, we completed the remediation of controls related to this material weakness, which includes, am ong other things, training our personnel who handle cust omer shipments to com pare product ordered to product selected in the inve ntory records prior to shipm ent and comparison of product ordered to produc t removed from inventory prior to invoicing, which would enhance our abil ity to prevent the wrong product from being shipped and to detect if the wrong product has been shipped prior to invoicing.

Except as d isclosed above, there were no ch anges in our internal con trol over financial reporting identified in m anagement's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the period covered by this Quarterly Report on Form 10-Q that m aterially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

75. In addition, the Form 10- Q also attached SOX certification s executed by Defendants Marrone and Boyd substantially sim ilar to the certifica tions referenced in paragraphs 54-56 *supra*.

76.     Each of the foregoing statem ents regarding M BII's products, revenues, losses and internal controls were materially false and misleading when made.  In violation of generally accepted accounting principles ("G AAP"), MBII fraudulently announced inflated revenues, earnings and earnings per share.    MBII furthe r misrepresented its inte rnal controls as be ing adequate when, in fact, they were in adequate and permitted the improper recordation of profits and losses during the Class Perio d.  MBII further m isrepresented its market share, financial results, and product efficacy and penetration.    When these m isrepresentations became public, Plaintiff and the Class were injured.

**C.      The Truth Emerges**

77.     On September 3, 2014, the Com pany announced that the Audit Commi ttee had begun an investigation into the acco unting practices of the Company, dating back until at least the fourth quarter of 2013.  It stated, in an 8-K filed with the SEC, that:

> **Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> On September 3, 2014, we issued a press release announcing that our board's Audit Committee has commenced an in ternal investigation after learning of documents calling into question the recogni tion of revenue in the fourth quarter of 2013 for an $870,000 transaction. On September 2, 2014 the Audit Committee concluded, after consultation with m anagement, that our previously reported financial statements as of Decem ber 31, 2013 and for th e fiscal year ended December 31, 2013 included in the Company's Annual Report on Form 10-K for the year ended December 31, 2013, the related report of the independent auditors on those 2013 financial statem ents dated March 25, 2014, and the unaudited interim financial statements included in the Co mpany's Quarterly Reports on Forms 10-Q for the quarters ended March 31, 2014 and June 30, 2014, should no longer be relied upon.
>
> The Audit Committee of the Board of Di rectors of the Co mpany and Company management have discussed the foregoing m atters with the Company's independent registered public accounting firm, Ernst & Young LLP.

/////

/////

78.     It further stated, in a press release en titled "Marrone Bio Innovations Announces Audit Committee Investigation" and attached to the 8-K filed with the SEC on Septem ber 3, 2014, that:

> Marrone Bio Innovations, Inc. (MBI)[NASDAQ: MBII] today announced that, at the recommendation of management, the Audit Committe e of its Board of Directors has commenced an intern al investigation after management learned of documents calling into question the recogni tion of revenue in the fourth quarter of 2013 for an $870, 000 transaction. The Audit Comm ittee has retained independent legal advisers to assist it in this investigation.

> In addition, the Audit Comm ittee has dete rmined that the company's financial statements for the fiscal year ended December 31, 2013, th e unaudited interim financial statements for the three month period ended March 31, 2014 and the three- and six- m onth periods ende d June 30, 2014, should no longer be relied upon as being in compliance with generally accepted accounting principles.

79.     On September 3, 2014, as the m arket absorbed the disclosures m ade in the SEC filing and press release issued that morning, MBII's stock price plummeted. The stock closed at $5.65 on Septem ber 2, 2014, the last day of trading prior to the release of the revelations contained in the press release. MBII stock cl osed on September 3, 2014, at $3.15, trading at its highest volume in history. By Septem ber 5, 2014, the stock was trading as low as $2.80 per share, reflecting a loss of **_nearly fifty percent_** of the Company's value.

## VIII.   LOSS CAUSATION / ECONOMIC LOSS

80.     During the Class Period, as detailed here in, Defendants engaged in a schem e to deceive the market and a course of conduct that artificially infl ated the Company's stock price, and operated as a fraud or deceit on acquirers of the Com pany's securities. As detailed above , when the truth about M BII's misconduct and its lack of operational and financial controls was revealed, the Company's securities declined p recipitously as the prio r artificial inflation no longer propped up its stock price. The decline in MBII's share pr ice was a direct result of the nature and extent of Defendants' fraud finally be ing revealed to investors and the market. The timing and m agnitude of the common stock price decline negates any inf erence that the loss

suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

81.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of MBII's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing MBII's securities to be artificially inflated. Plaintiff and other Class members purchased MBII's securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

## IX.     NO SAFE HARBOR

82.     The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements plead in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements plead herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of MBII who knew that those statements were false, misleading or omitted necessary information when they were made.

## COUNT I

**(Against MBII, the Director Defendants, Underwriter Defendants and IPO Individual Defendants)**

**Violations of Section 11 of the Securities Act**

83.     Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs. However, Defendants' liability under this Count is predicated on the participation of each Defendant in conducting the IPO pursuant to the Registration Statement, which contained untrue statements and omissions of material fact. This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. For purposes of asserting this claim under the Securities Act, Plaintiff does not allege that Defendants acted with *scienter* or fraudulent intent, which are not elements of a Section 11 claim.

