**LOWENSTEIN SANDLER LLP**
MICHAEL J. MCGAUGHEY (198617)
390 Lytton Avenue
Palo Alto, CA 94301
Telephone: 213-426-2170
Fax: 973-597-6233
mmcgaughey@lowenstein.com

*Counsel for Lead Plaintiffs Special Situations*
*Fund III QP, L.P. and Special Situations*
*Cayman Fund, L.P. and additional named*
*Plaintiff David M. Fineman*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPECIAL SITUATIONS FUND III QP, L.P., SPECIAL SITUATIONS CAYMAN FUND, L.P, and DAVID M. FINEMAN, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> MARRONE BIO INNOVATIONS, INC., PAMELA G. MARRONE, JAMES B. BOYD, DONALD J. GLIDEWELL, HECTOR ABSI, ELIN MILLER, RANJEET BHATIA, PAMELA CONTAG, TIM FOGARTY, LAWRENCE HOUGH, JOSEPH HUDSON, LES LYMAN, RICHARD ROMINGER, SHAUGN STANLEY, SEAN SCHICKEDANZ, and ERNST & YOUNG LLP, <br><br> Defendants. | Master File 2:14-cv-2571-MCE-KJN <br><br> Chief Judge Morrison C. England, Jr. <br><br> CONSOLIDATED CLASS ACTION <br><br> **SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

*(caption continued on the following page)*

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE 2:14-CV-2571-MCE-KJN

33452986.1

| | | |
|---|---|---|
| 1 | JOANN N. MARTINELLI, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| 2 | | ) |
| 3 | Plaintiff, | ) ) |
| 4 | vs. | ) ) |
| 5 | MARRONE BIO INNOVATIONS, INC., | ) ) |
| 6 | PAMELA G. MARRONE, DONALD J. GLIDEWELL, and JAMES B. BOYD, | ) ) |
| 7 | Defendants. | ) ) |
| 8 | | ) |

| | | |
|---|---|---|
| 9 | PAUL SAUSMAN, Individually and On Behalf of All Others Similarly Situated, | ) ) |
| 10 | | ) |
| 11 | Plaintiff, | ) ) |
| 12 | vs. | ) ) |
| 13 | MARRONE BIO INNOVATIONS, INC., | ) ) |
| 14 | PAMELA G. MARRONE, DONALD J. GLIDEWELL, and JAMES B. BOYD, | ) ) |
| 15 | | ) |
| 16 | Defendants. | ) ) |
| 17 | | |

| | | |
|---|---|---|
| 18 | SUSCHIA CHEN, Individually and On Behalf of All Others Similarly Situated, | ) ) |
| 19 | | ) |
| 20 | Plaintiff, | ) ) |
| 21 | vs. | ) ) |
| 22 | MARRONE BIO INNOVATIONS, INC., | ) ) |
| 23 | PAMELA G. MARRONE, DONALD J. GLIDEWELL, and JAMES B. BOYD, | ) ) |
| 24 | | ) |
| 25 | Defendants. | ) ) |
| 26 | | |

27   *(caption continued on the following page)*

28   SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE 2:14-CV-2571-MCE-KJN

33452986.1

1   KENT OLDHAM, Individually and On    )
    Behalf of All Others Similarly Situated,    )
2                                         )
                Plaintiff,                )
3                                         )
                                          )
4   vs.                                   )
                                          )
5   MARRONE BIO INNOVATIONS, INC.,        )
    JAMES B. BOYD, DONALD J.              )
6   GLIDEWELL, PAMELA G. MARRONE,         )
    RANJEET BHATIA, TIM FOGARTY,          )
7   LAWRENCE HOUGH, JOSEPH HUDSON,        )
    RICHARD ROMINGER, SEAN                )
8   SCHICKEDANZ, SHAUGN STANLEY,          )
    PIPER JAFFRAY & CO., STIFEL,          )
9   NICOLAUS & COMPANY,                   )
    INCORPORATED, ROTH CAPITAL            )
10  PARTNERS, LLC, and JEFFERIES LLC,     )
                                          )
11                                        )
                Defendants.               )
12                                        )
                                          )
13                                        )

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
    FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
    MASTER FILE 2:14-CV-2571-MCE-KJN

    33452986.1

# I.  INTRODUCTION

1.      Lead Plaintiffs Special Situations Fund III QP, L.P. and Special Situations Cayman Fund, L.P., ("Lead Plaintiffs" or "The Funds"), and additional named Plaintiff David M. Fineman ("Fineman" and, together with Lead Plaintiffs, "Plaintiffs"), by their undersigned attorneys, allege as follows upon personal knowledge as to their own acts, and upon information and belief as to all other matters.

2.      Plaintiffs' information and belief is based on, *inter alia*, its investigation conducted by and through Plaintiffs' counsel, which included, among other things, (i) a review of Defendants' public documents, (ii) filings made with the United States Securities and Exchange Commission ("SEC"), (iii) conference calls and announcements issued by Marrone Bio Innovations, Inc. ("MBII" or the "Company"), (iv) wire and press releases published by and regarding the Company and other information readily obtainable in the public domain, and (v) interviews with former MBII employees and other individuals with relevant personal knowledge.

3.      Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

# II.  NATURE OF THE CLASS ACTION

4.      This is a federal securities class action brought on behalf of three classes:

(a)  all persons who purchased or otherwise acquired MBII securities directly in or traceable to the Company's August 1, 2013 initial offering (the "Initial Public Offering") pursuant to MBII's Form S-1 Registration Statement, dated July 1, 2013 and its Prospectus dated August 1, 2013 (together, the "August 2013 Registration Statement").   This class asserts claims only for violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o (the "IPO Section 11 Class");

(b)  all persons who purchased or otherwise acquired MBII securities directly in the Company's secondary offering (the

---

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

"Secondary Offering") pursuant to MBII's Form S-1 Registration Statement, dated May 16, 2014 and its Prospectus dated June 5, 2014 (together, the "June 2014 Registration Statement"). This class asserts claims only for violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o (the "Secondary Section 11 Class" and, with the IPO Section 11 Class, the "Section 11 Classes"); and

(c) all persons who purchased or otherwise acquired MBII securities on the open market between March 26, 2014 and November 10, 2015, inclusive (the "Section 10(b) Class Period"). This class of investors asserts claims only for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as Section 20(a) of the Exchange Act (the "Section 10(b) Class").

5.      The Section 11 Classes do not assert any claims sounding in fraud, whether under Section 10(b) of the Exchange Act or otherwise.  Any person who did not purchase MBII shares directly in or traceable to the Initial Public Offering or directly in or traceable to the Secondary Offering and pursuant to the August 2013 Registration Statement or June 2014 Registration Statement (collectively, the "Registration Statements"), is not included in the Section 11 Classes.  The Section 10(b) Class does not assert any claims under Sections 11 or 15 of the Securities Act.

6.      MBII develops, manufactures and sells bio-based pest management and plant health products, comprised of naturally occurring micoorganisms (*e.g.*, bacteria and fungi) and plant extracts.  Its customers are a limited number of agricultural distributors, two of which, Crop Production Services and Helena Chemicals, were responsible for 43% of the Company's total revenues in 2014.  Its common stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "MBII."  The Company's securities began publicly trading on August 2, 2013, the day after the Initial Public Offering.

7.      MBII and certain of its officers and directors have presented to the public a far rosier picture of the Company's results of operations, financial condition, and the

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-2-

effectiveness of internal controls over financial reporting than was in fact the case.  The Company's investors were repeatedly told that MBII's consolidated financial statements -- which formed the backbone of the August 2013 and June 2014 Registration Statements -- were accurate, free of material error, and presented in accordance with U.S. Generally Accepted Accounting Principles ("GAAP").   MBII also certified that the Company's disclosure controls and procedures were adequate and effective as of December 31, 2013. These representations were materially false and misleading when made.

8.     Starting on September 3, 2014, the Company began to reveal that its consolidated financial statements were false when issued, could no longer be relied upon, and in fact had been materially overstated.   The Company first announced that the audit committee of its Board of Directors (the "Audit Committee") had "commenced an internal investigation after management learned of documents calling into question the recognition of revenue" of an $870,000 transaction -- equivalent to 15% of quarterly revenue -- that had occurred in the fourth quarter of 2013.   MBII simultaneously announced that the Audit Committee concluded that the Company's previously reported financial statements for the fiscal year ended December 31, 2013, the financial statements for the quarter ended March 31, 2014 and the financial statements for the quarter ended June 30, 2014, should no longer be relied upon as being in compliance with generally accepted accounting principles and would need to be restated.

9.     The Company's Restatement was, in effect, an express admission that MBII's financial statements were false and misleading when they were issued, as a result of the Company failing to consider relevant information available to it at the time the financial statements were prepared.

10.     On the release of the news, the Company's share price fell $2.50 from a close of $5.65 on September 2, 2014, to close at $3.15 on September 3, 2014.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-3-

11.     The price continued to fall in the days following the announcement, reaching an intraday low of $2.80 on September 5, 2014, closing that day at just $2.87.  Thus, in less than three days, MBII's securities depreciated by approximately 50% on news that the Company's reported financial statements could not continue to be relied upon as true and not misleading.

12.     Thereafter, MBII revealed that it had provided false and misleading financial information to its investors starting far earlier.  The Company announced that, in addition to the unreliable consolidated financial statements noted above, the financial statements for the quarters ended March 31, 2013, June 30, 2013, and September 30, 2013 could no longer be relied upon as being in compliance with generally accepted accounting principles and would need to be restated.

13.     It took MBII more than a year to get its financial house in order.  From August 13, 2014 onward, while its Audit Committee investigated the Company's accounting problems, MBII did not file a single periodic report with the SEC.  As a result of this inability to fulfill one of the basic corporate tasks of a publicly traded company, MBII spent nearly all of 2015 under warnings of delisting from the NASDAQ, who gave MBII until November 9, 2015 to file its delinquent reports.

14.     On November 10, 2015 MBII finally filed its belated annual report for the year ended December 31, 2014 on Form 10-K with the SEC ("the 2014 10-K" or "the Restatement"), as well as quarterly reports for the quarters ended March 31, 2015 and June 30, 2015.  The 2014 10-K contained fully restated financial information for the year ended December 31, 2013, as well as restated consolidated financial statements for the following quarterly periods:  March 31, 2013; June 30, 2013; September 30, 2013; December 31, 2013; March 31, 2014; and June 30, 2014.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

15.    The effects of the Restatement were significant.  For example, total revenues for 2013, originally reported in the June 2014 Registration Statement as $14.543 million, were reduced by $6.097 million, or 42%; gross profit for 2013, originally reported as $3.807 million, was reduced by $2.676 million, or 70%; net loss in 2013, originally reported as $28.489 million, was increased by $2.753 million, or $0.31 per diluted share; and product revenues and gross profit for the quarter ended March 31, 2013, which were originally reported in the August 2013 Registration Statement as $2.649 million and $935,000, were reduced by $539,000 (20%) and $158,000 (17%), respectively.

16.    In sum, the Restatement reduced MBII's previously reported product revenues by $6.1 million in 2013 and $600,000 in the first six months of 2014, or $6.7 million total. The Company re-characterized $4.7 million of its restated revenue as deferred product revenues, acknowledging that that $4.7 million was recognized too soon -- prior to satisfying GAAP revenue recognition criteria -- and thus incorrectly reported in the August 2013 and June 2014 Registration Statements.   The other $2 million was wiped off the books completely.

17.    The costs of the Restatement were significant as well.  In a conference call with investors following the Restatement, the Company revealed that it spent $5.6 million investigating its accounting problems, and expects to pay nearly $2 million in regulatory fines as well.

18.    The scope and nature of the Company's accounting errors went to the core of its business and contravened basic accounting principles.  Restatement adjustments required retroactively altering the way the Company recognized revenue on many of its sales to its principal customers, a limited number of agricultural distributors, from the "sell-in" basis to the "sell-through" basis.   "Sell-in" accounting allows for a company like MBII to immediately recognize distributor revenue once title for the product passes to the distributor.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-5-

"Sell-through" accounting, on the other hand, requires revenue to be deferred until the distributor resells the product to its end customer.  In other words, every dollar of product revenue that MBII recognized under the sell-in method that should have been recognized under the sell-through method was prematurely recognized, and should never have been reported to investors as top-line revenue.  By doing so, MBII was presenting the false and misleading picture that the Company was performing better than it really was.

19.     As a result of the misstatements of material fact in MBII's financial statements, the members of the Section 11 Classes have the right to recover their statutory measure of damages, and the Section 10(b) Class has suffered millions of dollars in losses on their investments in MBII stock.

### III.     JURISDICTION AND VENUE

20.     The claims asserted in the First, Second, Third and Fourth Causes of Action arise under Sections 11 and 15 of the Securities Act.

21.     The claims asserted in the Fifth and Sixth Causes of Action arise under Sections 10(b) and 20(a) of the Exchange Act.

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337; Section 22 of the Securities Act, 15 U.S.C. § 77v; and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District and the Company is headquartered in this District.

24.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

# IV.   PARTIES

**Lead Plaintiffs**

25.     Lead Plaintiff Special Situations Fund III QP, L.P. ("Fund III QP"), as set forth in the certification attached hereto as Exhibit A, purchased MBII securities (i) in the Secondary Offering and (ii) during the Section 10(b) Class Period, and has been damaged thereby.   On February 13, 2015, this Court appointed Fund III QP to serve as co-Lead Plaintiff in this consolidated securities class action.

26.     Lead Plaintiff Special Situations Cayman Fund, L.P. ("Cayman Fund"), as set forth in the certification attached hereto as Exhibit A, purchased MBII securities (i) in the Secondary Offering and (ii) during the Section 10(b) Class Period, and has been damaged thereby.   On February 13, 2015, this Court appointed Cayman Fund to serve as co-Lead Plaintiff in this consolidated securities class action.

**Additional Named Plaintiff**

27.     Plaintiff David M. Fineman, as set forth in the certification attached hereto as Exhibit B, purchased MBII securities directly in the Initial Public Offering and has been damaged thereby.

**Defendants**

28.     Defendant MBII is a Delaware corporation with its headquarters located at 1540 Drew Avenue, Davis, California 95618.

29.     Defendant Pamela G. Marrone ("Marrone") is the Company's founder and at all relevant times served as its President and Chief Executive Officer ("CEO").   Marrone signed the Registration Statements.   Marrone also signed certifications accompanying the Company's periodic SEC filings pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attesting that MBII's financial statements were accurate and that its systems of financial disclosure controls and procedures were effective.   In the Company's annual report for the

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

year ended 2013 (the "2013 Annual Report"), filed on Form 10-K with the SEC on March 25, 2014, MBII represented that the Company depends "heavily on the principal members of our management, particularly Dr. Pamela G. Marrone, our founder, President and Chief Executive Officer, the loss of whose services might significantly delay or prevent the achievement of our scientific or business objectives." The 2013 Annual Report further stated that "as our founder, Dr. Marrone is uniquely familiar with the business, structure, culture and history of [MBII] and that she also brings to the board of directors considerable expertise based on her management and technical and commercialization experience in the biopesticide industry."

30.     Defendant James B. Boyd ("Boyd") is the Company's CFO.  He has served as MBII's CFO since February 25, 2014.  Boyd signed the June 2014 Registration Statement. Boyd also signed SOX certifications attesting that MBII's financial statements were accurate and that its systems of internal controls over financial reporting were adequate.  Boyd is identified in the 2013 Annual Report as one of MBII's executive officers and key employees.

31.     Defendant Donald J. Glidewell ("Glidewell") served as the Company's CFO until his resignation in March 2014.  On November 7, 2013, the Company announced that Glidewell would resign pursuant to a transition agreement between Glidewell and the Company.  Glidewell signed the August 2013 Registration Statement.  Glidewell also signed SOX certifications attesting that MBII's financial statements were accurate and that its systems of internal controls over financial reporting were adequate.  Glidewell is identified in the 2013 Annual Report as one of MBII's executive officers and key employees.

32.     Defendant Hector Absi ("Absi") joined MBII as the Company's Senior Vice President of Commercial Operations in September 2012.  Absi was named MBII's Chief Operating Officer ("COO") -- a position the Company created specifically for him -- on January 14, 2014.  Absi served as COO until abruptly resigning effective August 22, 2014.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-8-

Absi is identified in the 2013 Annual Report as one of MBII's executive officers and key employees. Absi is named as a Defendant solely by the Section 10(b) Class and solely for violations of the Securities Act.

33.     Defendant Elin Miller ("Miller") is chairperson of the Board and signed the Registration Statements.

34.     Defendant Tim Fogarty ("Fogarty") is a member of the Board and signed the Registration Statements.

35.     Defendant Richard Rominger ("Rominger") is a member of the Board and signed the Registration Statements.

36.     Defendant Shaugn Stanley ("Stanley") is a member of the Board and signed the Registration Statements.

37.     Defendant Ranjeet Bhatia ("Bhatia") was a member of the Board at the time of the Initial Public Offering and Secondary Offering and signed the Registration Statements.

38.     Defendant Lawrence Hough ("Hough") was a member of Board at the time of the Initial Public Offering and Secondary Offering signed the Registration Statements.

39.     Defendant Joseph Hudson ("Hudson") was a member of the Board at the time of the Initial Public Offering and Secondary Offering and signed the Registration Statements.

40.     Defendants Miller, Fogarty, Rominger, Stanley, Bhatia, Hough and Hudson are referred to as the "Offering Defendants" and are named as defendants solely by the Section 11 Classes and solely for violations of the Securities Act. All of the Offering Defendants, along with Marrone, signed the Registration Statements issued in connection with the Initial Public Offering and the Secondary Offering. Defendant Glidewell signed the August 2013 Registration Statement. Defendant Boyd signed the June 2014 Registration Statement.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

41.     Defendant Sean Schickedanz ("Schickedanz") was a member of the Board at the time of the Initial Public Offering and signed the August 2013 Registration Statement. Schickedanz is named as a defendant solely by the IPO Section 11 Class and solely for violations of the Securities Act.