84.     This Count is asserted for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired the Company's securities in, or traceable to, the IPO.

85.     The Registration Statement contained untrue statements of material fact and omitted other facts necessary to make the statements not untrue, and failed to disclose material

facts as described above.  MBII was the Registrant, while the IPO Individual Defendants and the Director Defendants were executive officers an d/or directors of the Company at the tim e the IPO was declared effective by the S EC and they signed the Registratio n Statement.  As such, said Defendants issued, caused to be issued, and participated in the issuance of the Registration Statement and are subject to liab ility for violations of Section 11 of the Securities Act.  The Underwriter Defendants are also liable pursuant to Section 11 of the Securities Act because they were underwriters of the IPO and fa iled to exercise appropriate due diligence before conducting the IPO.

86.     Plaintiff and other members of the Class who acquired the MBII securities in, or traceable to, the IPO pursuant to the Registra tion Statement did not know of the negligent conduct alleged herein or the untrue statements of material fact and omissions of material facts as alleged herein, and could not have reasonably discovered such facts or conduct.

87.     Plaintiff has brought the present acti on as soon as the untrue statem ents contained in the Registration Statem ent were discovered or reasonably could have been discovered.  Likewise, less than three years have elapsed from the time that the securities upon which this Count is brought were offered to the public.

88.     Plaintiff and the other members of the Class have sustained damages.  The value of MBII's securities sold in the IPO has declined substantially subsequent to and in response to Defendants' violations of the Securities Act.  By reason of the foregoing, Defendants are liable for violating Section 11 of the Securities Act to Plaintiff and the other m embers of the Class who purchased or o therwise acquired MBII sh ares pursuant or traceabl e to the Registr ation Statement.

/////

/////

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

## COUNT II

2

### (Against MBII and the Underwriter Defendants)

3

### Violations of Section 12(a)(2) of the Securities Act

4

89.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully

5

set forth herein. This Count is asserted       against MBII and the Unde rwriter Defendants for

6

violations of Section 12(a)(2) of the Securities    Act, 15 U.S.C. § 77l(a)(2), on behalf of all

7

members of the Class who purchased or otherwise acquired the MBII shares pursuant to th      e

8

prospectus, which was part of the IPO (the "Prospectus").

9

90.    The Underwriter Defendants were sellers, of ferors, and/or solicitors of sales of

10

securities offered pursuant to the Prospectus.     MBII also active ly solicited the s ales of the

11

securities that were offered and sold pursuant     to the Prospectus. The Prospectus contained

12

untrue statements of material fact and omitted other facts necessary to make the statements not

13

misleading, and failed to disclose material facts, as set forth above.

14

91.    Plaintiff and other m embers of the Class who purchas ed or otherwise acquired

15

securities in the IPO pur suant to the m aterially untrue and misleading Prospectus did not know

16

or, in the exercise of reasonable diligence c  ould not have known, of the m aterially false and

17

misleading statements and omissions contained in the Prospectus.

18

92.    The Underwriter Defendants and MBII owed  to Plaintiff and other mem bers of

19

the Class who purchased or otherwise acquired secu rities in the IPO pursuant to the  materially

20

untrue Prospectus the duty to m ake a reasonable  and diligent investigation of the statem ents

21

contained in the Prospectus, to in sure such statements were true and that there was n o omission

22

of material fact necessary to  prevent the statements contained  therein from being m isleading.

23

The Underwriter Defendants and MBII did not m   ake a reasonable investigation or possess

24

reasonable grounds to believe that   the statem ents contained in  the Prospectus were true and

25

without omissions of any m aterial facts and we re not m isleading.  By virtue of the conduct

26

27

28

alleged herein, the Underwriter Defendants and MBII violated Section 12(a)(2) of the Securities Act.

93.     Plaintiff, individually and representatively, hereby offers to tender to Defendants those shares which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such shares,     in return for the consideration paid for those shares together with interest thereo  n. Class  members  who have sold their MBII s    hares  are entitled to rescissory damages.

**COUNT III**

**(Against the IPO Individual and Director Defendants)**

**Violations of Section 15 of the Securities Act**

94.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.  This Count is asserted agai nst the IPO Individual and  Director Defendants for violations of Section 15 of th  e Securities Act, 15 U.S.C. §   77o, on behalf of Plaintiff and the other members of the Class who purchased or otherwise acquired MBII's securities issued in the IPO.

95.     At all relevant tim es, the IPO Indivi dual  Defendants and Di rector  Defendants were controlling persons of the Company within   the meaning of Secti on  15 of the Securities Act.  Each of the IPO Individua l and Director Defendants served as  an executive officer and/or director of MBII prior to and at the tim  e of the IPO.  Each of the IPO Individual and Director Defendants at all relevant times participated in the operation and management of the Company, and  conducted and participated, directly and     indirectly, in  the c onduct  of MBII's  business affairs.  As officers and/or   directors of a publicly owned com  pany,  the IPO Individual and Director Defendants had a duty to dissem inate accurate and truthful information about MBII's securities and with respect to the Company's internal controls.  By reason of the aforementioned

conduct, the IPO Individual a nd Director Defendants are lia ble under Section 15 of the Securities Act, jointly and severally with, and to the same extent as, th e Company to Plaintiff and the other members of the Class.