42.     Defendant Pamela Contag ("Contag") is a member of the Board and signed the June 2014 Registration Statement. Contag is named as a defendant solely by the Secondary Section 11 Class and solely for violations of the Securities Act.

43.     Defendant Les Lyman ("Lyman") was at a member of the Board at the time of the Secondary Offering and signed the June 2014 Registration Statement. Lyman is named as a defendant solely by the Secondary Section 11 Class and solely for violations of the Securities Act.

44.     Defendant Ernst & Young LLP ("E&Y") is a limited liability partnership headquartered in New York and is one of the largest accounting firms in the United States. E&Y serves as MBII's independent registered public auditor. E&Y audited MBII's financial statements and its system of internal controls over financial reporting for the years ended December 31, 2014, 2013, and 2012. E&Y's audit opinion on the Company's financial statement for the year ended December 31, 2013 (the "2013 Financial Statements") was incorporated by reference into the June 2014 Registration Statement. On June 2, 2014, MBII filed E&Y's consent to include in the June 2014 Registration Statement E&Y's March 24, 2014 audit report on the 2013 Financial Statements, among other statements, and MBII's reference to E&Y as an "Expert" in the June 2014 Registration Statement.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-10-

# FIRST CAUSE OF ACTION

### By The IPO Section 11 Class Against
### MBII, Marrone, Glidewell, Schickedanz and the Offering Defendants
### <u>Violations of Section 11 of the Securities Act</u>

45.     Defendants' liability under this cause of action is predicated solely on the participation of each Defendant in signing the August 2013 Registration Statement, which contained admittedly untrue statements and omitted material facts necessary to make it not misleading.   Schickedanz and the Offering Defendants are additionally liable as directors of MBII.   This cause of action asserts exclusively strict-liability and negligence claims.   Any allegations of fraud, fraudulent conduct and/or motive are disclaimed in this cause of action. Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent in connection with the IPO.

46.     This cause of action is asserted for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the IPO Section 11 Class who purchased MBII stock directly from or traceable to the Initial Public Offering.

## Class Allegations By The IPO Section 11 Class

47.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased MBII securities directly in or traceable to the Company's Initial Public Offering pursuant to the August 2013 Registration Statement.   This class asserts claims only for violations of Sections 11 and 15 of the Securities Act.   The Section 11 Class does not assert any claims sounding in fraud, whether under Section 10(b) of the Exchange Act or otherwise.   Any person who did not acquire MBII shares directly in or traceable to the Initial Public Offering and pursuant to the August 2013 Registration Statement is not included in the IPO Section 11 Class.

48.     Excluded from the IPO Section 11 Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-11-

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

49.     The members of the IPO Section 11 Class are so numerous that joinder of all members is impracticable.   While the exact number of IPO Section 11 Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed IPO Section 11 Class.  MBII issued over 5.4 million shares of stock in the IPO.  Record owners and other members of the IPO Section 11 Class may be identified from records maintained by MBII or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff Fineman's claims are typical of the claims of the members of the IPO Section 11 Class, as all members of the IPO Section 11 Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiffs will fairly and adequately protect the interests of the members of the Section 11 Class and have retained counsel competent and experienced in class and securities litigation.   Indeed, the Funds have been appointed co-Lead Plaintiffs in this consolidated securities class action, and undersigned counsel has been named Lead Counsel.

52.     Common questions of law and fact exist as to all members of the IPO Section 11 Class and predominate over any questions solely affecting individual members of the IPO Section 11 Class.  Among the questions of law and fact common to the IPO Section 11 Class are:

    **1.**    whether the federal securities laws were violated by Defendants' acts as alleged herein; and

    **2.**    whether statements made by Defendants to the investing public in the August 2013 Registration Statement misrepresented and/or omitted material facts about the business, operations and management of MBII, including its financial statements.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

53.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual IPO Section 11 Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the IPO Section 11 Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**Substantive Allegations Under the Securities Act**

54.     On July 1, 2013, MBII filed a Form S-1 Registration Statement with the SEC, announcing that the Company intended to undertake an initial public offering of stock.  The Registration Statement was declared effective by the SEC on August 1, 2013.  Thereafter, pursuant to the Registration Statement and August 1, 2013 Prospectus, which forms part of the Registration Statement (collectively, the "August 2013 Registration Statement"), the Company offered and sold 5.462 million shares of common stock at an offering price of $12.00 per share.  Total net proceeds generated from the offering were approximately $56 million.

55.     The August 2013 Registration Statement contained untrue statements of material fact and omitted to state material facts necessary to make the statements therein not misleading.

56.     Among other materially untrue statements, the August 2013 Registration Statement represented that MBII's financial information as of March 31, 2013 and for the three months ended March 31, 2013 was accurate and reliable.

57.     The August 2013 Registration Statement further stated that this financial information was prepared pursuant to the rules and regulations of the SEC, which rules and regulations require that interim financial information include disclosures sufficient so as to make that information not misleading.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

58.     The August 2013 Registration Statement also represented in its section on "Significant Accounting Policies" that MBII properly recognized revenue on the "sell-in" method and that the distributors to whom MBII sold its products did not have price protection or return rights.  According to the August 2013 Registration Statement, for the quarter ended March 31, 2013, the Company derived $2.649 million in total product revenue.  Moreover, the August Registration Statement represented that MBII's gross profit for that same quarter was $935,000, and that its net loss was $10.749 million, or $8.48 per diluted share.

59.     These statements were untrue, and/or omitted material fact necessary to make them not misleading, as detailed below.

60.     On November 10, 2015, MBII restated its consolidated financial statements for the fiscal year ended December 31, 2013 and for the following quarters:  March 31, 2013; June 30, 2013; September 30, 2013; December 31, 2013; March 31, 2014; and June 30, 2014.  The Restatement corrected accounting errors related to the manner in which the Company recognized product revenues for products sold.

61.     FASB Statement of Financial Accounting Concepts ("CON") 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, and SEC Staff Accounting Bulletin ("SAB") 104, *Revenue Recognition*, govern the general principles of revenue recognition.

62.     Under CON 5, revenue must be both "earned" and either "realized" or "realizable" before it can be recognized in financial statements.  Revenue is "earned" if the business has substantially accomplished what it must do to be entitled to its contractual benefits.  Revenue is "realizable" when assets received are readily convertible to cash.

63.     Consistent with SAB 104, revenue generally is "earned" and "realized" or "realizable" when

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-14-

- *Persuasive evidence of an arrangement exists*.  The requirement that persuasive evidence of an arrangement exists is intended to ensure that the understanding between the parties about the specific nature and terms of a transaction has been finalized.  Determining the proper accounting treatment for a transaction depends on evidence of the final understanding between the parties, because a change in terms could lead to a different conclusion regarding the revenue recognition model to apply;

- *Delivery has occurred or services have been rendered*.  Unless delivery has occurred or services have been rendered, the seller has not substantially completed its obligations under the terms of the arrangement, and revenue should not be recognized.  Delivery is generally deemed to have occurred when the customer takes title and assumes the risks and rewards of ownership;

- *The seller's price to the buyer is fixed or determinable*.  Whether the price is fixed or determinable depends on many factors, including payment terms, discounts, and rebates, which can vary from arrangement to arrangement.  In determining whether the price is fixed or determinable, entities should evaluate all elements of an arrangement to ensure that amounts recognized as revenue are not subject to refund or adjustment; and

- *Collectability is reasonably assured*.  If the collection of fees in an arrangement is not reasonably assured, the CON 5 general principle of being realized or realizable is not met, and revenue recognition is precluded until collection is reasonably assured.

64.     The Restatement revealed that instead of recognizing product revenues primarily on a "sell-in" basis -- in which a sale is booked once the distributor takes title to MBII's product -- the Company should have been recognizing product revenues on a "sell-through" basis for certain distributors, meaning that unless MBII waited for its distributor to sell the Company's product to its final customer before booking a sale, MBII was recognizing revenues prematurely.

65.     On an aggregate basis for the fiscal year ended December 31, 2013 and the first two quarters of 2014, the Company improperly recognized $6.7 million of current revenue.   At a minimum, $2 million of that $6.7 million total should have never been recognized as current revenue and will in fact never be recognized as revenue in future

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-15-

periods.  At a maximum, $4.7 million of that $6.7 million total should have originally been recorded as deferred revenue and was thus prematurely recognized as top-line revenue.

66.     In other words, for those historical sales where revenue had previously been recognized using a "sell-in" method but in fact should have been recognized on a "sell-through" method, the revenue recognition criteria described above had not been satisfied and, contrary to what the Company had represented in the August 2013 Registration Statement, revenue associated with those sales should not have been recognized when it was.

67.     MBII explained that as a result of these accounting errors, the March 31, 2013 financial statements incorporated in the August 2013 Registration Statement overstated revenue and understated net loss as follows:

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-16-

| | **Three months ended March 31, 2013** (Unaudited) | | | |
| | **As reported** | **Revenue Related Adjustments** | **Other Miscellaneous Adjustments** | **As restated** |
|---|---|---|---|---|
| Revenues: | | | | |
| Product | $ 2,373 | $ (284) | $ — | $ 2,089 |
| License | 48 | — | — | 48 |
| Related party | 309 | (255) | — | 54 |
| Total revenues | 2,730 | (539) | — | 2,191 |
| Cost of product revenues [(1)] | 1,795 | (381) | — | 1,414 |
| Gross profit | 935 | (158) | — | 777 |
| Operating expenses: | | | | |
| Research, development and patent | 3,283 | — | — | 3,283 |
| Selling, general and administrative | 2,847 | — | — | 2,847 |
| Total operating expenses | 6,130 | — | — | 6,130 |
| Loss from operations | (5,195) | (158) | — | (5,353) |
| Other income (expense): | | | | |
| Interest income | 1 | — | — | 1 |
| Interest expense | (1,985) | — | 17 | (1,968) |
| Change in estimated fair value of financial instruments | (3,563) | — | — | (3,563) |
| Other expense, net | (7) | — | — | (7) |
| Total other income (expense), net | (5,554) | — | 17 | (5,537) |
| Loss before income taxes | (10,749) | (158) | 17 | (10,890) |
| Income taxes | — | — | — | — |
| Net loss | $ (10,749) | $ (158) | $ 17 | $ (10,890) |
| Net loss per common share: | | | | |
| Basic | $ (8.48) | $ (0.12) | $ 0.01 | $ (8.59) |
| Diluted | $ (8.48) | $ (0.12) | $ 0.01 | $ (8.59) |
| Weighted-average shares outstanding used in computing net loss per common share: | | | | |
| Basic | 1,268 | — | — | 1,268 |
| Diluted | 1,268 | — | — | 1,268 |

68.     In other words, according to the Restatement, the August 2013 Registration Statement was false and misleading because it overstated product and related party revenues for the quarter ended March 31, 2013 by $539,000, or 20%; overstated gross profit by $158,000, or 17%; and understated net loss by $158,000, or $0.12 per fully diluted share.

69.     In light of the foregoing, the statements referenced above in Paragraphs 56-58 were also each false and misleading statements of material fact when made because as a

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-17-

result of the Company's materially overstated revenue and gross profit, and materially understated net loss, MBII's financial information as of March 31, 2013 and for the three months ended March 31, 2013 was false.   At best, MBII had recognized revenue prematurely, accelerating earnings and making the Company's performance look better sooner.   At worst, MBII had recognized revenue it would never earn.

**Cause of Action**

70.   Plaintiff Fineman repeats and realleges the allegations contained in Paragraphs 45-69 as if fully set forth herein.

71.   This Cause of Action is asserted against MBII, Marrone, Glidewell, Schickedanz and the Offering Defendants under Section 11 of the Securities Act, 15 U.S.C. § 77k.

72.   The August 2013 Registration Statement contained untrue statements of material fact and omitted other facts necessary to make the statements not untrue, and failed to disclose material facts as described above.   MBII was the Registrant, while Marrone, Glidewell, Schickedanz and the Offering Defendants were responsible for the contents and dissemination of the August 2013 Registration Statement, and each of them signed the Registration Statement.

73.   MBII is strictly liable to Plaintiff Fineman and members of the IPO Section 11 Class, who purchased shares directly in or traceable to the IPO and pursuant to the August 2013 Registration Statement, which contained misstatements and omissions of material fact. Marrone, Glidewell, Schickedanz and the Offering Defendants are also liable to Plaintiff Fineman and members of the IPO Section 11 Class.

74.   This claim does not sound in fraud.   Plaintiff Fineman does not allege that MBII, Marrone, Glidewell, Schickedanz and the Offering Defendants acted with scienter or fraudulent intent.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

75.     By reason of the conduct alleged herein, MBII, Marrone, Glidewell, Schickedanz and the Offering Defendants each violated Section 11 of the Securities Act.

76.     Plaintiff Fineman and other members of the IPO Section 11 Class have sustained damages under 15 U.S.C. § 77k(e).  The value of the stock purchased by Plaintiff Fineman and other members of the IPO Section 11 Class has declined between the time of the Initial Public Offering and the date that Plaintiffs' Second Consolidated Amended Complaint for Violations of the Federal Securities Laws was filed.

77.     Plaintiff Fineman brought the present action promptly after the untrue statements contained in the August 2013 Registration Statement were discovered or reasonably could have been discovered and within one year from the time that Plaintiff Fineman discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff Fineman filed this complaint.  Less than three years have elapsed from the time that the securities upon which this cause of action is brought were offered to the public.  Consequently, this action is timely.

## SECOND CAUSE OF ACTION

### By the IPO Section 11 Class Against Marrone and Glidewell
### <u>Violations of Section 15 of the Securities Act</u>

78.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 45-77 as if fully set forth herein.

79.     By reason of the wrongful conduct described in the First Cause of Action, MBII committed a primary violation of Section 11 of the Securities Act, and Marrone and Glidewell are liable under Section 15 based on their control of MBII.

80.     At all relevant times, Marrone and Glidewell were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  At the time of the IPO, Marrone and Glidewell were two of MBII's three named executive officers.  Marrone is

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-19-

MBII's founder, and at all relevant times has served as its President and CEO.  Marrone was MBII's key employee, "uniquely familiar with the business, structure, culture and history of [MBII]."  Glidewell was listed in the August 2013 Registration Statement as one of MBII's key employees.   As CFO and corporate Secretary, Glidewell oversaw the financial accounting and reporting for MBII.

81.     At all relevant times, each of Marrone and Glidewell participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of MBII's business affairs.  As executive officers of a publicly owned company, Marrone and Glidewell had a duty to disseminate accurate and truthful information with respect to MBII's financial condition and results of operations.  Because of their positions of control and authority, Marrone and Glidewell were able to, and did, control the contents of the August 2013 Registration Statement, which contained false statements of material fact and/or omitted material facts that were required to be disclosed.

82.     This claim does not sound in fraud.  Plaintiff Fineman does not allege that Marrone and Glidewell acted with scienter or fraudulent intent.

83.     Plaintiff Fineman has brought the present action promptly after the untrue statements contained in the August 2013 Registration Statement were discovered or reasonably could have been discovered and within one year from the time that Plaintiff Fineman discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff Fineman filed this complaint.  Likewise, less than three years have elapsed from the time that the securities upon which this cause of action is brought were offered to the public.  Consequently, this action is timely.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-20-

**THIRD CAUSE OF ACTION**

**By the Secondary Section 11 Class Against MBII, Marrone,
Boyd, Contag, Lyman, the Offering Defendants and E&Y
Violations of Section 11 of the Securities Act**

84.     Defendants' liability under this cause of action is predicated solely on the participation of each Defendant in signing, or as to E&Y, serving as an accounting expert in connection with, the June 2014 Registration Statement, which contained untrue statements and omissions of material fact.  Contag, Lyman and the Offering Defendants are additionally liable as directors of MBII.  This cause of action does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically disclaimed in this cause of action.  Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent.

85.     This cause of action is asserted for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Secondary Section 11 Class who purchased MBII securities directly in or traceable to the Secondary Offering.

**Class Allegations By The Secondary Section 11 Class**

86.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased MBII securities directly in or traceable to the Company's Secondary Offering pursuant to the June 2014 Registration Statement.   This class asserts claims only for violations of Sections 11 and 15 of the Securities Act.   The Secondary Section 11 Class does not assert any claims sounding in fraud, whether under Section 10(b) of the Exchange Act or otherwise.  Any person who did not acquire MBII shares directly in or traceable to the Secondary Offering and pursuant to the June 2014 Registration Statement is not included in the Secondary Section 11 Class.

87.     Also excluded from the Secondary Section 11 Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

88.     The members of the Secondary Section 11 Class are so numerous that joinder of all members is impracticable.   While the exact number of Secondary Section 11 Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Secondary Section 11 Class.   MBII issued over 4.5 million shares of stock in the Secondary Offering.   Record owners and other members of the Secondary Section 11 Class may be identified from records maintained by MBII or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

89.     Lead Plaintiffs' claims are typical of the claims of the members of the Secondary Section 11 Class, as all members of the Secondary Section 11 Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

90.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Secondary Section 11 Class and have retained counsel competent and experienced in class and securities litigation.   Indeed, the Funds have been appointed co-Lead Plaintiffs in this consolidated securities class action, and undersigned counsel has been named Lead Counsel.

91.     Common questions of law and fact exist as to all members of the Secondary Section 11 Class and predominate over any questions solely affecting individual members of the Secondary Section 11 Class.   Among the questions of law and fact common to the Section 11 Class are:

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

1.      whether the federal securities laws were violated by Defendants' acts as alleged herein; and

2.      whether statements made by Defendants to the investing public in the June 2014 Registration Statement misrepresented and/or omitted material facts about the business, operations and management of MBII, including its financial statements.