## COUNT IV

### (Against MBII and the Individual Defendants)

### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

96.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

97.    This Count is asserted against MBII a nd the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S. C. § 78j(b), and SEC Rule 10b-5 prom ulgated thereunder.

98.    During the Class Period, these Defendants, singly and in concert, directly engaged in a comm on plan, scheme and unlaw ful course of conduc t, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and course of business which operated as fraud and deceit upon Plaintiff and th e other members of the Class, and failed to disclose material information in order to make the statem ents made, in l ight of the circumstances under which they were m ade, not misleading to Plaintiff and the other m embers of the Class. The purpose and effec t of said scheme, plan and unlawful course of conduct was, among other things, to induce Plaintiff and the ot her members of the Cla ss to purchase MBII's securities during the Class Period at artificially inflated prices.

99.    As a result of the f ailure to dis close material facts, the information these Defendants disseminated to the investing public was materially false and misleading as set forth above, and the m arket price of M BII's securities was artificially inflated during the Clas s Period. In ignorance of the false and misleading nature of the statements described above and

the deceptive and manipulative devices and contrivances employed by these Defendants, Plaintiff and other members of the Class relied, to their detriment, on the integrity of the market price of MBII's securities in purchasing their shares. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

100. Plaintiff and other members of the Class have suffered substantial damages as a result of the unlawful conduct alleged herein in an amount to be proved at trial.

101. By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of MBII's securities during the Class Period.

## COUNT V

### (Against the Individual Defendants)

### Violations of Section 20(a) of the Exchange Act

102. Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

103. The Individual Defendants, by virtue of their positions, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Exchange Act.

104. The Individual Defendants had the power and influence – and exercised such power and influence – as to cause MBII to engage in the unlawful conduct and practices complained of herein.

105.    By reason of the conduct alleged in Count IV of this  Complaint, the Individual Defendants are jointly and severally liable to the same extent as the Company for the aforesaid unlawful conduct, and are liable to    Plaintiff and to the other m   embers of the Class for the substantial damages which they suffered in connection with their purchases of MBII's securities during the Class Period.

## X.    **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF, ON HIS OWN BEHALF AND ON BEHALF OF THE CLASS, PRAYS FOR JUDGMENT AS FOLLOWS:

(a)    Determining this action to be a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other members of the Class    against Defendants, jointly and severally, f  or the dam ages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

(c)    Awarding Plaintiff the fees and expenses incurred in this action including reasonable allowance of fees for Plaintiff's attorneys and experts;

(d)    Granting extraordinary equitable and/or injunctive relief as permitted by law; and,

(e)    Granting such other and further relief as the Court m    ay deem just and proper.

/////
/////
/////
/////
/////

1

## **JURY TRIAL DEMANDED**

2

Plaintiff hereby demands a trial by jury.

3

DATED:  September 15, 2014

4

**GREEN & NOBLIN, P.C.**

5

6

By:  *s/ Robert S. Green*
     Robert S. Green

7

8

James Robert Noblin
Lesley E. Weaver
700 Larkspur Landing Circle
Suite 275
Larkspur, CA  94939
Telephone:  (415) 477-6700
Facsimile:  (415) 477-6710

9

10

11

12

**BLOCK & LEVITON LLP**
Jeffrey C. Block
Jason M. Leviton
Steven P. Harte
155 Federal Street, Suite 400
Boston, MA  02110
Telephone:  (617) 398-5600
Facsimile:  (617) 507-6020
Jeff@blockesq.com
Jason@blcokesq.com
Steven@blockesq.com

13

14

15

16

17

18

*Attorneys for the Plaintiff*

19

20

21

22

23

24

25

26

27

28

## PLAINTIFF'S CERTIFICATION OF SECURITIES
## FRAUD CLASS ACTION COMPLAINT

I, Kent Oldham, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

2      I have reviewed the facts and allegations against Marrone Bio Innovations Inc. (NASDAQ: MBII).

3.      I am willing to serve as a representative party on behalf of the class in this action, including providing testimony at deposition and trial, if necessary.

4.      My transactions in Marrone Bio Innovations Inc. securities during the Class Period are as follows:

| DATE | TRANSACTION (buy or sell) | NO. OF SHARES | PRICE PER SHARE |
|------|---------------------------|---------------|-----------------|
| 4/14/14 | Buy | 40 | $12.24 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

5.      I did not purchase these securities at the direction of counsel, or in order to participate in any private action arising under the federal securities laws.

6.      During the three-year period preceding the date of my signing this Certification, I have never sought to be appointed nor have I ever been appointed as lead plaintiff or class representative in any class action arising under the securities laws of the United States.

7.      I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any possible recovery, except for an award, as ordered or approved by the court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.

Signed under the penalties of perjury this _5_ day of September 2014.

Kent Oldham