92.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Secondary Section 11 Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Secondary Section 11 Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**Substantive Allegations Under the Securities Act**

93.     On May 16, 2014, MBII filed the June 2014 Registration Statement with the SEC, announcing that the Company intended to undertake a follow-on stock offering. Following amendments made to the June 2014 Registration Statement in response to comments received from the SEC, the June 2014 Registration Statement was declared effective by the SEC on June 5, 2014. Thereafter, on June 6, 2014, the Company offered and sold 4.5 million shares of common stock at an offering price of $9.50 per share. Total net proceeds generated from the offering were approximately $40 million.

94.     The June 2014 Registration Statement incorporated by reference MBII's Form 10-K for the year ended December 31, 2013 (the "2013 Annual Report"), which was filed with the SEC on March 25, 2014. The 2013 Annual Report included MBII's consolidated financial statements for the fiscal year ended December 31, 2013 (the "2013 Financial Statements"), which were audited by E&Y.

95.     The 2013 Annual Report represented that for the year ended December 31, 2013, MBII derived $12.657 million in product revenues and $1.693 million in related party

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-23-

revenues, earned gross profit of $3.807 million, and had deferred product revenues of $1.016 million.  The 2013 Annual Report represented that net loss was $28.867 million, or $3.94 per diluted common share.

96.    The June 2014 Registration Statement also incorporated MBII's consolidated financial statements for the quarter ended March 31, 2014.  According to the June 2014 Registration Statement, for the quarter ended March 31, 2014 the Company derived $2.097 million and $648,000 in product and related party revenue, respectively, and that MBII earned $1.138 million in gross profit.  The June 2014 Registration Statement represented that the Company incurred net loss of $10.246 million.

97.    In its section on "Significant Accounting Policies," the June 2014 Registration Statement represented that MBII properly recognized revenue on the "sell-in" method and that the distributors to whom MBII sold its products did not have price protection or return rights.

98.    The June 2014 Registration Statement represented that the 2013 Financial Statements and MBII's other financial statements were reliable and presented in accordance with Generally Accepted Accounting Principles.  GAAP are those principles recognized by accounting professional as the conventions, rules and procedures necessary to define accepted accounting practices at a given time.  Regulation S-X [17 C.F.R. § 210.4-01(a)(1)] provides that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

99.    The 2013 Annual Report also included information required by Item 307 in Regulation S-K [17 C.F.R. § 229.307] about MBII's disclosure controls and procedures and its internal control over financial reporting.  The 2013 Annual Report represented, under the heading "Evaluation of Disclosure Controls and Procedures," that

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

> Our management, with the participation of our chief executive officer (CEO) and chief financial officer, Mr. Glidewell (CFO), has evaluated the effectiveness of our disclosure controls and procedures . . . as of the end of the period covered by this Annual Report on Form 10-K.  Based on such evaluation, our CEO and CFO have concluded that as of December 31, 2013, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the [SEC], and that such information is accumulated and communicated to our management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

100.    The 2013 Annual Report was accompanied by SOX certifications signed by Marrone and Glidewell that, among other things, certified that the information contained in the Annual Report "fairly presents in all material respects the financial condition and results of operations of [MBII]."  Marrone and Glidewell further represented that they were

> responsible for establishing and maintaining disclosure controls and procedures for [MBII] and have . . . [d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; [e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and . . . [d]isclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

101.    The June 2014 Registration Statement, the 2013 Annual Report referenced therein, and the consolidated financial statements for the quarter ended March 31, 2014

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

incorporated therein contained materially false and misleading statements when made. Among other materially untrue statements, the June 2014 Registration Statement represented that MBII's financial statements were reliable and in compliance with GAAP.

102. On November 10, 2015, MBII restated its consolidated financial statements for the fiscal year ended December 31, 2013 and for the following quarters:  March 31, 2013; June 30, 2013; September 30, 2013; December 31, 2013; March 31, 2014; and June 30, 2014. The Restatement corrected accounting errors related to the manner in which the Company recognized revenues for product sold.

103. FASB Statement of Financial Accounting Concepts ("CON") 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, and SEC Staff Accounting Bulletin ("SAB") 104, *Revenue Recognition*, govern the general principles of revenue recognition.

104. Under CON 5, revenue must be both "earned" and either "realized" or "realizable" before it can be recognized in financial statements.  Revenue is "earned" if the business has substantially accomplished what it must do to be entitled to its contractual benefits.  Revenue is "realizable" when assets received are readily convertible to cash.

105. Consistent with SAB 104, revenue generally is "earned" and "realized" or "realizable" when

- *Persuasive evidence of an arrangement exists*.  The requirement that persuasive evidence of an arrangement exists is intended to ensure that the understanding between the parties about the specific nature and terms of a transaction has been finalized.  Determining the proper accounting treatment for a transaction depends on evidence of the final understanding between the parties, because a change in terms could lead to a different conclusion regarding the revenue recognition model to apply;

- *Delivery has occurred or services have been rendered*.  Unless delivery has occurred or services have been rendered, the seller has not substantially completed its obligations under the terms of the arrangement, and revenue

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-26-

should not be recognized.  Delivery is generally deemed to have occurred when the customer takes title and assumes the risks and rewards of ownership;

- *The seller's price to the buyer is fixed or determinable*.  Whether the price is fixed or determinable depends on many factors, including payment terms, discounts, and rebates, which can vary from arrangement to arrangement.  In determining whether the price is fixed or determinable, entities should evaluate all elements of an arrangement to ensure that amounts recognized as revenue are not subject to refund or adjustment; and

- *Collectability is reasonably assured*.  If the collection of fees in an arrangement is not reasonably assured, the CON 5 general principle of being realized or realizable is not met, and revenue recognition is precluded until collection is reasonably assured.

106.   The Restatement revealed that instead of recognizing product revenues primarily on a "sell-in" basis -- in which a sale is booked once the distributor takes title to MBII's product -- the Company should have been recognizing product revenues on a "sell-through" basis for certain distributors, meaning that unless MBII waited for its distributor to sell the Company's product to its final customer before booking a sale, MBII was recognizing revenues prematurely.

107.   On an aggregate basis for the fiscal year ended December 31, 2013 and the first two quarters of 2014, the Company improperly recognized $6.7 million of current revenue.   At a minimum, $2 million of that $6.7 million total should have never been recognized as current revenue and will in fact never be recognized as revenue in future periods.   At a maximum, $4.7 million of that $6.7 million total should have originally been recorded as deferred revenue and was thus prematurely recognized as top-line revenue.

108.   In other words, for those historical sales where revenue had previously been recognized using a "sell-in" method but in fact should have been recognized on a "sell-through" method, the revenue recognition criteria described above had not been satisfied and, contrary to what the Company had represented in the June 2014 Registration Statement, revenue associated with those sales should not have been recognized when it was.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-27-

109.   MBII explained that as a result of these accounting errors, its financial statements for the year ended December 31, 2013 had to be restated as follows:

| | As reported | Revenue Related Adjustments | Other Miscellaneous Adjustments | As restated |
|---|---|---|---|---|
| | | YEAR ENDED DECEMBER 31, 2013 | | |
| Revenues: | | | | |
| Product | $   12,657 | $    (5,069) | $        — | $   7,588 |
| License | 193 | — | — | 193 |
| Related party | 1,693 | (1,028) | — | 665 |
| Total revenues | 14,543 | (6,097) | — | 8,446 |
| Cost of product revenues, including cost of product revenues to related parties of $374 [(1)] for the year ended December 31, 2013 | 10,736 | (3,421) | (72) | 7,243 |
| Gross profit | 3,807 | (2,676) | 72 | 1,203 |
| Operating expenses: | | | | |
| Research, development and patent | 17,814 | — | 91 | 17,905 |
| Selling, general and administrative | 15,018 | (10) | 9 | 15,017 |
| Total operating expenses | 32,832 | (10) | 100 | 32,922 |
| Loss from operations | (29,025) | (2,666) | (28) | (31,719) |
| Other income (expense): | | | | |
| Interest income | 49 | — | — | 49 |
| Interest expense | (5,997) | — | (59) | (6,056) |
| Change in estimated fair value of financial instruments | 6,717 | — | — | 6,717 |
| Gain on extinguishment of debt | 49 | — | — | 49 |
| Other expense, net | (282) | — | — | (282) |
| Total other income, net | 536 | — | (59) | 477 |
| Loss before income taxes | (28,489) | (2,666) | (87) | (31,242) |
| Income taxes | — | — | — | — |
| Net loss | (28,489) | (2,666) | (87) | (31,242) |
| Deemed dividend on convertible notes | (1,378) | — | — | (1,378) |
| Net loss attributable to common stockholders | $ (29,867) | $ (2,666) | $ (87) | $(32,620) |
| Net loss per common share: | | | | |
| Basic | $    (3.42) | $    (0.31) | $   (0.01) | $   (3.74) |
| Diluted | $    (3.94) | $    (0.30) | $   (0.01) | $   (4.25) |
| Weighted-average shares outstanding used in computing net loss per common share: | | | | |
| Basic | 8,731 | — | — | 8,731 |
| Diluted | 8,911 | — | — | 8,911 |

110.   Furthermore, MBII explained that as a result of these accounting errors its financial statements for the quarter ended March 31, 2014 had to be restated as follows:

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-28-

| | Three months ended March 31, 2014 (Unaudited) | | | |
| | As reported | Revenue Related Adjustments | Other Miscellaneous Adjustments | As restated |
|---|---|---|---|---|
| Revenues: | | | | |
| Product | $ 2,097 | $ (43) | $ — | $ 2,054 |
| License | 45 | — | — | 45 |
| Related party | 648 | (43) | — | 605 |
| Total revenues | 2,790 | (86) | — | 2,704 |
| Cost of product revenues, including cost of product revenues to related parties of $161 for the three months ended March 31, 2014[(1)] | 1,652 | 69 | 72 | 1,793 |
| Gross profit | 1,138 | (155) | (72) | 911 |
| Operating expenses: | | | | |
| Research, development and patent | 4,282 | — | 15 | 4,297 |
| Selling, general and administrative | 6,330 | (18) | 12 | 6,324 |
| Total operating expenses | 10,612 | (18) | 27 | 10,621 |
| Loss from operations | (9,474) | (137) | (99) | (9,710) |
| Other income (expense): | | | | |
| Interest income | 10 | — | — | 10 |
| Interest expense | (773) | — | 167 | (606) |
| Other expense, net | (9) | — | — | (9) |
| Total other income (expense), net | (772) | — | 167 | (605) |
| Loss before income taxes | (10,246) | (137) | 68 | (10,315) |
| Income taxes | — | — | — | — |
| Net loss | $ (10,246) | $ (137) | $ 68 | $ (10,315) |
| Net loss per common share: | | | | |
| Basic | $ (0.52) | $ (0.01) | $ — | $ (0.53) |
| Diluted | $ (0.52) | $ (0.01) | $ — | $ (0.53) |
| Weighted-average shares outstanding used in computing net loss per common share: | | | | |
| Basic | 19,518 | — | — | 19,518 |
| Diluted | 19,518 | — | — | 19,518 |

111.   In other words, the June 2014 Registration Statement was false and misleading because it overstated total revenues for 2013 by $6.097 million, or 42%; overstated gross profits for 2013 by $2.676 million, or 70%; and understated net loss for 2013 by $2.666 million, or 9%.

112.   In addition, the June 2014 Registration Statement was false and misleading because it overstated total revenues for the quarter ended March 31, 2014 by $86,000, or 3%;

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-29-

overstated gross profits for that quarter by $155,000, or 14%; and understated net loss by $137,000.

113.   In light of the foregoing, the statements referenced above in Paragraphs 95-100 were each inaccurate statements of material fact when made because the 2013 Financial Statements, which were incorporated into the June 2014 Registration Statement, materially misstated product revenues by improperly or prematurely recognizing them. Thus, contrary to Marrone's and Glidewell's SOX certifications, the 2013 Form Annual Report did not "fairly present[] in all material respects the financial condition and results of operations of [MBII]."

114.   Further, the statement referenced above in Paragraph 99 that MBII's internal "Disclosure Controls and Procedures" were "effective[]" was a false and misleading statement of material fact when made because MBII failed to disclose the material weaknesses in its control environment and its system of internal controls over revenue recognition.

115.   Indeed, MBII has subsequently revealed that its disclosure controls and procedures were ineffective as of December 31, 2014, due to the following material weaknesses in MBII's internal controls over financial reporting:

> *Control Environment* - The control environment, which includes the Company's Code of Conduct, is the responsibility of senior management, sets the tone of our organization, influences the control consciousness of employees, and is the foundation for the other components of internal control over financial reporting.  The Audit Committee determined, based on the results of its independent investigation, that relevant information related to historical sales transactions, to which certain sales personnel were aware of, was consistently not shared with the finance department or the Company's external auditors, certain sales personnel executed inaccurate representation letters, and certain sales personnel mischaracterized expense reports to pay for storage or freight charges associated with certain sales transactions. As a result of these findings, we determined that certain former sales

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

personnel did not project an attitude of integrity and control consciousness, leading to insufficient attention to their responsibilities and internal controls. Further, effective mitigating controls were not in place to discourage, prevent or detect management override of internal control by certain sales personnel related to the Company's process for recognizing revenue.

*Revenue Recognition* – The Company's internal controls were not effectively designed to identify instances when sales personnel made unauthorized commitments with certain distributors, including "inventory protection" arrangements that would permit the distributors to return to the Company certain unsold products. In addition, controls were not in place to identify instances of management override of internal controls by sales personnel related to the recognition of sales to the Company's distributors. Consequently, revenue for certain transactions was recognized prior to satisfaction of all required revenue recognition criteria.

MBII did not report changes in its disclosure controls and procedures regarding the Company's control environment or its internal controls over revenue recognition at any point after December 31, 2013.  In light of the breadth of the Restatement -- which reaches back to the financial statements for the quarter ended March 31, 2013 and includes the Company's financial statements for the first and second quarters of 2014 -- the deficiencies in MBII's control environment and its ineffective internal controls over revenue recognition were present at the time the June 2014 Registration Statement was signed.

116.   The Company's Disclosure Controls and Procedures failed to prevent or detect material misstatements in MBII's financial statements.   As the Company has disclosed, had effective internal controls been in place at the time, the Company would have known to account for the restated revenue on a "sell-through," as opposed to a "sell-in" basis, and would not have improperly recognized it.

117.   The statements referenced above in Paragraph 97 were false and misleading statements of material fact for the additional reason that certain of MBII's distributors did in

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-31-

fact have protection rights that would allow them to return MBII's products to the Company, thereby precluding immediate revenue recognition.

**Auditor E&Y's False and Misleading Audit Report**

118.   E&Y's audit opinion on the 2013 Financial Statements was included in the June 2014 Registration Statement.

119.   E&Y is a firm of certified public accountants that has provided independent auditing and accounting services to MBII for a number of years.  E&Y's website describes its "Assurance" Services, which include Financial Statement Audit and Accounting Compliance and Reporting, as a "timely and constructive challenge to management, a robust and clear perspective to audit committees, and transparent information for . . . stakeholders and investors."

120.   E&Y's audit opinion on the 2013 Financial Statements represented as follows:

> **Report of Independent Registered Public Accounting Firm**
>
> The Board of Directors and Shareholders of Marrone Bio Innovations, Inc.
>
> We have audited the accompanying consolidated balance sheets of Marrone Bio Innovations, Inc. ("the Company") as of December 31, 2013 and 2012, and the related consolidated statements of operations, comprehensive loss, convertible preferred stock and stockholders' equity (deficit), and cash flows for each of the three years in the period ended December 31, 2013.  These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.
>
> ***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.***  We were not engaged to perform an audit of the Company's internal control over financial reporting.  Our audits included consideration of

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-32-

internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

*In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Marrone Bio Innovations, Inc. at December 31, 2013 and 2012*, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2013, *in conformity with U.S. generally accepted accounting principles.*

(emphasis added).

121.    E&Y's statement that "[i]n our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Marrone Bio Innovations, Inc. at December 31, 2013" implicitly represented the underlying fact that MBII's audited 2013 Financial Statements fairly represented the Company's financial position. This fact was untrue at the time E&Y rendered its audit opinion. As described above, the 2013 Financial Statements did not fairly represent MBII's financial position because they materially overstated revenues and gross profit, and materially understated net loss.

122.    Moreover, E&Y represented that its audit conformed to standards set forth by the Public Company Accounting Oversight Board ("PCAOB").

123.    This statement was false and misleading when made and omitted material facts, which rendered it misleading to an ordinary investor, as described herein.

124.    PCAOB standards require an auditor to evaluate whether a company's financial statements are presented fairly, in all material respects, in conformity the applicable

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-33-

financial reporting framework.  AU 14 ¶ 30.  This includes, for a public company like MBII, evaluating whether revenue was recognized in conformity with GAAP.

125.    To properly audit revenue, an auditor should understand a company's key products and services, as well as the business processes that affect revenue.  AU 12 ¶¶ 10, 28-32 (setting forth risk assessment procedures).  PCAOB standards also require an auditor to evaluate whether a company's selection and application of accounting principles are appropriate for its business and the applicable financial framework and accounting principles used in the company's relevant industry.  *Id.* ¶¶ 12-13.

126.    As the PCAOB has explained,

> [g]aining an understanding of the company, its environment, and its internal control over financial reporting includes gaining an understanding of the business, the different types of sales contracts, and the controls over revenue, including the company's development of accounting estimates for revenue.  Such an understanding necessarily includes knowledge of the company's key products and services and the contractual terms by which sales are made, such as the key provisions of contractual arrangements and the extent to which contractual terms are standardized across the company.

PCAOB, Staff Audit Practice Alert No. 12.

127.    Furthermore, PCAOB standards require that an auditor "obtain an understanding of internal control sufficient to plan the audit by performing procedures to understand the design of controls relevant to an audit of financial statements and ***determining whether they have been placed in operation***."  AU 319 ¶ 2.

128.    PCAOB standards define internal control as follows:

> *Internal control* is a process -- effected by an entity's board of directors, management, and other personnel -- designed to provide reasonable assurance regarding the achievement in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-34-

*Id.* ¶ 6.

129.    Internal control is comprised of five interrelated components: (a) control environment; (b) risk assessment; (c) control activities; (d) information and communication systems; and (e) monitoring.  *Id.* ¶ 7.

130.    PCAOB standards direct auditors of financial statements to gain an understanding of each component in planning the audit.  *Id.* ¶ 25.

131.    The knowledge obtained is to be used in order to: (a) "[i]dentify types of potential misstatement"; (b) "[c]onsider factors that affect the risk of material misstatement"; and (c) design both tests of controls and substantive tests.  *Id.*

132.    PCAOB standards direct an auditor to determine whether the audited entity is actually using internal controls and the extent to which the entity's use of those controls is effective.  *Id.* ¶ 27.

133.    By stating that it completed a PCAOB-compliant audit, and by offering an unqualified report on the 2013 Financial Statements, E&Y was thus affirming the following factual premises:   (i) that the transactions between MBII and its distributors actually supported revenue recognition, (ii) that E&Y had actually acquired sufficient knowledge to state that MBII's financial statements were prepared in accordance with GAAP, and (iii) that E&Y had gained an understanding of MBII's internal controls and that those controls had actually been placed in operation.

134.    Conducting a PCAOB-compliant audit of MBII required E&Y to gain an understanding of the transaction terms between MBII and the customers to whom MBII sold its products.  Specifically, MBII sold its products to a very limited number of agribusiness distributors -- as of December 31, 2013, sales to two distributors, Crop Production Services and The Tremont Group, accounted for 38% of MBII's total revenues.  As of the quarter ended March 31, 2014, five distributors -- Crop Production Services, Reister's, The Tremont

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-35-

Group, Growmark and Helena Chemicals -- accounted for 66% of the Company's total revenues.

135.     E&Y would have needed to understand these terms before it could opine that the Company's sales met GAAP revenue recognition criteria and the 2013 Financial Statements fairly presented the Company's financial position as of December 31, 2013. Indeed, since MBII sold its products to such a limited customer base, it was incumbent upon E&Y to scrutinize these transactions before opining that they satisfied PCAOB and GAAP standards.

136.     Given the scope of the Company's Restatement, E&Y could not have done so, because it would have uncovered that, as the Company has revealed, members of its sales staff entered into "inventory protection" arrangements with certain distributors that permitted those distributors to return unsold product, as well as arrangements with certain distributors that postponed payment to MBII until the Company's products were resold to their ultimate customer.

137.     Indeed, as MBII itself explained in the Restatement, the Company was only able to reveal the full scope of these arrangements by

> evaluating all distributor sales transactions during the periods [covered by, *inter alia*, the 2013 Financial Statements] on a customer-by-customer and transaction-by-transaction basis, including relevant documents and seeking any details of . . . undocumented arrangements or commitments.

138.     MBII undertook this evaluation of its historical sales to its distributors well after E&Y completed its audit of the 2013 Financial Statements.

139.     In other words, this was information that the Company and its auditor, E&Y, did not have before MBII announced that its historical financial statements were false and misleading and could no longer be relied upon, and without which the Company could not determine the scope of its previous accounting misstatements.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

140.     Accordingly, at the time E&Y completed its audit of the 2013 Financial Statements, E&Y did not in fact (i) have sufficient information to determine whether or not the terms of the Company's transactions with its limited number of distributors supported immediate revenue recognition, and (ii) had not acquired sufficient information to accurately state that MBII's financial statements were prepared in accordance with GAAP.

141.     By omitting to state these facts in its unqualified audit opinion, and instead stating that it completed a PCAOB-compliant audit, E&Y rendered its audit opinion false and misleading to the ordinary investor.

142.     Moreover, MBII has subsequently revealed that its disclosure controls and procedures were ineffective as of December 31, 2014, due to the following material weaknesses in MBII's internal controls over financial reporting:

> *Control Environment* - The control environment, which includes the Company's Code of Conduct, is the responsibility of senior management, sets the tone of our organization, influences the control consciousness of employees, and is the foundation for the other components of internal control over financial reporting.  The Audit Committee determined, based on the results of its independent investigation, that relevant information related to historical sales transactions, to which certain sales personnel were aware of, was consistently not shared with the finance department or the Company's external auditors, certain sales personnel executed inaccurate representation letters, and certain sales personnel mischaracterized expense reports to pay for storage or freight charges associated with certain sales transactions. As a result of these findings, we determined that certain former sales personnel did not project an attitude of integrity and control consciousness, leading to insufficient attention to their responsibilities and internal controls.  Further, effective mitigating controls were not in place to discourage, prevent or detect management override of internal control by certain sales personnel related to the Company's process for recognizing revenue.
>
> *Revenue Recognition* – The Company's internal controls were not effectively designed to identify instances when sales personnel made unauthorized commitments with certain distributors,

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-37-

including "inventory protection" arrangements that would permit the distributors to return to the Company certain unsold products. ***In addition, controls were not in place to identify instances of management override of internal controls by sales personnel related to the recognition of sales to the Company's distributors.*** Consequently, revenue for certain transactions was recognized prior to satisfaction of all required revenue recognition criteria.

(emphasis added).

143.    MBII did not report changes in its disclosure controls and procedures regarding the Company's control environment or its internal controls over revenue recognition at any point after December 31, 2013.  In light of the breadth of the Restatement -- which reaches back to the financial statements for the quarter ended March 31, 2013 and includes the Company's financial statements for the first and second quarters of 2014 -- the deficiencies in MBII's control environment and its ineffective internal controls over revenue recognition were present at the time E&Y conducted its audit

144.    A PCAOB-compliant audit would have uncovered these material weaknesses in MBII's internal controls, including -- critically -- MBII's inability to withstand management override by Company sales personnel of the Company's internal controls related to revenue recognition.  Indeed, at the time E&Y conducted its audit of the 2013 Financial Statements, MBII only employed eight salesmen.

145.    Given the ability of a known and limited subset of MBII employees to override management controls over revenue recognition, it was incumbent upon E&Y, consistent with PCAOB standards, to scrutinize sales terms between the Company and its distributors.

146.    As described above, however, E&Y did not do so, and did not disclose as much when it represented that it had undertaken a PCAOB-compliant audit.

147.    By omitting to state this fact -- that, despite management override of internal controls by sales personnel related to revenue recognition, E&Y did not scrutinize the terms

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-38-

of the transactions between those salesmen and MBII's distributors -- E&Y further rendered its audit opinion on the 2013 Financial Statements false and misleading to the ordinary investor.

**Cause of Action**

148.   Lead Plaintiffs repeat and reallege the allegations contained in Paragraphs 84-147 as if fully set forth herein.

149.   This Cause of Action is asserted against MBII, Marrone, Boyd, Contag, Lyman, the Offering Defendants and E&Y under Section 11 of the Securities Act, 15 U.S.C. § 77k.

150.   The June 2014 Registration Statement contained untrue statements of material fact and omitted other facts necessary to make the statements not untrue, and failed to disclose material facts as described above.  MBII was the registrant, while Marrone, Boyd, Contag, Lyman and the Offering Defendants were responsible for the contents and dissemination of the June 2014 Registration Statement, and each of them signed the June 2014 Registration Statement.

151.   MBII is strictly liable to Lead Plaintiffs and the other members of the Secondary Section 11 Class, who purchased shares pursuant to the June 2014 Registration Statement, which contained misstatements and omissions.  Marrone, Boyd, Contag, Lyman and the Offering Defendants are also liable to members of the Secondary Section 11 Class.

152.   By reason of the conduct alleged herein, MBII, Marrone, Boyd, Contag, Lyman and the Offering Defendants each violated Section 11 of the Securities Act.

153.   Defendant E&Y expressly consented to having its audit opinion for MBII's 2013 Financial Statement incorporated by reference into the June 2014 Registration Statement.  Accordingly, E&Y expressly consented to serve as an accounting expert with respect to the Secondary Offering.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-39-

154.   E&Y's opinion on MBII's 2013 Financial Statements, incorporated into the June 2014 Registration Statement, was materially false and misleading.  Contrary to E&Y's representation, the 2013 Financial Statements did not present fairly, in all material respects, the consolidated financial position of MBII at December 31, 2013 in conformity with GAAP.  Instead, MBII's audited 2013 Financial Statement contained untrue statements of material fact and failed to state other facts necessary to make the statements therein not misleading.  Indeed, MBII has now disclosed misstatements of material fact in in its previously reported financial statements, including the 2013 Financial Statements, restating the Company's financials to correct pervasive, material accounting errors.

155.   Moreover, E&Y's statement that it completed its audit of MBII in accordance with PCAOB standards was materially false and misleading when made, and omitted facts concerning E&Y's inquiry into and knowledge underpinning its audit opinion.  Specifically, E&Y omitted the material facts that at the time it completed its audit, E&Y did not have sufficient information to determine whether or not the terms of the Company's transactions with its distributors supported immediate revenue recognition under GAAP; had not acquired sufficient information to accurately state that MBII's financial statements were prepared in accordance with GAAP; and did not properly scrutinize the terms of transactions between MBII's limited number of salesmen and its limited number of distributors, given the material weakness in the Company's internal controls over financial reporting, specifically management override of internal controls by sales personnel related to revenue recognition.

156.   As an accounting expert that consented to the use of its audit opinion in the June 2014 Registration Statement, E&Y is liable to the IPO Section 11 Class under Section 11 of the Securities Act for its misrepresentations of embedded fact and omissions of material fact contained therein

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-40-

157.    Lead Plaintiffs and other members of the Secondary Section 11 Class have sustained damages.   The value of the stock acquired by Lead Plaintiffs and the other members of the Secondary Section 11 Class has declined between the time of the Secondary Offering and the date the Second Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws was filed.

158.    This claim does not sound in fraud.   Lead Plaintiffs do not allege that Marrone, Boyd, Contag, Lyman, the Offering Defendants, and E&Y acted with scienter or fraudulent intent.

159.    Lead Plaintiffs have brought the present action promptly after the untrue statements contained in the June 2014 Registration Statement were discovered or reasonably could have been discovered and within one year from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed this complaint.  Less than three years have elapsed from the time that the securities upon which this cause of action is brought were offered to the public. Consequently, this action is timely.

### FOURTH CAUSE OF ACTION

**By the Secondary Section 11 Class Against Marrone and Boyd**
**Violations of Section 15 of the Securities Act**

160.    Lead Plaintiffs repeat and reallege the allegations contained in Paragraphs 84-159 as if set forth fully herein.

161.    By reason of the wrongful conduct described herein, MBII committed a primary violation of Section 11 of the Securities Act, and Marrone and Boyd are liable under Section 15 based on their control of MBII.

162.    Marrone and Boyd were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  At the time of the Secondary Offering, Marrone

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-41-

and Boyd were two of MBII's three named executive officers.  Marrone is MBII's founder, and at all relevant times has served as its President and CEO.  At the time of the IPO, Boyd was MBII's CFO.  Marrone was MBII's key employee, "uniquely familiar with the business, structure, culture and history of [MBII]."  Marrone was responsible for the design and maintenance of MBII's financial disclosure controls and procedures, and signed numerous SEC filings and SOX certifications during the relevant time period.  Boyd was listed in the June 2014 Registration Statement as one of MBII's key employees.  As CFO, Boyd oversaw the financial accounting and reporting for MBII, and was responsible for the design and maintenance of its financial disclosure controls and procedures.  Boyd signed numerous SEC filings and SOX certifications on behalf of the Company.

163.    At all relevant times, each of Marrone and Boyd participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of MBII's business affairs.  As executive officers of a publicly owned company, Marrone and Boyd had a duty to disseminate accurate and truthful information with respect to MBII's financial condition and results of operations.  Because of their positions of control and authority, Marrone and Boyd were able to, and did, control the contents of the June 2014 Registration Statement, which contained false and misleading statements of material fact and/or omitted material facts that were required to be disclosed.

164.    This claim does not sound in fraud.  Lead Plaintiffs do not allege that Marrone and Boyd acted with scienter or fraudulent intent.

165.    Lead Plaintiffs have brought the present action promptly after the untrue statements contained in the June 2014 Registration Statement were discovered or reasonably could have been discovered and within one year from the time that Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Lead Plaintiffs filed this complaint.  Less than three years have elapsed from the time

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-42-

that the securities upon which this cause of action is brought were offered to the public. Consequently, this action is timely.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-43-

1
2
3

**FIFTH CAUSE OF ACTION**

**By The Section 10(b) Class Against MBII and Absi
Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**

4       166.    This Cause of Action is brought on behalf of purchasers of MBII's publicly

5   traded common stock during the Section 10(b) Class Period (March 26, 2014 to November

6   10, 2015, inclusive), asserted against MBII and the Section 10(b) Individual Defendants and

7   is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5

8   promulgated thereunder.

9   **Class Allegations By The Section 10(b) Class**

10      167.    Lead Plaintiffs brings this action as a class action pursuant to Federal Rule of

11  Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased or otherwise

12  acquired MBII securities on the open market between March 26, 2014 and November 10,

13  2015, inclusive.  This class of investors asserts claims only for violations of Section 10(b) of

14  the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, as

15  well as Section 20(a) of the Exchange Act.  The Section 10(b) Class does not assert any

16
17  claims under Section 11 of the Securities Act.

18      168.    Excluded from the Section 10(b) Class are Defendants, the officers and

19  directors of the Company, members of their immediate families and their legal

20  representatives, heirs, successors or assigns and any entity in which Defendants have or had a

21  controlling interest.

22      169.    The members of the Section 10(b) Class are so numerous that joinder of all

23  members is impracticable.  While the exact number of Section 10(b) Class members is

24  unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate

25  discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the

26  proposed Section 10(b) Class.  Record owners and other members of the Section 10(b) Class

27

28  SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-44-

may be identified from records maintained by MBII or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

170.   Lead Plaintiffs' claims are typical of the claims of the members of the Section 10(b) Class, as all members of the Section 10(b) Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

171.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Section 10(b) Class and have retained counsel competent and experienced in class and securities litigation.

172.   Common questions of law and fact exist as to all members of the Section 10(b) Class and predominate over any questions solely affecting individual members of the Section 10(b) Class.   Among the questions of law and fact common to the Section 10(b) Class are:

1.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

2.   whether statements made by Defendants to the investing public misrepresented and/or omitted material facts about the business, operations and management of MBII, including its financial statements;

3.   whether Defendants acted with scienter; and

4.   whether the members of the Section 10(b) Class have sustained damages caused by Defendants' fraud, and the proper measure of those damages.

173.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Section 10(b) Class members may be relatively small, the expense and burden of individual litigation make it impossible for

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-45-

members of the Section 10(b) Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**Applicability Of Presumption Of Reliance: Fraud On The Market Doctrine**

174.    At all relevant times, the market for MBII's securities was an efficient market for the following reasons, among others:

i.      MBII's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

ii.     During the Section 10(b) Class Period, MBII's securities were actively traded, demonstrating a very strong presumption of an efficient market;

iii.    As a regulated issuer, MBII filed with the SEC periodic public reports during the Section 10(b) Class Period;

iv.     MBII regularly communicated with public investors via established market communication mechanisms;

v.      MBII was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of those brokerage firms during the Section 10(b) Class Period. These analysts included, but were not necessarily limited to: Jefferies, Robert W. Baird and Stifel Nicolaus.  Each of these reports was publicly available and entered the public marketplace; and

vi.     unexpected material news about MBII was rapidly reflected in and incorporated into the Company's stock price during the Section 10(b) Class Period.

175.    As a result of the foregoing, the market for MBII's securities promptly digested current information regarding MBII from all publicly available sources and reflected such information in MBII's securities price.  Under these circumstances, all open market

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-46-

purchasers of MBII's securities during the Section 10(b) Class Period suffered similar injury through their purchase of MBII's securities at artificially inflated prices, and a presumption of reliance applies.

176.    A Class-wide presumption of reliance is also appropriate under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Section 10(b) Class's claims are grounded in part on Defendants' material omissions.   This action involves Defendants' failure to disclose material adverse information regarding MBII's improper revenue recognition methodologies and fraudulent sales practices -- information that Defendants were obligated to disclose.   Positive proof of reliance is not a prerequisite to recovery.  The facts withheld were material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of these facts, as set forth below, that requirement is satisfied here.

**Substantive Allegations Under the Exchange Act**

177.    Defendants' fraudulent scheme was a simple one:  promise unrealistic and unsustainable revenue growth and then make sure that MBII's reported performance met that guidance despite the fact that its actual performance did not.

178.    Seizing on the momentum of a successful August 2013 initial public offering of stock, and touting a stable of commercially viable bio-pesticides and a "robust" pipeline of new products ready to hit the market, MBII sold to its investors -- and saddled its sales and marketing staff with -- an ambitious growth plan:  double net revenues in 2013, and then redouble them in 2014.

179.    The Company, however, faced a major problem.   As Lead Plaintiffs' investigation has revealed, and the Company's own revelations have confirmed, MBII's "robust" pipeline was illusory, and its commercially viable products were far less effective

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-47-

than advertised.   This made MBII's "double and redouble" sales strategy impossible to achieve.

180.    To compensate, the Company's sales staff, led by and with the knowledge of Chief Operating Officer Hector Absi, embarked on a campaign of finagling sales, stuffing channel with product, extending terms and cutting deals to ensure that MBII could meet its reported sales goals, improperly recognizing revenue along the way.

181.    As a result of this fraud, the Company was able to report revenues of $14.5 million for the full year 2013, a growth over 2012 revenues of 104%.   Reported revenues remained falsely inflated for the first six months of 2014, and the Company confirmed that investors should expect to see revenues again double in 2014.

182.    The truth, eventually, emerged.   In August 2014, shortly after the Company capitalized on its illusory revenue growth by selling a secondary offering of stock to unsuspecting investors -- and reaping more than $40 million in the process -- the Company revealed that Absi had abruptly left and, as a result, MBII would be unable to meet revenue guidance.   Much of his eight member sales staff followed Absi out of the Company.

183.    Then, MBII announced that its previously reported financial statements were false, and admitted that because of material misstatements in their reported revenues, gross profits and net loss, among other misapplications of U.S. Generally Accepted Accounting Principles ("GAAP"), those financial statements would have to be restated.

184.    When the truth came to light, MBII's stock price collapsed, and has continued to sink as MBII has revealed further details of its fraud.

185.    Following this disclosure, the SEC commenced an investigation of MBII, which investigation is ongoing.

186.    For over a year, MBII was unable to file periodic financial statements with the SEC while the Audit Committee of the Company's Board of Directors investigated MBII's

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-48-

accounting practices.  Then, on November 10, 2015, the Company publicly announced the final results of the Audit Committee's investigation ("the Restatement").  The Restatement confirmed that MBII had materially overstated revenues and gross profits for 2013, and materially understated net loss.  The Restatement also revealed pervasive material weaknesses in MBII's disclosure controls and procedures as a result of a Company-wide failure to maintain an adequate control environment and maintain adequate internal controls over revenue recognition policies and procedures.  As a result of these deficient disclosure controls and procedures, the Company could not effectively prevent materially misleading historical revenue, gross profit and net loss numbers from being reported to its investors.

187.    The Audit Committee laid the blame at the feet of certain unnamed "sales personnel" who have since left the Company and who failed to share with the Company's finance department or external auditors critical information relevant to MBII's historical sales to its customers, a limited number of agribusiness distributors.  As Lead Plaintiffs' investigation has revealed, however, MBII's former COO Hector Absi, who left the Company shortly before MBII announced the Audit Committee investigation, was integrally involved in the Company's accounting shenanigans, and indeed orchestrated them to ensure the Company would appear to meet its own ambitious revenue guidance.  Absi -- and thus MBII itself -- knew full well that the Company was reporting false and misleading financial information to its investors, making the Company's performance appear substantially better than it really was and artificially inflating the price of MBII's stock.

188.    Lead Plaintiffs bring this claim to recover for themselves and on behalf of the Section 10(b) Class the substantial damages that were caused by Defendants' wrongful conduct.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-49-

A.   **MBII Sows The Seeds For Its Own Fraud By Presenting Itself As A Company On The Cusp Of Vibrant Growth With A Robust Pipeline Of Products**

189.   MBII's grossly falsified financial information was a problem of its own making, resulting from the Company setting unreachable goals, telling its investors it could and would meet those goals, and then having its sales force commit fraud to make it appear, at least temporarily, that the touted numbers had been met.

190.   MBII is the brainchild of Dr. Pamela Marrone.  According to an article in the Sacramento Business Journal, Marrone, MBII's founder, President and CEO, "has had a lifelong fascination with little critters."  Marrone has proven adept at turning those bugs into money.   In 1995, Marrone founded AgraQuest, Inc., a supplier of biological pest management solutions based on natural microorganisms (*i.e.*, bacteria, fungi, etc.). AgraQuest would later be sold to Bayer CropScience for $425 million.

191.   In 2006, Marrone founded Marrone Organic Innovations, Inc., which would later change its name to Marrone Bio Innovations.  MBII designs, manufactures and sells bio-based pest management and plant health products.  During the Section 10(b) Class Period, MBII derived substantially all of its revenue from producing and selling two products:  Regalia, a biofungicide made from an extract of the giant knotweed plant that acts by turning on a plant's "immune system"; and Grandevo, a bioinsecticide that purports to work as a feeding inhibitor for insects and mites.  For the years ended December 31, 2013, 2012, and 2011, the Company derived approximately 97%, 96%, and 96%, respectively, of its revenues from the sale of Regalia and Grandevo.

192.   At all relevant times, MBII had eight salesmen, who worked directly for, or closely with, Absi, MBII's Senior Vice President of Commercial Operations and, beginning in January 2014, Chief Operating Officer.  The other members of the Company's marketing force focused on "technical support and demonstration and research field trials."

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-50-

193.     In August 2013, MBII closed an initial public offering of 5.462 million shares of common stock, netting approximately $56 million in proceeds.  Prior to this influx of cash, MBII had funded its operations primarily with net proceeds from convertible preferred stock, notes, and loans.

194.     Marrone and MBII seized on the momentum from the IPO and aggressively marketed the Company as poised to capitalize on a potential $40 billion market opportunity for bio-based control agents for crop protection and agribusiness.

195.     Indeed, in its Quarterly Report for the quarter ended June 30, 2013, signed by Marrone and filed with the SEC on Form 10-Q on September 13, 2013 (the "2013 Second Quarter Report") -- MBII's first periodic report after the IPO -- the Company provided promising news to investors.

196.     As MBII reported in a press release accompanying the 2013 Third Quarter Report, total revenues were $4.5 million, "an almost 200% increase over the second quarter of 2012," while net loss for the same period had declined from $3.9 million in 2012 to $1.6 million in 2013.  Marrone in particular noted the "ongoing robust demand for [MBII's] environmentally responsible, bio-based products."

197.     In a telling indicator that the future was bright, MBII reported that it had signed a lease for a larger headquarters in Davis, California.  In fact, MBII would be moving into the building formerly occupied by AgraQuest, Marrone's previous company.

198.     Commenting on the Company's promising financial results, Defendant Glidewell, MBII's then-CFO, highlighted "the increased demand" for MBII's products "among our growing customer base," and the Company's plan to "leverage our platform and products to penetrate new markets, segments and geographies."

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

199.    A key driver of MBII's "rapid growth" potential was its pipeline of product candidates, *i.e.*, those products that were not yet commercially viable but were expected to hit the market soon.

200.    In the press release accompanying the Company's quarterly report for the Third Quarter of 2013 (the "2013 Third Quarter Report"), for instance, the Company highlighted "[f]our product pipeline candidates" that showed positive field trial results." This would allow MBII to remain a leader in the bio-pesticide space, armed with a "broad product pipeline" and "robust [intellectual property]."

201.    In that same press release, the Company reported revenue growth of 82%, with growth over the first nine months of 2013 of 102%.  Net loss meanwhile, had halved compared to the same period in 2012.

**B.    MBII's Revenues Are Projected To Double, And Then Redouble**

202.    The manifestation of that continued growth was MBII's stated internal and external plan to double revenues annually, starting in 2013.

203.    In the September 12, 2013 press release accompanying the Company's first publicly filed financial reports -- for the quarter ended June 30, 2013 -- MBII stated that its business outlook for the full year 2013 was for "revenues to approximately double compared to the full year 2012."

204.    In a November 8, 2013 conference call with investors and securities analysts, Defendants Absi and Glidewell reaffirmed this aggressive growth strategy.  In response to a question from an analyst with the investment bank Jefferies, Absi represented that MBII was on track to "deliver more than double" the amount of business the Company delivered in 2012.

205.    MBII's reported financial performance for the third quarter of 2013 was reported in line with these projections.  According to the 2013 Third Quarter Report,

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-52-

revenues for the nine months ended September 30, 2013 totaled $8.576 million, or ***exactly double*** the $4.246 million in revenues reported for the same period in 2012.  Revenues for the three months ended September 30, 2013 nearly doubled, to $1.346 million.  Net loss for the three months ended September 30, 2013, meanwhile, halved from the third quarter of 2012, falling to $6.110 million.

206.   Emboldened by this promising outlook, MBII doubled down on its revenue strategy, representing to its investors that the Company's revenues for the full year 2014 would "continue to at least double compared to the full year 2013."

C.   **The Growth Of MBII's Product Revenues, And Its Revenue Recognition Procedures For Sales To Its Distributors, Were Of Critical Importance To Investors, But Easily Manipulated By Absi And The Company**

207.   As a public company, MBII is required to report its financial results in accordance with GAAP.  GAAP requires a business to report, among other things, its gross profit and net loss in its financial statements.

208.   The key driver of MBII's gross profit was its product revenues.  For instance, for the nine months ended September 30, 2013, the 2013 Third Quarter Report represented that of the Company's reported $8.576 million in total revenues, product revenues accounted for $7.674 million, or 89%.

209.   Given this reality, and the Company's professed "double and then redouble" revenue growth strategy, the manner in which the Company recognized its revenues was obviously of great importance to its investors.

210.   Indeed, in the 2013 Annual Report MBII listed "revenue recognition" first amongst those "assumptions and estimates" having the "greatest potential impact on our consolidated financial statements."

211.   FASB Statement of Financial Accounting Concepts ("CON") 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, and SEC Staff

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-53-

Accounting Bulletin ("SAB") 104, *Revenue Recognition*, govern the general principles of revenue recognition.

212.    Under CON 5, revenue must be both "earned" and either "realized" or "realizable" before it can be recognized in financial statements.  Revenue is "earned" if the business has substantially accomplished what it must do to be entitled to its contractual benefits.  Revenue is "realizable" when assets received are readily convertible to cash.

213.    Consistent with SAB 104, revenue generally is "earned" and "realized" or "realizable" when

- *Persuasive evidence of an arrangement exists*.  The requirement that persuasive evidence of an arrangement exists is intended to ensure that the understanding between the parties about the specific nature and terms of a transaction has been finalized.  Determining the proper accounting treatment for a transaction depends on evidence of the final understanding between the parties, because a change in terms could lead to a different conclusion regarding the revenue recognition model to apply;

- *Delivery has occurred or services have been rendered*.  Unless delivery has occurred or services have been rendered, the seller has not substantially completed its obligations under the terms of the arrangement, and revenue should not be recognized.  Delivery is generally deemed to have occurred when the customer takes title and assumes the risks and rewards of ownership;

- *The seller's price to the buyer is fixed or determinable*.  Whether the price is fixed or determinable depends on many factors, including payment terms, discounts, and rebates, which can vary from arrangement to arrangement.  In determining whether the price is fixed or determinable, entities should evaluate all elements of an arrangement to ensure that amounts recognized as revenue are not subject to refund or adjustment; and

- *Collectability is reasonably assured*.  If the collection of fees in an arrangement is not reasonably assured, the CON 5 general principle of being realized or realizable is not met, and revenue recognition is precluded until collection is reasonably assured.

214.    These GAAP principles are consistent with the way in which MBII described its revenue recognition policies in the "Critical Accounting Policies and Estimates" portion

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-54-

of the Company's Management Discussion and Analysis ("MD&A") in its periodic filings with the SEC.  During the Section 10(b) Class Period, MBII represented that the Company recognized revenues "when persuasive evidence of an arrangement exists, delivery and transfer of title has occurred or services have been rendered, the price is fixed or determinable and collectability is reasonably assured, unless contractual obligations, acceptance provisions or other contingencies exist." (*See, e.g.*, 2013 Annual Report, at 76.)

215.    Throughout the Section 10(b) Class Period, MBII's product revenues consisted of "revenues generated from sales to distributors and from sales of our products to direct customers, net of rebates and cash discounts."

216.    MBII's principal -- indeed, practically only – customers, however, were its distributors.   MBII sold it bio-pesticide products to the distributors used by major agrichemical companies, including:   Crop Production Services, Engage Agro and Helena Chemicals, among others.

217.    Prior to and throughout the Section 10(b) Class Period, a very limited number of distributors accounted for the vast majority of MBII's revenues.  For instance, for the year ended December 31, 2012, Crop Production Services, Engage Agro and Helena Chemicals accounted for 33%, 13% and 12% of the Company's total revenues, respectively (or, 58% total).  Crop Production Services specifically accounted for 60% and 43% of the Company's total revenues, respectively, reported for the three and six months ended June 30, 2013 in the 2013 Second Quarter Report.   In the 2013 Annual Report, filed with the SEC on the Company represented that Crop Production Services and The Tremont Group accounted for 28% and 10% of the Company's total revenues, respectively.   In the 2014 First Quarter Report, five distributors -- Crop Production Services, Reister's, The Tremont Group, Growmark and Helena Chemicals -- accounted for 66% of the Company's total revenues.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-55-

218.     Accordingly, properly accounting for sales of product to this limited number of customers was critically important to a fair and accurate representation of the Company's financial performance.  The converse, however, was also true:  given the outsized influence that distributor sales had on the Company's top-line revenue, those sales could be -- and, as it turns out, were in fact -- manipulated to substantially (and fraudulently) boost revenues and profits, and diminish net loss.

219.     Throughout the Section 10(b) Class Period, MBII recognized revenue at the point in time that a distributor took delivery of, and title to, a product.  The Company referred to this as the "sell-in" method of accounting, as a sale was booked when the product was shipped to the distributor, without regards to whether the distributor ever sold MBII's product to its end user.  MBII represented it was able to immediately recognize revenue on a sell-in basis because, as the Company stated in the 2013 Third Quarter Report and 2013 Annual Report, its "[d]istributors do not have price protection or return rights."

220.     It was not until MBII's fraud came to light that the Company would reveal that many transactions with its limited number of distributors did come with price protection or return rights, and thus the Company was violating GAAP revenue recognition standards by recognizing revenue -- thus creating the false appearance of improving performance -- before the price to the distributor was fixed or determinable, as set forth above.

221.     Moreover, MBII historically did not defer sales revenue to later period.  For instance, the Company reported no deferred revenues in its financial statements for the year ended December 31, 2012, or in the 2013 Second Quarter Report.

222.     In connection with the 2013 Third Quarter Report, however, the Company disclosed for the first time it was offering some extended terms on sales -- beyond its normal net 90 day terms -- and recording deferred product revenues of $770,000, or approximately

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-56-

40% of revenues in total, taking into account the $1.346 million of total revenues recorded on a current basis for the three months ended September 30, 2013.

223.    In the Company's November 7, 2013 conference call, Glidewell was quick to emphasize that the Company was not going to offer extended terms across the board, and that deferral of revenue was temporary.  Glidewell offered three considerations underpinning the Company's ability to extend payment terms:

> First, the proceeds from our initial public offering gave us the working capital required to offer such terms.  Secondly, we entered the row crop market where extended terms are the norm.  Third, extended payment terms help us drive larger order size which reduces logistical and other costs related to servicing these accounts.

224.    Glidewell further advised that after the Company built the history of offering and collecting on longer term receivables, "we can on a GAAP basis recognize these sales on a sell-in versus a sell-through model.  We will continue to provide detail on the recognized and deferred revenue pieces."

225.    Thus, Glidewell affirmed to investors both the importance to the Company of the "sell-in" method of revenue recognition and the circumscribed purpose and scope of the Company's offering of extended terms, which would not preclude the use of the "sell-in" method.

**D.    Pressure Builds Internally At MBII, Whose Products Cannot Support The Company's Touted Growth Strategy**

226.    According to Confidential Witness 1 ("CW1"), a product development sales support specialist employed by MBII from April 2012 to April 2014, the Company's sales goals as of late 2013 were "incredible."  CW1 learned about the numbers MBII was supposed to meet -- and indeed, would eventually falsify – during a sales meeting at MBII corporate headquarters in Davis, presided over by Absi.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-57-

227.    CW1 described goals that were stretched so thin that it "appeared to be a joke" in contrast to previous targets.   These extravagant sales goals came on the heels of the Company's IPO.  In CW1's opinion, it "would have taken a miracle" for salesman to reach their goals.  In fact, as described *infra*, it actually took fraud.

228.    According to Confidential Witness 2 ("CW2"), a senior regulatory manager employed by MBII from December 2011 to April 2014, Absi himself stated that the Company's stated sales goals were "ridiculously high" in light of the fact that, unbeknownst to investors, the Company's products were "not viable."  Indeed, according to CW2, based on represented sales goals MBII was "in crisis mode to increase sales and come up with" new products.

229.    According to CW2, Absi spoke directly to Marrone about the Company's onerous stated sales goals, and tried to discourage her from publicly promoting its Regalia product as capable of enhancing crop yields when there was no actual efficacy data to back up that claim.  Absi, however, told CW2 that Marrone had already promised investors an aggressive product release schedule, and his pleas were likely to fall on deaf ears.

230.    CW1 confirmed that MBII's soon-to-be-commercialized products were more pipe dream than pipeline, and that the Company was engaged in a "pattern of shameless promotion of weak products" and was forecasting "developmental products that were nowhere even close to a legitimate launch into the marketplace."

231.    For example, Zequanox, the third of the Company's commercially available products (after Regalia and Grandevo), which the Company began selling in late 2012, was touted as an potent way to kill Zebra mussels, a prolific and fast-spreading barnacle-like invasive species.  In reality, however, its efficacy was overstated and Zequanox was difficult to produce at a competitive cost.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-58-

232.     Equally troubling was a bioherbicide (basically, weed killer) called "Opportune," which MBII described as one of the Company's "Robust Pipeline of Novel Product Candidates."   According to CW1, Opportune was often spoken about in marketing meetings as an illustration of MBII's strong developmental pipeline.   Marrone herself authorized the marketing and promotion of Opportune.

233.     The Company, however, promoted Opportune as an organic herbicide before ever field testing it.   When CW1 finally received a sample of Opportune to conduct a field study -- at an organic strawberry grower site in Oregon -- CW1 observed that Opportune burned the strawberry crop along with the weeds it was supposed to kill.   Moreover, according to CW2, Opportune cost approximately $15,000 per gallon to manufacture.   Since the product only worked at 3 gallons per acre, the cost to the end user would be something in the neighborhood of $45,000 per acre for a poor level of weed control.

234.     Opportune has never been made commercially available.

**E.     Consistent With Defendants' Predictions, MBII Delivers On Its Promises Of Doubled Revenue For 2013, All While Affirming That Its Disclosure Controls And Procedures Are Effective**

235.     Despite being hampered with (undisclosed) underperforming products and an (undisclosed) busted pipeline, the Company appeared to deliver the as-promised doubled revenue in 2013.   In the Company's annual report for 2013, signed by Marrone and Glidewell and filed on Form 10-K with the SEC on March 25, 2014 (the "2013 Annual Report"), MBII reported total revenues for the year ended December 31, 2013 of $14.543 million, $1.693 million of which was related party revenues.   This represented a 104% percent increase over the $7.140 million total revenues earned in 2012, and a nearly three-fold increase over the $5.251 million in total revenues earned in in 2011.

236.     The Section 10(b) Class Period begins on March 26, 2014, the first trading day after MBII publicly filed the 2013 Annual Report with the SEC.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

237.    The Company's reported performance for the fourth quarter of 2013 was also robust.  MBII reported total revenues of $5.967 million, a 106% increase from the same period in 2012, while reporting net losses of $9.991 million, down from $17.096 million a year prior.

238.    The 2013 Annual Report  also included information required by Item 307 of Regulation S-K [17 C.F.R. § 229.307] about MBII's disclosure controls and procedures and its internal control over financial reporting.  The 2013 Annual Report represented, under the heading "Evaluation of Disclosure Controls and Procedures," that

> Our management, with the participation of our chief executive officer (CEO) and chief financial officer, Mr. Glidewell (CFO), has evaluated the effectiveness of our disclosure controls and procedures . . .  as of the end of the period covered by this Annual Report on Form 10-K.  Based on such evaluation, our CEO and CFO have concluded that as of December 31, 2013, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the [SEC], and that such information is accumulated and communicated to our management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

239.    The 2013 Annual Report was accompanied by SOX certifications signed by Marrone and Glidewell that, among other things, certified that the information contained in the Annual Report "fairly presents in all material respects the financial condition and results of operations of [MBII]."  Marrone and Glidewell further represented that they were

> responsible for establishing and maintaining disclosure controls and procedures for [MBII] and have . . . [d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-60-

those entities, particularly during the period in which this report is being prepared; [e] valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and . . . [d]isclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

240.    In the March 6, 2014 press release announcing the Company's apparent financial successes for 2013, Absi credited "healthy demand for our innovative and effective products" as the main driver of the Company's robust revenue growth and the Company's "strong sales in the fourth quarter of [2013]."

241.    The Company's professed optimism was not hampered by pedestrian performance in the first and second quarter of 2014.

242.    On May 15, 2014, MBII filed its quarterly report for the quarter ended March 31, 2014 (the "2014 First Quarter Report"). The 2014 First Quarter Report was signed by Defendant Boyd. In the 2014 First Quarter Report, MBII reported total revenues of $2.8 million, only $0.1 million more than $2.7 million earned in the first quarter of 2013. Net loss was reported as $10.2 million, only $0.5 less than the Company's net loss of $10.7 million in the first quarter of 2013.

243.    As the Company would later reveal, however, even the financial statements reported in the first half of 2014 -- in which MBII's reported revenue began to come back down to Earth -- were materially false and misleading.

F.    **The Reality Behind The Numbers:  Absi And His Sales Staff Orchestrate Rampant Sales Manipulation To Deliver On The Company's Stated Revenue Targets**

244.    Lead Plaintiffs' investigation has revealed that MBII did not meet its forecasted revenue growth for 2013 because of the "healthy demand for our innovative and

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

effective products." Rather, the Company's "strong sales in the fourth quarter of [2013]" were instead driven by members of the Company's sales staff, with Absi's knowledge, fraudulently forcing through sales at year end, cutting deals with distributors to get the Company's product sold, and stuffing the distribution channel in the process.

245. As revealed in the Restatement, discussed *infra*, the Company has since disclosed that it violated GAAP in the 2013 Annual Report by significantly overstating revenues and gross profit and understating net loss for the year ended 2013. According to the Restatement, MBII's materially misstated financial information was caused by "the failure of certain employees to share with the Company's finance department . . . important transaction terms." Lead Plaintiffs' investigation has confirmed that one of these employees was MBII's own COO, Absi.

246. As discussed above, Defendants knew that MBII's products were not performing as advertised, and the touted pipeline of products was not a viable means by which to boost revenues. Indeed, CW2 was present in meetings where Absi himself said that the Company's sales goals were "ridiculously high" because MBII's products "were not viable." CW2 also described discussion with colleagues who expressed to CW2 "concerns about the [Company's] products" and indeed described some of them as "snake oil."

247. According to the CWs, Absi took it on himself to sell the "snake oil" by any means necessary.

248. Nearing the end of 2013, MBII faced another problem. Most of the limited number of distributors who accounted for the vast majority of MBII's product revenues had bought all of the product that they needed for the year.

249. According to CW1, "it became clear by November that most distributors were already filled to capacity with product[,] as seasonal use begins to drop off dramatically as row crops are harvested." In other words, there would be no demand for biopesticides at the

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-62-

onset of winter because pesticide products -- including MBII's -- are generally not sprayed onto crops until the next planting season, which would not begin until March or April 2014.

250. This reality -- that seasonal forces naturally drove down demand as 2013 drew to a close -- was at loggerheads with the Company's need to show its investors that it could make good on its promise to deliver more than $14 million in revenue (double 2012's $7.1 million figure). As CW1 described, however, MBII was still "pushing to increase product placement into distribution channels at the end of the fourth quarter" of 2013.

251. Given the Company's "sell-in" method of revenue recognition -- *i.e.*, booking sales once MBII products were shipped -- this problem could be overcome by getting as much product as possible to distributors as soon as possible, regardless of how, or when, the distributor could sell it.

252. According to CW1, one way in which Absi and his sales staff were able to move the necessary product to already overstuffed distributors was by offering creative and unprecedented terms.

253. In the Company's November 7, 2013 conference call, Glidewell had represented to MBII's investors that the Company only ever extended terms beyond net 90 days because MBII was entering the row crop market -- where longer terms were the norm -- and because such terms reduced logistical and other costs associated with servicing accounts.

254. According to CW1, however, the Company's sales staff was offering terms beyond 90 days -- to 120 or even 180 days (6 months) -- "in order to achieve sales goals" at year-end. Indeed, CW1 was told by contacts at distributors that "the creative extended payment terms [were] offered with the intent to meet the sales goals." CW2 was also "informed of atypical and extended terms of payment for sales." CW2 noticed that "terms of payment, in a one year period," went from "30-60 days"; then "90-120 days"; and, "in the second part of 2013 terms went to 180 days." A distribution manager asked CW1 directly

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-63-

"how [MBII] was able to offer such terms."   CW1 responded by saying that they were unprecedented.

255.   Given the Company's use of the "sell-in" revenue recognition methodology, however, sales with terms extended into the middle of 2014 could be booked as revenue in 2013 once the Company's distributors took shipment of product, so long as those terms were never reported.

256.   Accordingly, in conversations with Absi and Carlos Reyes, MBII's then-Vice President of Product Development ("Reyes"), CW2 was told that the Company wanted to move product "by the truck load to distributors," and "not focus on individual sales to growers."

257.   Unsurprisingly, this resulted in the distribution channel being stuffed with MBII products.  Indeed, according to CW1, Crop Production Services -- who in 2013 was responsible for 28% of MBII's overall revenues -- had a warehouse in Pasco, Washington that was "full of product."  CW2 confirmed that salesmen told him that the "barns were so loaded" that no one would be buying Regalia in particular for "2-3 years."

258.   CW1 also described conversations between salesmen and friends of theirs at MBII's distributors.  As a Product Development Sales Support specialist, CW1 "traveled with salesmen in their trucks to certain calls and . . .  attended sales meetings and overheard conversations between veteran sales staff and distribution managers."  CW1 overheard conversations "in which salesmen would ask the [distributors'] managers to go back to see if they had warehouse space or could move product to customers."  These salesman pleaded with their customers to take more product, saying they "needed to reach their numbers."  According to CW1, it would have taken a miracle for MBII's salesmen to reach their 2013 goals.  Unsurprisingly, the Company has now admitted that the revenue numbers it was reporting at the time were materially false, misleading, and inflated.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-64-

259.   CW1 specifically overheard conversations with salesmen named Sean Musser and Brian Tipton -- or, one quarter of MBII's eight-man sales staff -- in which they played "upon their collegial relationship" with certain managers at distributor locations "in order to ask for help to submit a purchase order for more [MBII] product."

260.   According to CW1, "Hector knew what was going on."   Indeed, "Absi exhibited very organized and strategically tactical sales skill.   It appeared to [CW1] that he kept tight control over all sales activities and through his Sales Manager, Neil Job, was fed sales numbers and progress routinely." CW1 further stated that "Absi was involved with every level of the conditions of sales.   It necessitated his approval for the terms, the agreements and purchase orders."

261.   In other words, it would have been -- and indeed, was -- impossible for MBII's eight salesman to finagle sales and alter terms to push product onto their handful of distributors without Absi knowing.

262.   MBII further boosted its illusory sales figures by engaging in "inventory transfer" with one of its key distributors, Engage Agro.  CW2 recounted a conversation with Absi when Absi had mentioned inventory transfer to CW2.  The term was unfamiliar to CW2, who inquired to Reyes about it.  According to CW2, Reyes explained to CW2 that "MBII shared some warehouse space with Engage Agro and that they could make it appear that a sale had happened by simply transferring inventory (driving a fork lift with [MBII] products from one section of the warehouse to the other)."

263.   According to CW2, the manner in which MBII made its sales goals for the year ended 2013 was also "suspicious."   CW2 described overhearing Absi "pacing up and down the hall" adjacent to CW2's office in MBII's Davis, California headquarters, aggressively trying to close sales around Christmas 2013.  At that juncture, CW2 was aware that MBII "still needed to sell more than a million dollars of product" within the last week of

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-65-

the year.  According to CW2, however, the Company met its sales numbers for the year through "hundreds of thousands of dollars worth of sales between Christmas and New Years."

264.    In sum, the much-ballyhooed doubling of revenues in 2013 was not as a result of the "healthy demand for [MBII's] innovative and effective products" or the Company's "robust pipeline" of new biopesticides.  Rather, it was the result of garden-variety channel stuffing and fraudulent sales practices orchestrated by -- or with the knowledge of -- Absi, the Company's COO.  As the Company would later disclose in the Restatement, this knowing fraud caused MBII to improperly recognize millions of dollars of revenue in violation of GAAP, misleading the Company's investors by portraying a far more successful picture of MBII than was in fact the case.  This false and misleading financial information kept the price of MBII's stock artificially inflated throughout the course of the Section 10(b) Class Period.

G.    **MBII's Discloses An Innocuous Material Weakness In Its Internal Controls, But Fails To Disclose The Company's Pervasive Accounting Fraud**

265.    Despite the Company's rampant sales manipulation -- orchestrated by Absi and his sales staff -- MBII represented that its disclosure controls and procedures over financial accounting were effective as of December 31, 2013.  In light of the above, and as confirmed by the Restatement, that statement was false and misleading when made.  Had effective disclosure controls and procedures been in place at the time, it would have been impossible for MBII's sales staff -- with Absi's knowledge -- to pull off their fraud.

266.    In the Company's quarterly report for the first quarter of 2014 (the "2014 First Quarter Report"), signed by the Defendant Boyd, the Company revealed for the first time that, contrary to its representations in the 2013 10-K, MBII disclosed a minor weakness in its

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-66-

disclosure controls and procedures as of December 31, 2013.  Specifically, MBII disclosed that

> in connection with the preparation of our financial statements for the three months ended March 31, 2014, we determined that *we had a material weakness in our internal control over financial reporting because we did not maintain effective controls over our shipping process which resulted in the shipment of the wrong product to a customer.  We discovered that we did not have effective controls to prevent or detect an instance where the product shipped was not the same as the product ordered by a customer.*  While the deficiency in this instance did not result in a material misstatement of our financial statements, it is possible that there could be a material misstatement if the control deficiency is not remediated.  Accordingly, management determined that this control deficiency represents a material weakness in our internal controls over financial reporting, and accordingly, our internal control was ineffective at both December 31, 2013 and March 31, 2014.

(2014 First Quarter Report, at 34 (emphasis added).)

267.    In other words, MBII disclosed the innocuous fact that the Company had shipped the wrong product to a customer.  This mistake had no effect on the Company's previously reported financial statements, and did not serve to fully correct the Company's false and misleading statement that its disclosure controls and procedures over financial accounting were effective as of December 31, 2013.

268.    Indeed, the Company represented in that same Report that besides the product shipment blunder, "there were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the period covered by this Quarterly Report on Form 10-Q that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."  For instance, absent from this disclosure was any indication that -- as the Company would later reveal in connection with the Restatement -- MBII's control

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-67-

environment and internal controls over revenue recognition were ineffective. This is so despite MBII's knowledge at this time that its doubled revenue figures in 2013 were illusory, false and misleading, and the result of fraud.

      **H.** **Absi And Glidewell Take Advantage Of The Fraudulently Inflated 2013 Revenue Numbers By Executing Insider Stock Sales The Day After MBII's IPO Lock-Up Ends**

269. The 180-day lock-up of shares issued in MBII's August 1, 2013 IPO ended on January 28, 2014.

270. On January 29, 2014, Absi and Glidewell executed significant insider sales of MBII stock. The sales were executed pursuant to undisclosed Rule 10b5-1 plans, entered into by Absi and Glidewell on December 13, 2013. These Rule 10b5-1 plans made it easier for Absi and Glidewell to sell their MBII stock without incurring insider trading liability.

271. Specifically, Absi exercised 26,250 options at $6.28 and sold all 26,250 shares for $17, for total proceeds of $281,400.

272. Glidewell, who had announced he was retiring in November 2013, and would leave the Company in March 2014, reaped a significant sum more. On January 29, Glidewell exercised 63,738 options at $1.19; 6,903 options at $1.41; and 4,854 options at $3.11. Glidewell sold all 75,495 shares at $17, netting total proceeds of $1,182,738 from these sales.

273. On February 3, 2014, Glidewell again executed a number of lucrative stock sales. Glidewell exercised 1,992 options at $1.19; 266 options at $1.41; 5,852 at $3.11; and 21,910 at $6.28. Glidewell sold all 30,020 shares at $15.40, reaping total proceeds of $303,767.

274. On March 3, 2014, Glidewell executed additional stock sales pursuant to his undisclosed Rule 10b5-1 Plan. Glidewell exercised 1,992 options at $1.19; 265 options at $1.41; and 644 options at $6.28. Glidewell sold 2,398 shares at $14.86, reaping total proceeds of $36,492.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-68-

275.    According to CW1, these sales came as a surprise to many MBII employees, who were told by Marrone personally at a meeting at MBII's Davis headquarters and via teleconference at the time of the IPO that there was a waiting period for people who acquired stock in the IPO, and that the waiting period was longer for key MBII personnel like Absi.

276.    The key question it raised in CW1's mind, and others at MBII:  what was it that Absi knew, while others did not?  As described herein, Absi knew that MBII's reported revenue numbers were illusory, and that he should profit while he still could.

I.    **Absi Abruptly Resigns, And MBII Immediately Announces That Its Audit Committee Is Investigating The Company's Sales Practices**

277.    Absi was clearly integral to the Company's historical and professed future growth.

278.    Indeed, according to CW1, "before Absi joined [MBII], the sales team had not achieved their sales goals for at least previous three quarters.  After Absi joined, [MBII] hit their goals for the next three quarters."  As Lead Plaintiffs' investigation has revealed, and the Company itself has admitted, much of Absi's success with MBII was attributable to fraud.

279.    On August 7, 2014, the Company announced in a press release that Absi was resigning effective August 22, 2014, and that as a result, the Company was suspending revenue guidance for 2014.

280.    In connection with that announcement, MBII issued another press release announcing its financial performance for the Second Quarter of 2014.  In that release, the Company revealed that "[r]evenues for the second quarter totaled $3.6 million, compared to $4.5 million in the second quarter of 2013."  As in the 2014 First Quarter Report, the Company primarily blamed "the ongoing impact of adverse weather across the Company's growing regions" for its failure to exceed revenue projections.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

281.     On the news that, among other things, Absi was resigning and MBII's revenues had fallen for the first time, the price of MBII stock dropped significantly, falling more than $4 per share to close at $5.51 per share on August 8, 2014, on unusually high volume.

282.     CEO Marrone confirmed Absi's critical role at MBII, stating on the Company's August 7, 2014 conference call with analysts and investors that Absi's departure "leaves us with a gap in our team-building plan" significant enough that the Company should both suspend annual revenue guidance and indeed "back off" the Company's goal "to double our revenues" in 2014.

283.     Indeed, the Company would later reaffirm Absi's core role, stating in the Restatement that MBII was "seriously and negatively impacted by the departures of our former chief operating officer, who led our sales and marketing teams, and significant members of our sales staff in the third quarter of 2014."

284.     Absi's resignation was effective August 22, 2014.

285.     Just twelve days later, on September 3, 2014, the Company issued a press release "announc[ing] that, at the recommendation of management, the Audit Committee of its Board of Directors ha[d] commenced an internal investigation after management learned of documents calling into question the recognition of revenue in the fourth quarter of 2013 for an $870,000 transaction," and that the "Audit Committee ha[d] retained independent legal advisers to assist it in this investigation."  The time period of the transaction in question -- the fourth quarter of 2013 -- coincides with what Lead Plaintiffs' investigation has uncovered was when Absi and his sales staff were most aggressively stuffing channel and otherwise manipulating sales to ensure that the Company could meet its revenue guidance for 2013.

286.     The release also disclosed that "the Audit Committee ha[d] already determined that the company's financial statements for the fiscal year ended December 31,

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-70-

2013, the unaudited interim financial statements for the three month period ended March 31, 2014 and the three- and six- month periods ended June 30, 2014, should no longer be relied upon as being in compliance with generally accepted accounting principles."

287.    On this news, the price of MBII stock again plummeted, falling $2.50 per share to close at $3.15 per share on unusually high trading volume of more than 2.5 million shares traded.

**J.      The SEC Launches An Investigation Into MBII's Accounting Practices**

288.    The disclosure of MBII's accounting fraud has led to an investigation of MBII and its management by the SEC.

289.    On or about September 25, 2014, MBII received a letter from the SEC reminding MBII that "[s]ince the company and its management are in possession of all facts relating to a company's disclosure, they are responsible for the accuracy and adequacy of the disclosures they have made."

290.    On information and belief, the SEC's investigation of MBII is currently ongoing.  MBII disclosed that it has engaged in discussions with the SEC's Division of Enforcement staff "concerning the resolution of any enforcement action that it may recommend," and that the Company has recorded an accrual of $1.8 million in its financial statements for the year ended December 31, 2014 as an estimate of the penalties arising from an enforcement action.

**K.      The Audit Committee Announces The Results Of Its Investigation And MBII Restates More Than A Year's Worth Of Revenue, Gross Profits And Net Loss Figures**

291.    Over the course of more than a year, the Company released a series of partial corrective disclosures as its Audit Committee investigated the scope of the Company's accounting fraud.  From September 3, 2014 onward, the Company failed to file any periodic report with the SEC.  As a result, NASDAQ notified MBII that the Company's stock was

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-71-

subject to delisting from the exchange.  MBII would be given until November 9, 2015 to file its delinquent reports.

292.    On April 17, 2015, the Company announced further results from the Audit Committee's investigation into MBII's historical accounting and revenue recognition practices.  The Company stated, in a report filed with the SEC on Form 8-K, that:

> [T]he Audit Committee concluded, after consultation with management, that in addition to the 2013 Fiscal Year and 2014 Quarterly Financial Statements, the Company's previously reported unaudited interim financial statements as of and for the three months, the three and six months and the three and nine months ended March 31, 2013, June 30, 2013 and September 30, 2013, respectively, should no longer be relied upon.  Although the Company expects to restate certain of its previously filed financial statements, the Company's evaluation process is ongoing; accordingly, the Company cannot at this time provide an estimate of the timing, extent, or effect of such restatement.

293.    On May 18, 2015, MBII announced that it would not be able to timely file with the SEC the Company's Quarterly Report for the three-month period ended March 31, 2015.  In its Form 12b-25 filed with the SEC on that date, MBII reiterated that

> the Company's previously reported financial statements as of December 31, 2013 and for the fiscal year ended December 31, 2013, the related report of the independent auditors on those 2013 financial statements dated March 25, 2014, and the unaudited interim financial statements as of and for the three months and the three and six months ended March 31, 2014 and June 30, 2014, respectively, should no longer be relied upon.

294.    MBII further stated that "the Company's previously reported unaudited interim financial statements as of and for the three months, the three and six months and the three and nine months ended March 31, 2013, June 30, 2013 and September 30, 2013, respectively, also should no longer be relied upon."

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

295.   On the release of this news, the price of MBII's common stock fell from $2.94 to $2.36, on unusually heavy volume.  The price continued to decline in the days following the May 18, 2015 announcement, dropping to $1.94 on May 22, 2015.

296.   Thereafter, on July 9, 2015, MBII announced that the Company, in over a year's worth of financial statements, had improperly recognized revenue on a "sell-in" rather than a "sell-through" basis.

297.   Specifically, in a report filed with the SEC on Form 8-K, MBII explained that these financial statements, as well as certain financial statements that the Company had yet to report, are

> expected to be presented using a "sell-through" method as to some or all distributors rather than the "sell-in" method previously used by the Company.  In general, under the "sell-through" method sales by the Company to distributors would not be recognized as product revenues until the distributors sell the product through to end-users, rather than at the time of the initial sale to the distributors under the "sell-in" method.  The Company is evaluating the appropriate application of the sell-through method, including the particular distributors and applicable periods as to which the Company would apply the sell-through method.  The principal impact of switching from a "sell-in" to a "sell-through" method is that product revenues with respect to the applicable distributors are expected to be deferred to later periods.

298.   The Company further stated that

> [i]n addition to the expected change in methodology from "sell-in" to "sell-through" for sales to distributors, and the resulting deferral in revenue recognition to later periods, the Company also expects to recognize, in the aggregate, approximately $1.7-2.0 million less in product revenues than previously reported for 2013 and the first six months of 2014 because certain distributors have returned (or are in the process of returning) product to the Company pursuant to "inventory protection" rights.

299.   On November 10, 2015, the Audit Committee released the final results of its investigation into MBII accounting practices.   Simultaneously therewith, MBII filed its

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-73-

delinquent annual report for 2014 (the "2014 10-K"), which included restated financial statements for the fiscal year ended 2013 and fourth quarter of 2013. The release of the Restatement caused MBII's common stock to drop to from $2.61 to $2.30 on November 10, and to fall again on November 11 to $2.21.

300. In the Explanatory Note to the 2014 10-K, the Audit Committee summarized its principal findings as follows:

- certain employees did not share with the Company's finance department or the external auditors certain important transactional terms related to historical sales transactions;

- certain sales personnel executed inaccurate "sales representation" letters, which are intended to inform the Company's finance department and the external auditors of any commitments not included on a customer purchase order provided to the finance department; and

- certain employees mischaracterized expenses related to agreements to pay for the storage and freight fees associated with certain transactions.

### 1. MBII's Adjustments To Reported Revenue, Gross Profit And Net Loss In The 2013 Annual Report

301. In restating the 2013 Annual Report, the Audit Committee confirmed what Lead Plaintiff's investigation had uncovered: MBII's revenue gains in 2013 were illusory and the result of fraud, and that as a result of that fraud the Company had prematurely recognized revenue without satisfying the criteria for revenue recognition under GAAP. What the Restatement did not uncover, and what Lead Plaintiffs have now discovered, is that Absi was well aware of the sales practices that MBII's Audit Committee has revealed and represented are to blame for the Company's false and misleading financial statements.

302. According to the Audit Committee, for the year ended December 31, 2013 MBII overstated its total revenues by $6.097 million, or 42%, and overstated gross profits by $2.676 million, or 70%. In other words, the Audit Committee revealed that the Company had only performed half as well (or worse) as it said it did in 2013.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-74-

303.     Moreover, the GAAP errors identified by the Audit Committee meant that not only had MBII overstated total revenues and gross profits, it had also understated net loss in the 2013 Annual Report by $2.753 million ($2.666 million of which was revenue related), or 9.6%.

### 2.     MBII's Adjustments To Reported Revenue, Gross Profit And Net Loss In The 2013 Fourth Quarter Report

304.     The Audit Committee further revealed that, as a result of the GAAP errors described above, revenues for the quarter ended December 31, 2013 were overstated by $3.693 million, or 62%, and overstated gross profit such that instead of realizing a $1.501 million profit for the quarter, the Company had in fact suffered a loss of $376,000.

305.     Moreover, the GAAP errors identified by the Audit Committee meant that not only had MBII overstated total revenues and gross profits for the quarter ended December 31, 2013, it had also understated net loss in the for the quarter ended December 31, 2013 by $2.030 million ($1.939 million of which was revenue related), or 20%.

### 3.     MBII's Adjustments To Reported Revenue, Gross Profit And Net Loss In The 2014 First Quarter Report And 2014 Second Quarter Report

306.     The Restatement has also confirmed that, as a result of the GAAP errors identified above, MBII's reported revenue, gross profit and net loss for the first two quarters of 2014 were false and misleading.

307.     The 2014 First Quarter Report, signed by Boyd and filed with the SEC on May 15, 2014, overstated total revenue by $86,000, or 4%; overstated gross profits by $155,000, or 14%; and understated net loss by $137,000.

308.     Meanwhile, the 2014 Second Quarter Report, signed by Boyd and filed with the SEC on August 13, 2014, overstated total revenue by $495,000, or 14%; overstated gross profits by $357,000, or 46%; and overstated net loss by $357,000.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

309.   The Restatement has confirmed that the same improper revenue recognition practices that rendered the 2013 Annual Report materially false and misleading pervaded the 2014 First and Second Quarter Reports, and rendered the revenue, gross profit and net loss figures provided therein materially false and misleading as well.

### 4.   MBII Admits To Material Weaknesses In Its Internal Controls During The Relevant Period

310.   In the Restatement, MBII admitted that, in light of the Audit Committee's findings, the statement in the 2013 Annual Report concerning the effectiveness of MBII's disclosure controls and procedures were false and misleading.

311.   In the 2014 Annual Report, MBII reported that its disclosure controls and procedures were ineffective as of December 31, 2014, due to the following material weaknesses in MBII's internal controls over financial reporting:

> *Control Environment* - The control environment, which includes the Company's Code of Conduct, is the responsibility of senior management, sets the tone of our organization, influences the control consciousness of employees, and is the foundation for the other components of internal control over financial reporting. The Audit Committee determined, based on the results of its independent investigation, that relevant information related to historical sales transactions, to which certain sales personnel were aware of, was consistently not shared with the finance department or the Company's external auditors, certain sales personnel executed inaccurate representation letters, and certain sales personnel mischaracterized expense reports to pay for storage or freight charges associated with certain sales transactions. As a result of these findings, we determined that certain former sales personnel did not project an attitude of integrity and control consciousness, leading to insufficient attention to their responsibilities and internal controls. Further, ***effective mitigating controls were not in place to discourage, prevent or detect management override of internal control by certain sales personnel related to the Company's process for recognizing revenue.***

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

***Revenue Recognition*** – The Company's internal controls were not effectively designed to identify instances when sales personnel made unauthorized commitments with certain distributors, including "inventory protection" arrangements that would permit the distributors to return to the Company certain unsold products. In addition, controls were not in place to identify instances of management override of internal controls by sales personnel related to the recognition of sales to the Company's distributors. Consequently, revenue for certain transactions was recognized prior to satisfaction of all required revenue recognition criteria.

312.   The material weaknesses described above existed as of December 31, 2013, since besides an innocuous shipping blunder described *supra* in Paragraphs 265-268, the Company reported that there were no material changes in its internal control mechanisms, and yet significant revenue recognition problems were made during that time.   If the Company had an effective control environment and effectively designed revenue recognition controls in place as of that date, the material misstatements of MBII's revenue, gross profits and net loss in the 2013 Annual Report and 2013 Fourth Quarter Report would not have occurred.

**Defendants' False And Misleading Statements**

   **A.   MBII's 2013 Annual Report**

313.   MBII filed its 2013 Annual Report on or about March 25, 2014.  It was signed by, among others, Marrone and Glidewell, who also signed the requisite SOX certifications. The 2013 Annual Report contained materially false and misleading statements concerning MBII's financial results and the adequacy of the Company's disclosure controls and procedures over financial reporting.

   **1.   False And Misleading Statements Concerning MBII's Financial Results**

314.   In the consolidated financial statements to the 2013 Annual Report, MBII stated that its total revenues were for the year ended December 31, 2013 were $14.543 million.  This statement was materially false and misleading because revenues for the year

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-77-

ended December 31, 2013 were overstated in the 2013 Annual Report by $6.097 million, or 42%.  Revenues were overstated in the 2013 Annual Report because the Company had committed GAAP errors by improperly recognizing product revenues on a "sell-in" as opposed to a "sell-through" basis, in light of sales terms -- known to Defendant Absi and others -- that should have precluded the application of such methodology.

315.   In the consolidated financial statements to the 2013 Annual Report, MBII stated that its gross profit was for the year ended December 31, 2013 was $3.807 million. This statement was materially false and misleading because gross profit was overstated in the 2013 Annual Report for the year ended December 31, 2013 by $2.676 million, or 70%. Gross profit was severely overstated because the Company's total revenues were severely overstated.

316.   In the consolidated financial statements to the 2013 Annual Report, MBII stated that its net loss for the year ended December 31, 2013 was $28.489 million.  This statement was materially false and misleading because net loss was understated in the 2013 Annual Report for the year ended December 31, 2013 by $2.753 million, or 9.6%.

317.   In the consolidated financial statements to the 2013 Annual Report, MBII stated that its total revenues for the quarter ended December 31, 2013 were $5.967 million. This statement was materially false and misleading because revenues for the quarter ended December 31, 2013 were overstated in the 2013 Annual Report by $3.693 million, or 62%, by reason of the known GAAP errors described above.

318.   In the consolidated financial statements to the 2013 Annual Report, MBII stated that its gross profit for the quarter ended December 31, 2013 was $1.501 million.  This statement was materially false and misleading because gross profit for the quarter ended December 31, 2013 was in fact so overstated by reason of the known GAAP errors described above that the Company actually suffered a gross (loss) for the quarter of $376,000.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-78-

319.    In the consolidated financial statements to the 2013 Annual Report, MBII stated that its net loss for the quarter ended December 31, 2013 was $9.991 million.  This statement was materially false and misleading because net loss for the quarter ended December 31, 2013 was understated by $2.030 million ($1.939 million of which was revenue related), or 9.6%, by reason of the known GAAP errors described above.

320.    In their respective certifications to the 2013 Annual Report, Marrone and Glidewell certified pursuant to Section 1350 of Chapter 63 of Title 18 of the United States Code that:  "[T]he Annual Report of Marrone Bio Innovations, Inc. on Form 10-K for the fiscal year ended December 31, 2013 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report on Form 10-K fairly presents in all material respects the financial condition and results of operations of Marrone Bio Innovations, Inc."

321.    These statements were materially false and misleading because, as explained above, MBII had overstated revenues and gross profit, and understated net loss, for the year ended December 31, 2013.

## 2. False And Misleading Statements Concerning MBII's Disclosure Controls And Procedures

322.    In the MD&A section of the Company's 2013 Annual Report, MBII stated the following with respect to its disclosure controls and procedures:

> Our management, with the participation of our chief executive officer (CEO) and chief financial officer, Mr. Glidewell (CFO), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a- 15(e) and 15d- 15(e) under the Securities Exchange Act of 1934, as amended (Exchange Act)), as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our CEO and CFO have concluded that as of December 31, 2013, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-79-

Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission (SEC), and that such information is accumulated and communicated to our management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

There were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the period covered by this Annual Report on Form 10-K that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

323. Further, in their respective SOX certifications to the 2013 Annual Report, Marrone and Glidewell both stated as follows:

The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

324. These statements were materially false and misleading. Whatever disclosure controls and procedures MBII had in place as of December 31, 2013, were inadequate and ineffective. If MBII had had effective disclosure controls and procedures in place, the material misstatements of MBII's revenue, gross profits and net loss in the 2013 Annual Report and 2013 Fourth Quarter Report would not have occurred.

325. Indeed, MBII has subsequently admitted that its disclosure controls and procedures were ineffective as of December 31, 2014, due to the following material weaknesses in MBII's internal controls over financial reporting:

*Control Environment* - The control environment, which includes the Company's Code of Conduct, is the responsibility of senior management, sets the tone of our organization, influences the control consciousness of employees, and is the foundation for the other components of internal control over financial reporting. The Audit Committee determined, based on the results of its independent investigation, that relevant information related to historical sales transactions, to which certain sales personnel were aware of, was consistently not shared with the finance department or the Company's external auditors, certain sales personnel executed inaccurate representation letters, and certain sales personnel mischaracterized expense reports to pay for storage or freight charges associated with certain sales transactions. As a result of these findings, we determined that certain former sales personnel did not project an attitude of integrity and control consciousness, leading to insufficient attention to their

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-81-

responsibilities and internal controls.  Further, effective mitigating controls were not in place to discourage, prevent or detect management override of internal control by certain sales personnel related to the Company's process for recognizing revenue.

***Revenue Recognition*** – The Company's internal controls were not effectively designed to identify instances when sales personnel made unauthorized commitments with certain distributors, including "inventory protection" arrangements that would permit the distributors to return to the Company certain unsold products.  In addition, controls were not in place to identify instances of management override of internal controls by sales personnel related to the recognition of sales to the Company's distributors.  Consequently, revenue for certain transactions was recognized prior to satisfaction of all required revenue recognition criteria.

326.   The material weaknesses described above existed as of December 31, 2013, since besides an innocuous shipping blunder described *supra* in Paragraphs 265-268, the Company reported that there were no material changes in its internal control mechanisms, and yet significant revenue recognition problems were made.  If the Company had an effective control environment and effectively designed revenue recognition controls in place as of that date, the material misstatements of MBII's revenue, gross profits and net loss in the 2013 Annual Report and 2013 Fourth Quarter Report would not have occurred.

**B.    MBII's March 6, 2014 Press Release**

327.   On March 6, 2014, MBII issued a press release reporting its financial results for the year and quarter ended December 31, 2013.

328.   In the section entitled "Financial Highlights for the Fourth Quarter of 2013," MBII provided that "[r]evenues for the fourth quarter 2013 totaled $6 million, representing growth of 106%[,]" and "[r]evenue for the full year 2013 totaled $14.5 million, representing growth of 104%."  The press release further represented that the Company experienced "[n]et loss of $10 million, compared to net loss of $17.1 million in the fourth quarter of 2012."

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

329.     These statements were materially false and misleading when made, for the reasons described above in Paragraphs 314-321.

**C.     MBII's 2014 First Quarter Report And May 13, 2014 Press Release**

330.     MBII filed its 2014 First Quarter Report on Form 10-Q with the SEC on May 15, 2014.  It was signed by Boyd, and accompanied by SOX certifications signed by Marrone and Boyd.

331.     In the consolidated financial statements to the 2014 First Quarter Report, MBII stated that its total revenues for the quarter ended March 31, 2014 were $2.790 million.  This statement was materially false and misleading because revenues for the quarter ended March 31, 2014 were overstated in the 2014 First Quarter Report by $86,000, or 3%, by reason of the known GAAP errors described above.

332.     In the consolidated financial statements to the 2014 First Quarter Report, MBII stated that its gross profit for the quarter ended March 31, 2014 was $1.138 million.  This statement was materially false and misleading because gross profit for the quarter ended March 31, 2014 was overstated by $155,000, or 14%, by reason of the known GAAP errors described above.

333.     In the consolidated financial statements to the 2014 First Quarter Report, MBII stated that its net loss for the quarter ended March 31, 2014 was $10.246 million.  This statement was materially false and misleading because net loss for the quarter ended March 31, 2014 was understated by $69,000, by reason of the known GAAP errors described above.

334.     In the May 13, 2014 press release announcing MBII's financial results for the quarter ended March 31, 2014, the Company similarly represented that revenues for the quarter were $2.8 million and net loss was $10.2 million.  These statements were materially false and misleading for the same reasons that the 2014 First Quarter Report was materially false and misleading.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

### D.     MBII's 2014 Second Quarter Report And August 7, 2014 Press Release

335.     MBII filed its 2014 Second Quarter Report on Form 10-Q with the SEC on August 13, 2014.  It was signed by Boyd, and accompanied by SOX certifications signed by Marrone and Boyd.

336.     In the consolidated financial statements to the 2014 Second Quarter Report, MBII stated that its total revenues for the quarter ended June 30, 2014 were $3.629 million. This statement was materially false and misleading because revenues for the quarter ended June 30, 2014 were overstated in the 2014 Second Quarter Report by $495,000, or 14%, by reason of the known GAAP errors described above.

337.     In the consolidated financial statements to the 2014 Second Quarter Report, MBII stated that its gross profit for the quarter ended June 30, 2014 was $780,000.  This statement was materially false and misleading because gross profit for the quarter 2014 Second Quarter Report was overstated by $357,000, or 46%, by reason of the known GAAP errors described above.

338.     In the consolidated financial statements to the 2014 Second Quarter Report, MBII stated that its net loss for the quarter ended June 30, 2014 was $10.385 million.  This statement was materially false and misleading because net loss for the quarter ended March 31, 2014 was understated by $326,000, by reason of the known GAAP errors described above.

339.     In the August 7, 2014 press release announcing MBII's financial results for the quarter ended June 30, 2014, the Company similarly represented that revenues for the quarter were $3.6 million, while net loss was $10.4 million.   These statements were materially false and misleading for the same reasons that the 2014 Second Quarter Report was materially false and misleading.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-84-

**Summary Of Defendants' Scienter**

340.    Lead Plaintiffs repeat and reallege the allegations contained in Paragraphs 166-339 above as if fully set forth herein.

341.    Defendants acted with scienter, defined as intentional misconduct or deliberate recklessness, with respect to the materially false and misleading statements discussed above.

342.    Defendant Absi was integral to MBII's sales and marketing practices.  Based on his success in helping the Company deliver on its promise to double revenues in 2013, Absi was given the newly created title of Chief Operating Officer in January 2014.  As COO, and Senior Vice President of Commercial Operations before that, Absi bore the ultimate responsibility for MBII's sales and marketing practices, and the internal reporting of the revenue numbers actually reported in the Company's financial statements.

343.    Absi orchestrated or knew of MBII's fraudulent scheme, carried out by his sales staff, to make good on the Company's promise to double revenues in 2013 by extending terms on sales and stuffing channel.  According to CW1, "Absi was involved with every level of the conditions of sales.  It necessitated his approval for the terms, the agreements and purchase orders."  According to CW2, Absi himself stated that the Company's stated sales goals were "ridiculously high" in light of the fact that, unbeknownst to investors, the Company's products were "not viable."   Thus, Absi knew that to deliver on MBII's promise of doubled revenue would take extraordinary measures.  Absi also knew that the Company's use of the "sell-in" revenue recognition method would allow for sales to be booked immediately, in 2013 or early 2014, without focusing on whether or not the distributor could ever sell the Company's products on to the end user.  Absi left the Company on August 22, 2014.  Less than two weeks later, MBII announced that its Audit Committee was instituting an investigation into the Company's historical sales practices.  Lead Plaintiffs' investigation

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

has revealed that Absi was one of "certain sales employees" responsible for MBII's premature misreporting of revenues, overstating of gross sales and understating of net loss, and the eventual Restatement of same.

344.    Absi also knew or was reckless in not knowing that MBII's disclosure controls and procedures were ineffective and contained material weaknesses.  The material weaknesses in Control Environment and Revenue Recognition were so pervasive that Absi, as COO of the Company, must have known about the systemic ineffectiveness of MBII's disclosure controls and procedures and attendant internal controls.  Indeed, Absi was one of the "certain sales personnel" identified in the Restatement as responsible for the precise material weaknesses identified therein.  As a member of MBII's senior management, it was Absi's responsibility to set the tone for MBII, influence the control consciousness of employees, and lay the foundation for the other components of the Company's internal controls.  It is implausible that Absi would have been unaware of the weaknesses in this system of internal controls when he was himself responsible for them.

345.    Absi's scienter is further demonstrated by the fact that at all relevant times MBII only had eight full-time salesman and sold to a very limited number of agribusiness distributors.  It is implausible that MBII's sales personnel could have orchestrated the scheme attributed to them without Absi knowing about it.  Indeed, CW1 stated that "Hector knew what was going on," and "he kept tight control over all sales activities and through his Sales Manager, Neil Job, was fed sales numbers and progress routinely."  Absi's critical role at MBII was confirmed when he resigned from the Company, leaving MBII with a "gap" significant enough that the Company both suspended annual revenue guidance and indeed "back[ed] off" the Company's goal "to double our revenues" in 2014.  Indeed, the Company would later reaffirm Absi's core role, stating in the Restatement that MBII was "seriously and negatively impacted by the departures of our former chief operating officer, who led our

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-86-

sales and marketing teams, and significant members of our sales staff in the third quarter of 2014."

346.     MBII acted with scienter because the scienter of its COO, Absi, is imputed to MBII.  As MBII's Senior Vice President of Commercial Operations and then COO, Absi was -- along with the Company's CEO and CFO -- one of only three named executive officers at MBII.  Furthermore, the Company has admitted that its sales staff intentionally falsified sales or failed to disclose important transaction terms, leading to the improper recognition of product revenues.

**Loss Causation**

347.     As a result of Defendants' misrepresentations and omissions of material facts, the prices of MBII's common stock were artificially inflated throughout the Class Period.  As such, Lead Plaintiffs and the Section 10(b) Class purchased MBII common stock at artificially inflated prices during the Section 10(b) Class Period.   But for Defendants' misrepresentations and omissions, Lead Plaintiffs and the Section 10(b) Class would not have purchased MBII common stock at all or at these artificially inflated prices.  The Section 10(b) Class suffered economic losses as the price of MBII common stock fell in response to the issuance of partial corrective disclosures, as summarized herein.

348.     During the period when MBII filed its 2013 Third Quarter Report, its 2013 Annual Report, its 2014 First Quarter Report, and its 2014 Second Quarter Report, and up until August 8, 2014, MBII's shares traded in the $9-$15 range.

349.     On August 7, 2014, MBII's shares closed at $9.54 per share.

350.     After the markets closed on August 7, 2014, MBII issued a press release and Marrone and Boyd held an investor conference call in which the Defendants revealed that Absi had resigned, and the Company suspended annual guidance.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-87-

351.    In response to the August 7, 2014 partial corrective disclosure, MBII's stock dropped to as low as $5.31 a share and closed at a price of $5.51 per share.

352.    By September 2, 2014, MBII's stock had risen slightly, to $5.65 per share. On September 3, 2014, however, MBII issued another partial corrective disclosure when it issued a press release announcing that the Audit Committee had commenced an internal investigation into the Company's revenue recognition practices and announced that certain previously issued financial statements could no longer be relied upon.

353.    The September 3, 2014 partial corrective disclosure caused the following drops in MBII's stock:  on September 3, 2014, MBII's stock closed at a price of $3.15 per share; on September 4, 2014, MBII's stock closed at a price of $3.12 per share; and on September 5, 2014, MBII's stock closed at a price of $2.87.

354.    Between September 5, 2014 and May 18, 2015, MBII's shares hovered between $2.80 and $2.90, as the market waited for MBII to release the results of the Audit Committee's investigation.

355.    On May 18, 2015, MBII's stock price closed at $2.96 per share.  After the market closed, the Company announced that, in addition to the financial statements referenced in the September 3, 2014 partial corrective disclosure, "the Company's previously reported unaudited interim financial statements as of and for the three months, the three and six months and the three and nine months ended March 31, 2013, June 30, 2013 and September 30, 2013, respectively, also should no longer be relied upon."

356.    The May 18, 2015 partial corrective disclosure caused MBII's common stock to drop to $2.36 on May 19, $2.08 on May 20, $2.04 on May 21, and $1.94 on May 21.

357.    By November 9, 2015, MBII's stock had risen to $2.61.  On November 10, 2015, the Company announced the results of the Restatement, revealing the full scope of Defendants' fraud.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

358.    The November 10, 2015 partial corrective disclosure caused MBII's common stock to drop to $2.30 on November 10 and $2.21 on November 11.

**No Safe Harbor**

359.    The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the false and misleading statements plead herein.  The statements alleged herein to be false and misleading all relate to then-existing facts and conditions, and the safe harbor has no applicability.

360.    In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Moreover, to the extent that there were cautionary statements purporting to identify factors that could cause actual results to differ, such warnings were themselves misleading because they warned of "risks" that had actually already materialized.

361.    Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of MBII who knew that those statements were false, misleading or omitted necessary information when they were made.  MBII's safe-harbor warnings accompanying its purportedly forward-looking statements issued during the Section 10(b) Class Period were thus ineffective to shield those statements from liability.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

**Cause of Action**

362.    Lead Plaintiffs repeat and reallege the allegations contained in Paragraphs 166-361 above as if fully set forth herein.

363.    During the Section 10(b) Class Period, Defendants MBII and Absi carried out a plan, scheme, and course of conduct which was intended to and, throughout the Section 10(b) Class Period, did:  (i) deceive the investing public, including Lead Plaintiffs and other Section 10(b) Class members, regarding MBII's business, operations, and management, including the Company's reported revenues, net loss, and disclosure controls and procedures, and the intrinsic value of MBII's securities, as alleged herein; (ii) enable Defendants to artificially inflate the price of MBII's securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase MBII's stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants jointly and individually took the actions set forth herein.

364.    Defendants MBII and Absi (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of MBII's stock during the Class Period in an effort to maintain artificially high market prices for that stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants MBII and Absi are sued as primary participants in the wrongful and illegal conduct charged herein.

365.    Defendants MBII and Absi, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-90-

information about the business, operations, and prospects of MBII as specified herein, including the Company's reported revenues, net loss, and disclosure controls and procedures.

366.    During the Section 10(b) Class Period, Defendants MBII and Absi made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

367.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal MBII's true condition from the investing public and to support the artificially inflated prices of MBII's stock.

368.    Lead Plaintiffs and the Section 10(b) Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for MBII's stock. Lead Plaintiffs and the Section 10(b) Class would not have purchased MBII's stock at the prices they paid had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

369.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Section 10(b) Class suffered economic loss and damages in connection with their respective purchases of the Company's stock during the Section 10(b) Class Period as the prior artificial inflation in the price of MBII's stock was removed over time.

370.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

371.    Defendants' earliest fraud was discovered on or about August 22, 2014.  Lead Plaintiffs have brought this claim within two years of discovery of the violations alleged

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-91-

herein, and within five years of the date of those violations.  Consequently, this action is timely.

### SIXTH CAUSE OF ACTION

**By the Section 10(b) Class Against Marrone, Glidewell, Absi and Boyd**
**Violations of Section 20(a) of the Exchange Act**

372.    Lead Plaintiffs reassert and reallege the allegations contained in Paragraphs 166-371 as if fully set forth herein.

373.    By reason of the wrongful conduct described herein, MBII committed a primary violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

374.    Marrone, Glidewell, Absi and Boyd, by virtue of their positions, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Exchange Act.

375.    Marrone, Glidewell, Absi and Boyd had the power and influence -- and exercised such power and influence -- as to cause MBII issue the false and misleading statements of material fact set forth above.  At all times during the Section 10(b) Class Period, MBII only had three named executive officers at any given time.  Marrone, Glidewell, Absi and Boyd were each one of those three named executive officers during the Section 10(b) Class Period.

376.    Marrone was MBII's founder, and at all relevant times served as the President and CEO of the company that bears her name.  Marrone was MBII's key employee, "uniquely familiar with the business, structure, culture and history of [MBII]," and accordingly she exercised significant control over MBII's business.  Marrone was responsible for the design and maintenance of MBII's financial disclosure controls and

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-92-

procedures, and signed the 2013 Annual Report and numerous SOX certifications during the Section 10(b) Class Period.

377.   Glidewell was the Company's CFO and Secretary until retiring in March 2014.  Glidewell signed the 2013 Annual Report and SOX certifications thereto.  As CFO, Glidewell was ultimately responsible for MBII's finances, including the accurate reporting of those finances.  Glidewell was also responsible for the design and maintenance of MBII's financial disclosure controls and procedures.  Furthermore, as discussed above Glidewell executed numerous lucrative insider stock sales during the Section 10(b) Class Period, reaping over $1 million from those sales.

378.   As MBII's Senior Vice President of Commercial Operations and, as of January 2014, COO of the Company, Absi bore the ultimate responsibility for MBII's sales and marketing practices, and the ultimate responsibility for the Company to meet and report its projected revenue guidance.  Absi orchestrated, or was aware of, MBII's scheme to defraud its investors by falsifying revenue during the Section 10(b) Class Period.  Absi was so integral to MBII's business that when he abruptly resigned on August 7, 2014, the Company had to suspend revenue guidance for the rest of the year.  In reference to Absi, MBII has stated in the Restatement that the Company was "seriously and negatively impacted by the departure[] of our former chief operating officer," a departure from which MBII is struggling to recover.

379.   Boyd was named MBII's CFO effective February 2014, replacing Glidewell. Boyd was appointed MBII's assistant secretary effective March 2014.  As CFO, Boyd was ultimately responsible for MBII's finances, including the accurate reporting of those finances.  Boyd signed the false and misleading 2014 First Quarter Report and 2014 Second Quarter Report, including SOX certifications thereto.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-93-

380.   By reason of the conduct alleged in the Fifth Cause of Action in this Complaint, Marrone, Glidewell, Absi and Boyd are jointly and severally liable to the same extent as the Company for the aforesaid unlawful conduct, and are liable to Lead Plaintiffs and to the other members of the Section 10(b) Class for the substantial damages which they suffered in connection with their purchases of MBII's securities during the Section 10(b) Class Period.

381.   Defendants' earliest fraud was discovered on or about August 22, 2014.  Lead Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the date of those violations.  Consequently, the action is timely.

## V.        PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the IPO Section 11 Class, pray for judgment as follows:

(a)     Determining this action to be a proper class action and certifying Plaintiff Fineman as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff Fineman and other members of the IPO Section 11 Class against Defendants MBII, Marrone, Glidewell, Schickedanz and the Offering Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of these Defendants, together with interest thereon;

(c)     Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys and experts; and

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-94-

(d)     Granting such other and further relief as the Court may deem just and proper.

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Secondary Section 11 Class, pray for judgment as follows:

(a)     Determining this action to be a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Lead Plaintiffs and other members of the Secondary Section 11 Class against Defendants MBII, Marrone, Boyd, Contag, Lyman, the Offering Defendants and E&Y, jointly and severally, for the damages sustained as a result of the wrongdoings of these Defendants, together with interest thereon;

(c)     Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys and experts; and

(d)     Granting such other and further relief as the Court may deem just and proper.

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Section 10(b) Class, pray for judgment as follows:

(a)     Determining this action to be a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Lead Plaintiffs and other members of the Section 10(b) Class against Defendants MBII, Marrone, Glidewell, Boyd and Absi, jointly and severally, for the damages

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE NO. 2:14-CV-2571-MCE-KJN

-95-

sustained as a result of the wrongdoings of these Defendants, together with interest thereon;

(c)     Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys and experts; and

(d)     Granting such other and further relief as the Court may deem just and proper.

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury as to all issues so triable.

DATED: January 11, 2016

/s/ Michael J. McGaughey
MICHAEL J. McGAUGHEY (198617)
**LOWENSTEIN SANDLER LLP**
390 Lytton Avenue
Palo Alto, CA 94301
Telephone: 213-426-2170
Fax: 973-597-6233
E-mail: mmcgaughey@lowenstein.com

*Counsel for Lead Plaintiffs Special Situations Fund III QP, L.P. and Special Situations Cayman Fund, L.P. and Additional Named Plaintiff David M. Fineman, and Lead Counsel for the Classes*

Appearance *pro hac vice*:
LAWRENCE M. ROLNICK
STEVEN M. HECHT
THOMAS E. REDBURN, JR.
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020
          - and –
65 Livingston Avenue
Roseland, NJ 07068
Telephone: 646-414-6902
Fax: 973-597-2381
E-mail: shecht@lowenstein.com
tredburn@lowenstein.com

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN

-97-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2016, I caused the foregoing SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS to be electronically filed with the Clerk of Court using the Court's CM/ECF system, which will send notification of such filing to counsel of record.

 /s/ Michael J. McGaughey___
Michael J. McGaughey

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
MASTER FILE No. 2:14-CV-2571-MCE-KJN