MAYER BROWN LLP
ELIZABETH MANN (SBN 10654)
emann@mayerbrown.com
350 South Grand Avenue, 25th Floor
Los Angeles, California 90071-1503
Telephone: (213) 229-9500
Facsimile: (213) 625-0248

MAYER BROWN LLP
STANLEY J. PARZEN (admitted pro hac vice)
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Attorneys for Defendant
ERNST & YOUNG LLP

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPECIAL SITUATIONS FUND III QP, L.P., SPECIAL SITUATIONS CAYMAN FUND, L.P., and DAVID M. FINEMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>MARRONE BIO INNOVATIONS, INC., PAMELA G. MARRONE, JAMES B. BOYD, DONALD J. GLIDEWELL, HECTOR ABSI, ELIN MILLER, RANJEET BHATIA, PAMELA CONTAG, TIM FOGARTY, LAWRENCE HOUGH, JOSEPH HUDSON, LES LYMAN, RICHARD ROMINGER, SHAUGN STANLEY, SEAN SCHICKEDANZ, and ERNST & YOUNG LLP,<br><br>Defendants. | Master File 2:14-cv-2571-MCE-KJN<br><br>CONSOLIDATED CLASS ACTION<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ERNST & YOUNG LLP'S MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>Chief Judge<br>Morrison C. England, Jr.<br><br>Date: September 8, 2016<br>Time: 2:00 p.m.<br>Dept: 501 I Street, Courtroom 7<br>Sacramento, CA 95814 |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................. 1

II.     BACKGROUND .............................................................................................. 2

    A.   The Undisclosed Arrangements With Distributors ................................. 2

    B.   The Conclusions Of The SEC And The U.S. Attorney............................ 4

    C.   Plaintiffs' Claims ................................................................................... 5

    D.   EY's Audit Opinion ............................................................................... 7

III.    ARGUMENT ................................................................................................... 7

    A.   A Complaint Must Be Dismissed If It Does Not State A Plausible Claim ............ 7

    B.   Plaintiffs Have Not Alleged Facts To Establish Statutory Standing ...................... 8

    C.   Plaintiffs Have Not Stated A §11 Claim Against EY ........................................... 11

        1.   EY's potential liability is limited to its audit report—it cannot be liable for misstatements in the company's financial statements ............... 11

        2.   Plaintiffs have no §11 claim under Omnicare ........................................... 14

            a.   Under *Omnicare*, EY's report expresses opinions, not facts ........ 14

            b.   Plaintiffs have no false statement claim........................................ 15

            c.   Plaintiffs have no omission claim .................................................. 16

        3.   The internal controls allegations cannot be the basis for a claim ............ 18

        4.   There is no loss causation ......................................................................... 19

IV.     CONCLUSION ................................................................................................ 20

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ERNST & YOUNG LLP'S MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT,

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...........................................................................8, 11, 18, 19

*Bell Atl. v. Twombly,*
   550 U.S. 544 (2007) ................................................................................8, 10, 18

*Bily v. Arthur Young & Co.,*
   834 P.2d 745 (Cal. 1992) ...................................................................12, 13, 15, 18

*Brown v. Ambow Educ. Holding,*
   2014 WL 523166 (C.D. Cal. Feb. 6, 2014)..............................................................20

*Buttonwood Tree Value Partners v. Sweeney,*
   2012 WL 2086607 (C.D. Cal. June 7, 2012) ............................................................15

*Century Alum. Sec. Litig., In re,*
   729 F.3d 1104 (9th Cir. 2013)......................................................................8, 9, 10, 11

*Dronsejko v. Grant Thornton,*
   632 F.3d 658 (10th Cir. 2011).....................................................................................14

*Fait v. Regions Fin.,* 712 F. Supp. 2d 117 (S.D.N.Y. 2010),
   *aff'd,* 655 F.3d 105 (2d Cir. 2011) .............................................................................19

*IKON Office Sols., In re,*
   277 F.3d 658 (3d Cir. 2002)........................................................................................14

*Kirkwood v. Taylor,*
   590 F. Supp. 1375 (D. Minn. 1984), *aff'd,* 760 F.2d 272 (8th Cir. 1985) ............9, 10

*Lehman Bros. Sec. Litig., In re,*
   131 F. Supp. 3d 241 (S.D.N.Y. 2015).........................................................................15

*Lehman Bros. Sec. Litig., In re,*
   799 F. Supp. 2d 258 (S.D.N.Y. 2011).........................................................................15

*Lloyd v. CVB Fin.,*
   811 F.3d 1200 (9th Cir. 2016).............................................................................20, 21

*Longtop Fin. Techs. Sec. Litig., In re,*
   910 F. Supp. 2d 561 (S.D.N.Y. 2012).........................................................................15

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014)....................................................................20

*Monroe v. Hughes*,
  31 F.3d 772 (9th Cir. 1994)......................................................................20

*Omnicare v. Laborers Dist. Council*,
  135 S. Ct. 1318 (2015) ..............................................2, 12, 14, 15, 16, 17, 18, 19, 20

*OSG Sec. Litig., In re*,
  2015 WL 3466094 (S.D.N.Y. May 29, 2015)............................................20

*Puda Coal Sec. Litig., In re*,
  30 F. Supp. 3d 230  (S.D.N.Y. 2014).......................................................12

*Querub v. Moore Stephens Hong Kong*,
  2016 WL 2942415 (2d Cir. May 20, 2016) ..............................................1, 12, 15

*Rubke v. Capitol Bancorp*,
  551 F.3d 1156 (9th Cir. 2009)..................................................................17

*Se. Pa. Transp. v. Orrstown Fin.*,
  2015 WL 3833849 (M.D. Pa. June 22, 2015) ..........................................16

*SEC v. Arthur Young & Co.*,
  590 F.2d 785 (9th Cir. 1979).....................................................................13

*Special Situations Fund v. Deloitte Touche*,
  33 F. Supp. 3d 401 (S.D. N.Y. 2014), *aff'd*, 2016 WL 1392280 (2d Cir. Apr. 8,
  2016) .............................................................................................................12

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016).......................................................................17

*Ultramares Corp. v. Touche*,
  174 N.E. 441 (N.Y. 1931)..........................................................................13

*Van Wagoner Funds, In re*,
  382 F. Supp. 2d 1173 (N.D. Cal. 2004) ...................................................20

*Velti PLC Sec. Litig., In re*,
  2015 WL 5736589 (N.D. Cal. Oct. 1, 2015).............................................16, 17, 20

- iii -

# TABLE OF AUTHORITIES
(continued)

Page

**Statutes and Rules**

15 U.S.C. §77k(a) ....................................................................................8, 15, 16

15 U.S.C. §77k(e) ...................................................................................................20

Securities Act of 1933, §11 ........................................................................ *passim*

**Other Authorities**

PCAOB, *ACAP Committee's Recommendation Relating to the Auditor's Reporting Model* (2010)..........................................................................................13

PCAOB Auditing Standards ...............................................................................13

    AS 1001.03....................................................................................................13, 14

    AS 1001.05.........................................................................................................15

    AS 1015.10.........................................................................................................13

    AS 1015.11....................................................................................................15, 18

    AS 1015.12.........................................................................................................14

    AS 1015.13.........................................................................................................13

    AS 1305.03.........................................................................................................19

    AS 3101.08.........................................................................................................13

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ERNST & YOUNG LLP'S MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT __

## I.     INTRODUCTION

The sole claim against Ernst & Young LLP ("EY"), under §11 of the Securities Act of 1933, alleges that Marrone Bio Innovations ("MBI") improperly accounted for revenue in its 2013 financial statements and that EY's audit report, which expressed an opinion on the financial statements, included misstatements or omission of material fact. Lead plaintiffs allegedly bought stock in MBI's Secondary Offering; that offering's registration statement included EY's report.

The threshold problem with this claim is that plaintiffs have not alleged sufficient facts to establish §11 standing: *i.e.*, one cannot tell from the Third Amended Class Action Complaint ("TAC," Doc. No. 76) whether the shares plaintiffs allegedly purchased were from the Secondary Offering (as required for the claim against EY) or, instead, were shares from previous issuances.

The claim also fails on the merits. Plaintiffs allege that MBI recognized revenue too soon because some of its sales personnel reached unauthorized side agreements with certain distributors of MBI products. These agreements allowed those distributors to return unsold products to MBI or delay paying MBI until the products were sold to end users. But those arrangements with distributors were *concealed* from EY (and MBI's own finance department), as the TAC admits and as documents cited in the TAC—from MBI's Audit Committee, the SEC, and the U.S. Attorney—all conclude. Plaintiffs also admit that MBI sales personnel lied to EY— indeed, one was recently indicted on federal criminal charges for doing so—and provided EY with letters falsely representing no such side agreements with the distributors existed.

Plaintiffs cannot state a §11 claim. Their lead theory, added in their recent amendment, asserts that EY "certified" —or guaranteed the correctness of—the financial statements that MBI prepared and thus is liable for any errors in the financial statements. But EY's consent and its report are not "certifications" of the financial statements (nor could they be under professional standards), do not use the word "certify," and make clear that EY did not guarantee the financial statements are correct. Instead, EY only expressed an opinion on the financial statements, based on its audit—during which MBI personnel hid key information from EY about the terms with MBI's distributors. Further, the Second Circuit recently rejected the same certification argument that plaintiffs make here and rejected cases plaintiffs relied on in moving to amend. *Querub v.*

1

1 | *Moore Stephens Hong Kong*, 2016 WL 2942415 (2d Cir. May 20, 2016) (summary order).

2 |     Moreover, under *Omnicare v. Laborers Dist. Council*, 135 S. Ct. 1318 (2015), which

3 | governs §11 liability for opinions, there is no false-statement claim because plaintiffs have not

4 | alleged—and cannot allege—that EY did not believe its audit opinion when issuing it. Nor is

5 | there an omission claim, which under *Omnicare* must be based on information that the defendant

6 | was aware of at the time of its opinion: a defendant cannot be liable for omitting information

7 | concealed from it. Plaintiffs allege *no* facts showing that EY knew of the secret terms during its

8 | audit. Indeed, their allegations show that the most plausible explanation for why MBI's financial

9 | statements were wrong is that critical information was hidden from EY. Further, EY's report

10 | stated the basis for its opinion; *Omnicare* holds that when that is done, there is no §11 liability.

11 |     Finally, EY's audit report did not cause the alleged losses as a matter of law: MBI's Audit

12 | Committee, the SEC, and the U.S. Attorney all concluded that the inappropriate revenue

13 | recognition was caused by hiding from EY and MBI's finance department the unauthorized terms

14 | with distributors. As a result, the TAC demonstrates that there can be no loss causation as to EY.

15 | **II.    BACKGROUND**

16 |     The facts below are based on the well-pleaded allegations in the TAC and documents that

17 | the TAC cites and relies on, of which the Court may take judicial notice: documents filed with

18 | and by the SEC and documents filed by the U.S. Attorney. See EY's Request For Judicial Notice.

19 |     **A.    The Undisclosed Arrangements With Distributors.**

20 |     MBI sells pest management and plant health products to agricultural distributors. TAC

21 | ¶¶ 6, 266. MBI accounts for its sales revenue through either "sell-in" accounting, which allows it

22 | to immediately recognize revenue from the distributor once the distributor has title to the product,

23 | or "sell-through" accounting, which defers recognition of the revenue until the distributor resells

24 | the product to an end user. *Id*. ¶ 18. The method that should be used for particular sales depends

25 | on many factors, including the contract terms between MBI and the distributors. *Id*. ¶¶ 103-05.

26 |     MBI previously recognized revenue from most sales using "sell-in" accounting. *Id*. ¶ 97.

27 | But for sales to some distributors, MBI allegedly should have used "sell-through" accounting (*id*.

28 | ¶¶ 106, 108) because those distributors had "protection rights" allowing them to return products

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ERNST & YOUNG LLP'S TO DISMISS
THE THIRD AMENDED CLASS ACTION COMPLAINT

to MBI or postpone payment until they resold MBI's products to ultimate customers. *Id*. ¶¶ 117, 181. Those terms were "unprecedented" and "atypical" for MBI. *Id*. ¶¶ 319, 321. Since MBI allegedly used incorrect accounting for those sales, it recognized revenue inappropriately and overstated its 2013 financial results, which were restated in November 2015. *Id*. ¶¶ 14, 106-12.

As part of a fraudulent scheme orchestrated by defendant Hector Absi, MBI's former Chief Operating Officer, the unprecedented arrangements with distributors were not disclosed to EY or MBI's finance department. *Id*. ¶¶ 32, 181, 230-33, 309-40. An investigation by MBI's Audit Committee found that "'relevant information related to historical sales transactions, to which certain sales personnel were aware of, *was consistently not shared with* the finance department or *the Company's external auditors* [EY].'" *Id*. ¶¶ 391, 412 (emphasis added; quoting 11/10/15 10-K at iii (EY Ex. A)). Those "'sales personnel made *unauthorized commitments* with certain distributors, including "inventory protection" arrangements that would permit the distributors to return to the Company certain unsold products.'" *Id*. ¶¶ 115, 192 (emphasis added; quoting 11/10/15 10-K at iii). There were "'instances of management override of internal controls by sales personnel related to the recognition of sales to…distributors.'" *Id*. The Audit Committee also found that "'certain sales personnel executed *inaccurate representation letters*.'" *Id*. ¶¶ 391, 412 (emphasis added; quoting 11/10/15 10-K at iii). Those letters "'are intended to inform the Company's finance department and the external auditors of any commitments not included on a customer purchase order.'" *Id*. ¶ 377 (quoting 11/10/15 10-K at ii). In short, sales personnel "*failed to share with the* Company's finance department or *external auditors critical information* relevant to MBI[]'s historical sales" to certain distributors. *Id*. ¶ 230 (emphasis added).

The Audit Committee determined that the failure to disclose key transaction terms to EY and MBI's finance department caused MBI to recognize revenue inappropriately:

> [T]he Audit Committee principally determined that *as a result of the failure of certain employees to share with* the Company's finance department or *the external auditors important transaction terms* with distributors, including "inventory protection" arrangements that would permit the distributors to return to the Company certain unsold products, the Company inappropriately recognized revenue for certain historical sales transactions with these distributors prior to satisfying the criteria for revenue recognition required under U.S. Generally Accepted Accounting Principles (GAAP).

EY Ex. A at i (11/10/15 10-K) (emphasis added). Plaintiffs do not allege that EY knew, based on the information it had when issuing its March 2014 audit report, of the undisclosed sales terms.

After the Audit Committee's investigation ended in February 2015, MBI's management performed a more-detailed evaluation. *Id*. at ii. Plaintiffs allege that MBI "was only able to reveal the full scope" of the undisclosed terms with distributors "by 'evaluating all distributor sales transactions…on a customer-by-customer and transaction-by transaction basis, including… seeking any details of…undocumented arrangements or commitments.'" TAC ¶ 184; see EY Ex. A at ii (11/10/15 10-K). In this "complex[]" process, MBI evaluated the "relevant facts and circumstances" for "each individual transaction"; for "many transactions," it had to seek "additional information" from distributors about their sales to end users. EY Ex. B at ii (5/18/15 Form 12b-25 filing). Plaintiffs allege that this transaction-by-transaction investigation occurred "*well after* EY completed its audit of the 2013 Financial Statements," and it revealed "information that [MBI] and its auditor, *E&Y*, *did not have before* [MBI] announced" the restatement of its financial statements in November 2015. TAC ¶¶ 185-86 (emphasis added).

### B.     The Conclusions Of The SEC And The U.S. Attorney.

The TAC "is based on," *inter alia*, "information obtained from documents filed by the SEC" in cases against Absi and MBI, SEC orders in administrative proceedings, and "documents filed by the Department of Justice" in a criminal case against Absi. TAC ¶ 2. Plaintiffs attached those documents to their motion for leave to amend. Doc. Nos. 59-4, 59-5, 59-6, 59-8.

Both agencies concluded that MBI personnel concealed key information from EY. In recent complaints against MBI and Absi, the SEC alleged that Absi "concealed his scheme from …MBI's independent auditors"; "conceal[ed] the inventory protection and other sales concessions from…MBI's independent auditors"; and made "false" written "representations to the auditors" that "he was not aware of any side agreements with distributors." Doc. No. 59-4 ¶¶ 14, 46-47; Doc. No. 59-5 ¶¶ 14, 46-47. An agreed SEC order against Donald Glidewell, MBI's ex-CFO (Doc. No. 59-8 n.1) stated that Absi and others hid contract terms from EY. Absi told "MBI's employees to conceal the inventory protection terms from MBI's accountants," including ordering them "to hide a side letter" in late 2013 and "physically remove the inventory protection

1   terms from the face of a purchase order." *Id*. ¶ 11. Absi "also lied on a sales certification provided

2   to him by MBI's independent auditor in connection with their year-end 2013 audit by certifying

3   in writing that he was not aware of any terms or conditions MBI had agreed to with distributors

4   that were not reflected in written agreements or purchase orders." *Id*. ¶ 12.

5        The U.S. Attorney recently indicted Absi for lying to EY, alleging that Absi and others

6   under his direction "concealed from, caused to be concealed from, or otherwise omitted reporting

7   to MBI's…external auditors that the sales of MBI's products included inventory protection."

8   Doc. No. 59-6 ¶ 16. Absi provided "false and fraudulent information" to "MBI's external auditors

9   as to the date of delivery and transfer of title" of MBI's products. *Id*. ¶ 18. And in 2014, "Absi

10  signed a letter in connection with the audit by MBI's external auditor in which Absi falsely and

11  fraudulently attested and certified that he had no knowledge of any side agreements with any MBI

12  customer or distributor which would or did involve inventory protection." *Id*. ¶ 40.

13       Both agencies also have concluded that Absi's scheme to hide inventory protection terms

14  from EY and MBI's finance department caused MBI to prepare allegedly incorrect financial

15  statements (which plaintiffs claim caused their alleged harm). The SEC summarized in the

16  Glidewell order that Absi's instructions to MBI's employees "to conceal the inventory protection

17  terms from MBI's accountants…caused MBI to file financial statements that were not in

18  accordance with GAAP." Doc. No. 59-8 ¶ 11. Likewise, Absi's criminal indictment alleges:

19       *Because of Absi's concealment* from MBI's accounting department-controller and *from
         MBI's external auditors* of the inventory protection agreements with customers in
20       connection with their purchase of MBI products, *and because of the false and fraudulent
         information Absi provided to* the accounting department and *MBI's external auditors* as to
21       the date of delivery and transfer of title, MBI's accounting department recorded millions
22       of dollars of revenue in MBI's financial statements that should not have been recorded in
         accordance with GAAP or with MBI's accounting principles.
23

24  Doc. No. 59-6 ¶ 18 (emphasis added; capitalization omitted).

25       **C.       Plaintiffs' Claims.**

26       This case involves three sets of MBI securities. Two are not at issue in the claim against

27  EY: stock sold (a) in MBI's August 2013 Initial Public Offering; and (b) on the open market

28  starting in August 2013. TAC ¶ 4. The claim against EY, alleged under §11 of the Securities Act

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ERNST & YOUNG LLP'S TO DISMISS
THE THIRD AMENDED CLASS ACTION COMPLAINT

of 1933, 15 U.S.C. §77k, is based solely on a third set: stock sold in MBI's June 2014 Secondary Offering. TAC ¶¶ 4(b), 44, 132-208. The registration statement for that offering included EY's audit opinion on MBI's year-end 2013 financial statements. *Id.* ¶ 165.

Plaintiffs "specifically disclaim[]" "[a]ny allegations of fraud or fraudulent conduct" for their §11 claim; they "do not allege that EY acted with scienter or fraudulent intent." *Id.* ¶¶ 132, 207. Instead, they assert that "E&Y is statutorily liable" for "the misstatements of material fact contained in the 2013 Financial Statements" (*id.* ¶ 134), even though the financial statements themselves "'are the responsibility of the Company's management'" (*id.* ¶ 165). Plaintiffs allege that EY is liable for "misstatements of fact" in the financial statements "because they were made in the portion of the June 2014 Registration Statement that E&Y prepared or certified." *Id.* ¶ 161. The alleged factual misstatements in the financial statements were incorrect because the financial statements improperly or prematurely recognized revenue due to the concealed arrangements with certain distributors. *Id.* ¶¶ 146, 152-60.

Plaintiffs also allege that EY is liable for "the misstatements and omissions of material fact in E&Y's audit report." *Id.* ¶ 134. First, they allege that EY's "audit opinion…express[ed] the view" that MBI's 2013 financial statements "were presented in conformity with GAAP"; plaintiffs call this a false statement of "fact." *Id.* ¶¶ 162, 166. Second, plaintiffs allege that EY's audit opinion falsely stated that "its audit conformed to standards set forth by the Public Company Accounting Oversight Board ('PCAOB')" (*id.* ¶¶ 167-68), which required EY to "gain an understanding" of the transaction terms between MBI and its customers. *Id.* ¶¶ 179-80. Plaintiffs allege that "[g]iven the scope of the…Restatement, E&Y could not have done so, because it would have uncovered" the actual arrangements. *Id.* ¶ 181. Because EY purportedly "did not contact…customers directly," it allegedly lacked sufficient information at the time of its audit to state its GAAP opinion. *Id.* ¶¶ 189-90, 204. Plaintiffs further claim that EY's alleged misstatements were also omissions "concerning E&Y's inquiry into and knowledge underpinning its audit opinion." *Id.* ¶ 204. See *id.* ¶ 191 (EY "omitt[ed] to state" that it did not have sufficient information about MBI's transactions with some distributors to state its GAAP opinion); ¶¶ 195-97, 204 (EY "did not disclose" that it allegedly "did not scrutinize" or "did not verify" the

1    transaction terms for certain distributors).[1]

2        Finally, plaintiffs allege that MBI's internal controls over revenue recognition were

3    deficient, which a proper audit "would have uncovered" (*id*. ¶¶ 193-94), but they admit that

4    internal controls were the "'responsibility of [MBI's] senior management'" (*id*. ¶ 391) and that

5    EY's audit report "'express[ed] no…opinion'" on "'the effectiveness of [MBI's] internal control

6    over financial reporting.'" *Id*. ¶ 165. See EY Ex. A at 166 (11/10/15 10-K) (MBI management's

7    statement that internal controls over financial reporting have "inherent limitations" and can "be

8    circumvented" by "individual acts," "collusion," or "management override of the controls").

9        **D.    EY's Audit Opinion.**

10        EY's 2013 audit opinion does not and could not state that EY "certified" anything. See

11    TAC ¶ 165; pp. 12-13, *infra* (explaining that professional standards bar EY from certifying finan-

12    cial statements). EY's opinion said: EY's "'responsibility is to express an opinion on [MBI's]

13    financial statements based on our audits'"; its audits were conducted in accordance with PCAOB

14    standards, which provide "'reasonable assurance about whether the financial statements are free

15    of material misstatement'" and include examining evidence "'on a test basis'"; "'[w]e believe that

16    our audits provide a reasonable basis for our opinion'"; and "'[i]n our opinion, the financial

17    statements'" present fairly MBI's financial position in conformity with GAAP. *Id*. Plaintiffs

18    allege these statements were untrue because the financial statements were not reliable and did not

19    comply with GAAP, and EY's audits did not conform to PCAOB standards. *Id*. ¶¶ 101, 166-68.

20    **III.    ARGUMENT**

21        **A.    A Complaint Must Be Dismissed If It Does Not State A Plausible Claim.**

22        A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for

23

---

24    [1]    Plaintiffs claim "the SEC has now revealed" that EY "merely ask[ed] Absi" to confirm sales
terms with distributors and to certify there were no other terms. TAC ¶ 182. The SEC filings that
25    the TAC cites do not say that, and plaintiffs point to no other support for this allegation. The SEC
alleged only that MBI's controller—whom Absi lied to about sales terms (Doc. No. 59-4 ¶ 17;
26    Doc. No. 59-5 ¶ 17)—"prepared and sent terms and conditions confirmations" to distributors,
asking them to "verify specific terms," and asked Absi to "review the confirmations for accuracy"
27    before they were sent. Doc. No. 59-4 ¶ 45; Doc. No. 59-5 ¶ 45. The SEC did not—and could
not—state that EY did not *receive* confirmations directly from distributors.

28

7

1   relief that is plausible on its face'"—that is, it must "plead[] factual content that allows the court

2   to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*

3   *v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)).

4   Moreover, "conclusory" allegations are "not entitled to be assumed true," and "'naked

5   assertion[s]' devoid of 'further factual enhancement'" are insufficient. *Id.* at 678, 681. And in

6   determining whether a claim is plausible, a court must consider "obvious alternative

7   explanation[s]" for the defendant's conduct. *Twombly*, 550 U.S. at 567. When it is "more likely"

8   that the conduct was not wrongful, the allegations do not state a claim. *Iqbal*, 556 U.S. at 681.

9   **B.    Plaintiffs Have Not Alleged Facts To Establish Statutory Standing.**

10   Plaintiffs may bring §11 claims when they bought shares issued under a registration

11   statement that had false statements or omissions of material fact. 15 U.S.C. §77k(a). But "when a

12   company has issued shares under more than one registration statement, the plaintiff must prove

13   that her shares were issued under the allegedly false or misleading registration statement, rather

14   than some other registration statement." *In re Century Alum. Sec. Litig.*, 729 F.3d 1104, 1106 (9th

15   Cir. 2013) (affirming dismissal of §11 claim for insufficient standing allegations). There are "two

16   ways" for plaintiffs "to prove that the shares they purchased came from the pool of shares issued

17   in the secondary offering, rather than from the pool of previously issued shares": (1) "prove that

18   they purchased their shares directly in the secondary offering itself," or (2) "prove that their

19   shares, although purchased in the aftermarket, can be traced back to the secondary offering." *Id*.

20   Two lead plaintiffs assert claims based on the June 6, 2014 Secondary Offering and try to

21   satisfy the first option: they assert that they bought MBI stock "in the Secondary Offering" (TAC

22   ¶¶ 25-26) and "directly purchased" specified numbers of shares in the Secondary Offering at

23   $9.50 per share. Dkt. No. 76-1, ¶ 6. Their attached certification also states that each plaintiff

24   bought additional shares on the same date (and other dates) "in the open market" at different

25   prices. See *id*. & attached transaction summaries. On the date of the Secondary Offering, there

26   were many previously issued MBI shares: they had been sold in the August 1, 2013 Initial Public

27   Offering ("IPO") (TAC ¶ 4(a)) and on "the open market" since August 1, 2013 (*id*. ¶ 210).

28   Plaintiffs have not alleged facts sufficient to show that they "purchased their shares

8

directly in the secondary offering itself." *Century Alum.*, 729 F.3d at 1106. The problem is made clear in the Secondary Offering's prospectus (part of that offering's registration statement, TAC ¶ 4(b)). First, the prospectus states that the Secondary Offering's five underwriters would "offer the shares of common stock to the public at the public offering price…*and to certain dealers*…at that price less a concession." EY Ex. C at 124 (emphasis added) (6/5/14 prospectus). Second, it says that the underwriters are all "full service financial institutions engaged in various activities, which may include *securities trading*," and that "[i]n the ordinary course of their various business activities, the underwriters…may make or hold a broad array of investments and actively trade… equity securities," which "*may involve our securities*." *Id.* at 127 (emphasis added). And third, the prospectus states that as of March 31, 2014, "some of our shares of common stock are held by brokers and other institutions on behalf of stockholders." *Id.* at 36. The prospectus does not say whether the "other institutions" holding previously issued stock (*id.*) included any of the five "full service financial institutions" (*id.* at 127) serving as underwriters.

In light of these facts, there are at least three possibilities for the shares that the lead plaintiffs bought on June 6, 2014 for $9.50 per share—they bought their shares: (1) from "certain dealers" (*id.* at 124) that *also* held MBI shares that had been purchased on the open market or in the 2013 IPO; (2) from underwriters that were holding shares purchased on the open market or the IPO *and* shares from the Secondary Offering; or (3) from underwriters that held *only* shares sold in the Secondary Offering. But at present, it is impossible to conclude that the third alternative applies to lead plaintiffs. The complaint does not even allege that they bought their shares from one of the underwriters, much less that that underwriter held and sold only Secondary Offering shares on June 6, 2014. See *Kirkwood v. Taylor*, 590 F. Supp. 1375, 1381 (D. Minn. 1984) (plaintiffs lacked §11 standing because the court could not "assume that [the underwriter's] house account inventory contained only new stock up through the date of [plaintiff's] purchase," and plaintiffs have "not shown that just because they purchased from an underwriter that they necessarily bought only new offering stock"), *aff'd*, 760 F.2d 272 (8th Cir. 1985) (table). If alternatives (1) or (2) apply and plaintiffs bought from a seller that also held open market or IPO shares on June 6, 2014, plaintiffs would be "require[d]" to "trace the chain of title for their shares

9

back to the secondary offering," which is "'often impossible'"—many sellers "'do not identify specific shares with particular accounts but instead treat the account as having an undivided interest in the house's position.'" *Century Alum.*, 729 F.3d at 1106-07. When, as here, "*all* of the company's shares" are not "directly traceable to the offering in question," "further factual enhancement is needed": "a greater level of factual specificity will be needed before a court can reasonably infer" that the plaintiffs' shares "are traceable to a particular offering." *Id*. at 1107.

Plaintiffs could easily provide greater specificity if it existed. When shares are bought from underwriters, there are documents showing this fact, such as "an indication of interest by the broker on behalf of the customer, the customer's receipt of a preliminary prospectus," a "purchase order ticket," "the customer's confirmation slip," and "special coding of the transaction by the brokerage firm." *Kirkwood*, 590 F. Supp. at 1378. And (if true), plaintiffs could attach documents showing that the underwriters from which they purchased sold only Secondary Offering shares.

Because plaintiffs allege none of this and attach no such documents, they have not shown that they have standing to assert a §11 claim. Considering their allegations, their certification, and the prospectus, "plaintiffs' shares could have come from the secondary offering, but the 'obvious alternative explanation' is that they could instead have come from the pool of previously issued shares."[2] *Century Alum.*, 729 F.3d at 1108 (quoting *Twombly*, 550 U.S. at 567). And when the allegations are "'merely consistent with'" both alternatives, "[s]omething more is needed" to withstand a motion to dismiss, "such as facts tending to exclude the possibility that the alternative explanation is true." *Id*. (quoting *Iqbal*, 556 U.S. at 678). Unless plaintiffs offer "something more," their theory "is merely *possible* rather than plausible," and thus their claim against EY must be dismissed because plaintiffs "lack statutory standing under § 11." *Id*. at 1108-09.

---

[2]   In *Century Alum.*, one plaintiff alleged "that he directed his broker to purchase…shares in the secondary offering and that his broker executed the purchase through Citigroup," which was involved in a joint venture with one of the underwriters. 729 F.3d at 1109. The Ninth Circuit held that "[e]ven accepting these allegations as true, we cannot reasonably infer that [the] shares are traceable to the secondary offering," because the allegations "are also consistent with Citigroup having filled the order with previously issued shares it was holding. Absent something more, such as an allegation that Citigroup held *only* shares issued in the secondary offering, these allegations are insufficient to withstand a motion to dismiss." *Id*. Plaintiffs here have provided even less specificity than the allegations that the Ninth Circuit held were insufficient in *Century Alum.*

**C.   Plaintiffs Have Not Stated A §11 Claim Against EY.**

**1.   EY's potential liability is limited to its audit report—it cannot be liable for misstatements in the company's financial statements.**

Even if plaintiffs have statutory standing, they have not stated a §11 claim against EY. As an auditor, EY may be sued under §11 only for misstatements or omissions of fact in the portions of the registration statement that it has "with [its] consent been named as having prepared or certified." 15 U.S.C. §77k(a)(4). Here, EY prepared and consented to have included in the registration statement its audit report expressing its opinion on MBI's 2013 financial statements. TAC ¶¶ 44, 165; EY Ex. D at F-2 (EY audit report in registration statement). EY's consent said only: "We consent to the incorporation by reference…of the reference to our firm under the caption 'Experts' and our report dated March 25, 2014 relating to the consolidated financial statements of [MBI]." EY Ex. E at Ex. 23.1 (6/5/14 Form S-1MEF). Thus, EY consented only to including its audit report, and it did not state that it certified anything in the registration statement. Accordingly, EY's potential liability is limited to factual misstatements or omissions in its report.

Plaintiffs nonetheless allege that EY "certified" MBI's financial statements (TAC ¶¶ 161, 201), and thus may be strictly liable for everything in the financial statements, but that conclusory allegation cannot be accepted as true. *Iqbal*, 556 U.S. at 678-79, 681. The text of EY's consent and audit report show that EY did not certify anything; the word "certify" is not there.[3] Instead, EY consented only to the inclusion of its "report" (EY Ex. E at Ex. 23.1); the report, in turn, states that EY expressed an "'opinion'" on the financial statements "'based on our audits,'" that "'[w]e believe that our audits provide a reasonable basis for our opinion,'" and that the "financial statements are the responsibility of [MBI's] management." TAC ¶ 165. Hence, there cannot be §11 liability unless there is a misstatement or omission of material fact in EY's audit report.

In moving to amend, plaintiffs cited two cases from the Southern District of New York to support their theory that auditors certify financial statements and therefore can be liable for factual misstatements in the financial statements. Doc. No. 58 at 9; Doc. No. 63 at 6. The Second

---

[3]   In contrast, the "Certification" attached to the TAC states that the plaintiffs "hereby certify" facts about their securities transactions. Doc. No. 76-1. Likewise, MBI officials state that they "certify" various items in MBI's SEC filings. EY Ex. A, Exs. 31.1-32.1 (11/10/15 10-K).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ERNST & YOUNG LLP'S TO DISMISS
THE THIRD AMENDED CLASS ACTION COMPLAINT

1  Circuit, however, has now rejected that position. In a §11 case against an auditor where company

2  financial statements were false because they included the assets of a subsidiary that, in fact, had

3  been stolen by an insider, the Second Circuit held the auditor not liable for false statements within

4  the financial statements because the audit report provided an opinion, not a certification: "*Audit*

5  *reports*, labeled 'opinions' and involving considerable subjective judgment, *are statements of*

6  *opinion* subject to the *Omnicare* standard for Section 11 claims." *Querub*, 2016 WL 2942415, *3

7  (emphasis added), *aff'g*, *In re Puda Coal Sec. Litig.*, 30 F. Supp. 3d 230, 259 (S.D.N.Y. 2014)

8  ("an auditor's 'opinion, just like those rendered by all or substantially all accounting firms, is

9  explicitly labeled as just that—an opinion that the audit complied with…broadly stated

10 standards'"). As noted in a case brought by the same plaintiffs and law firm as here, auditors do

11 not "'by virtue of auditing a company's financial statements, somehow make, own or adopt the

12 assertions contained therein.'" *Special Situations Fund v. Deloitte Touche*, 33 F. Supp. 3d 401,

13 443 (S.D. N.Y. 2014), *aff'd*, 2016 WL 1392280, *3 (2d Cir. Apr. 8, 2016) (summary order) (an

14 audit report is a "statement of opinion"). See *Bily v. Arthur Young & Co.*, 834 P.2d 745, 763 (Cal.

15 1992) ("an audit report is not a simple statement of verifiable fact"; it is "a professional opinion

16 based on numerous and complex factors" and requires "complex professional judgment").

17       Indeed, auditors *cannot* certify a company's financial statements. Plaintiffs admit that

18 PCAOB standards govern EY's work (TAC ¶¶ 167-79), and the auditor's report that the PCAOB

19 *requires* auditors to use does not and cannot have the word "certify." Rather, the PCAOB requires

20 auditors to express the auditor's "opinion" that the financial statements present fairly the

21 company's financial position in conformity with GAAP; states that the audit examines evidence

22 "on a test basis" and is designed to obtain "reasonable assurance" about whether the financial

23 statements are free of material misstatement; and states "that the auditor believes that his or her

24 audit provides a reasonable basis for his or her opinion." PCAOB Auditing Standards, AS

25 3101.08.[4] EY's audit report mirrors the mandated PCAOB report. See TAC ¶ 165. In short,

26 "[s]ince the auditor's opinion on the financial statements…is based on the concept of obtaining

27

28 [4]    The PCAOB auditing standards (AS) cited in this brief are collected in EY Ex. E.

12

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ERNST & YOUNG LLP'S TO DISMISS
THE THIRD AMENDED CLASS ACTION COMPLAINT

1    reasonable assurance, the auditor is not an insurer and his or her report does not constitute a

2    guarantee." AS 1015.13. See *SEC v. Arthur Young & Co.*, 590 F.2d 785, 788 (9th Cir. 1979) (an

3    auditor is not "an insurer of his client's honesty" in preparing its financial statements and "'is not

4    a guarantor of the reports he prepares'"); AS 1015.10 ("Absolute assurance is not attainable

5    because of the nature of audit evidence and the characteristics of fraud").[5]

6          Given PCAOB standards, it makes sense that auditors cannot "certify" the truth of the

7    figures in a company's financial statements. Financial statements are prepared by *the company*.

8    AS 1001.03; *Bily*, 834 P.2d at 749, 762; TAC ¶ 165. Because "the client necessarily furnishes the

9    information base for the audit," there is an "inherent dependence of the auditor on the client."

10   *Bily*, 834 P.2d at 762, 766. "The entity's transactions…are within the direct knowledge and

11   control of management. The auditor's knowledge of these matters…is limited to that acquired

12   through the audit." AS 1001.03. See *Dronsejko v. Grant Thornton*, 632 F.3d 658, 663 (10th Cir.

13   2011) ("A company's management—not the auditor—is responsible for the information

14   contained in its financial statements"). If items are "concealed" from an auditor, documents

15   "withheld, misrepresented, or falsified," or there is "a *side agreement* that management or a third

16   party has *not disclosed*," then "a properly planned and performed audit may not detect a material

17   misstatement" in a company's financial statements. AS 1015.12 (emphasis added). See *In re*

18   *IKON Office Sols.*, 277 F.3d 658, 673 (3d Cir. 2002) (an audit "conducted in strict accordance

19   with professional standards" "does not guarantee that a client's accounts and financial statements

20   are correct any more than a sanguine medical diagnosis guarantees well-being").

21

22   [5]    In 1933, when §11 was adopted, auditors sometimes did certify financial figures. In
     *Ultramares Corp. v. Touche*, 174 N.E. 441, 442 (N.Y. 1931) (Cardozo, J.), for example, the
23   auditor's "'Certificate of Auditors'" stated in part: "'We have examined the accounts of Fred
     Stern & Co., Inc., for the year ending December 31, 1923, and hereby certify that the annexed
24   balance sheet is in accordance therewith and with the information and explanations given us.'"
     That certification warranted the accuracy of the underlying balance sheets. But an auditor's role
25   has changed substantially since then; among other things, auditors today no longer review every
     one of the company's transactions. See PCAOB, *ACAP Committee's Recommendation Relating*
26   *to the Auditor's Reporting Model* at 3-7 (2010) (https://pcaobus.org/News/Events/Documents/
     04072010_SAGMeeting/Auditor's_Reporting_Model.pdf) (discussing the historical evolution of
27   auditors' reports). Current professional standards bar auditors from certifying financial statements
     (although some courts occasionally use that term as an inaccurate shorthand for what auditors do).
28

1    Thus, there was no certification here—and there could not have been. Instead, the only

2    part of the registration statement for which EY might be subject to §11 liability is its audit report.

3    And as explained next, EY's potential liability for its report is governed by *Omnicare v. Laborers*

4    *Dist. Council*, 135 S. Ct. 1318 (2015), because the report expressed EY's opinions.

5                    **2.        Plaintiffs have no §11 claim under *Omnicare*.**

6                          **a.        Under *Omnicare*, EY's report expresses opinions, not facts .**

7    *Omnicare* rests on the distinction between facts and "expressions of opinion." *Id*. at 1326.

8    "[A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement

9    of opinion ('I think the coffee is hot') does not"—an opinion expresses "'a belief.'" *Id*. at 1325.

10   See *id*. at 1326 (a statement of what "'I *believe*'" is "one of opinion"; statements are opinions

11   when they express "a view, not a certainty").

12   EY's audit report fits squarely within *Omnicare*'s description of an opinion. It stated:

13   "'[o]ur responsibility is to *express an opinion* on these financial statements'"; its audits, which

14   examine information "'on a test basis,'" are performed to "'obtain *reasonable assurance* about

15   whether the financial statements are free of material misstatement'"; the audits were conducted in

16   accordance with PCAOB standards; "'*[w]e believe* that our audits provide a reasonable basis for

17   *our opinion*'"; and "'[i]n *our opinion*, the financial statements…present fairly'" MBI's financial

18   position in conformity with GAAP. TAC ¶ 165 (emphasis added; quoting audit report).

19   Because EY's report did not "express[] certainty" (*Omnicare*, 135 S. Ct. at 1325) about

20   MBI's financial condition, its GAAP opinion was just that—an opinion, not a statement of fact.

21   See *In re Lehman Bros. Sec. Litig.*, 799 F. Supp. 2d 258, 303 (S.D.N.Y. 2011) (auditor's GAAP

22   opinion "'indicates the auditor's *belief* that the financial statements…are not materially

23   misstated'"). The report's statements about EY's audits were also opinions. In observing

24   generally accepted auditing standards ("GAAS"), "the independent auditor must exercise his

25   judgment in determining which auditing procedures are necessary in the circumstances to afford a

26   reasonable basis for his opinion." AS 1001.05. Auditors exercise "judgment regarding both the

27   areas to be tested and the nature, timing, and extent of the tests to be performed." AS 1015.11.

28   There is "discretion and judgment on the part of the auditor at every stage." *Bily*, 834 P.2d at 763.

Moreover, "[m]any" GAAS standards "are couched in rather general and in some cases inherently subjective terms," and thus "an opinion that the audit complied with these broadly stated standards" is "inherently…one of opinion." *Lehman*, 799 F. Supp. 2d at 300, 302.[6] Accord, *e.g.*, *Buttonwood Tree Value Partners v. Sweeney*, 2012 WL 2086607, *2 (C.D. Cal. June 7, 2012) ("Determining whether Deloitte complied with GAAS would not be easily answerable as true or false" because it is a "statement[] of opinion"); *In re Longtop Fin. Techs. Sec. Litig.*, 910 F. Supp. 2d 561, 580 (S.D.N.Y. 2012) ("auditor reports of GAAS compliance are 'inherently…opinion'").

### b.      Plaintiffs have no false statement claim.

Under §11, plaintiffs must allege that EY made "an untrue statement of a material fact or omitted to state a material fact required to be stated" in a registration statement. 15 U.S.C. §77k(a). Thus, there are "two ways" to seek to impose §11 liability: "one focusing on what the statement says and the other on what it leaves out." *Omnicare*, 135 S. Ct. at 1323.

For "what the statement says" (*id.*), there are two possible grounds for §11 liability for opinions. One is that the speaker did not "actually hold[] the stated belief"—that would be an "untrue statement of fact" about the speaker's "'existing state of mind.'" *Id.* at 1326. But when plaintiffs "do not contest that [the] opinion was honestly held" and the defendant's "belief turned out to be wrong," that "is not an 'untrue statement of material fact'" giving rise to §11 liability. *Id.* at 1327. Plaintiffs do not allege any facts showing that EY did not believe its GAAP and GAAS opinions when issued. Moreover, they "specifically disclaim[]" "[a]ny allegations" of "fraud or fraudulent conduct" and "scienter or fraudulent intent" as to EY; the §11 claim "does not sound in fraud." TAC ¶ 132. And when, as here, a "complaint explicitly 'exclude[s] and disclaim[s]' any allegation sounding in fraud or deception," that means that the plaintiffs "do not contest that [the] opinion was honestly held." *Omnicare*, 135 S. Ct. at 1327. See *In re Velti PLC Sec. Litig.*, 2015 WL 5736589, *18 (N.D. Cal. Oct. 1, 2015) (§11 false-statement claim dismissed

---

[6]     A later *Lehman* decision, *In re Lehman Bros. Sec. Litig.*, 131 F. Supp. 3d 241, 251 n.44 (S.D.N.Y. 2015) (*Lehman II*), reiterated that GAAP and GAAS statements in audit reports are opinions under *Omnicare*. Apparently realizing that their *Omnicare* argument was problematic, when plaintiffs here moved to amend, they focused on a certification theory, citing *Lehman II*. As noted earlier, however, the Second Circuit rejected the certification argument in *Querub*. The plaintiffs' briefs in *Querub* relied on *Lehman II* in making that losing argument.

1   because the complaint "repeatedly disavows any allegation sounding in fraud or deception").

2         Second, there may be liability based "on what the statement says" (*Omnicare*, 135 S. Ct.

3   at 1323) when "some sentences that begin with opinion words like 'I believe' contain embedded

4   statements of fact," like the italicized words here: "'I believe our TVs have the highest resolution

5   available because *we use a patented technology* to which our competitors do not have access.'"

6   *Id*. at 1327. There could be liability "if the supporting fact [the speaker] supplied were untrue."

7   *Id*. But EY's audit opinion does not contain any "embedded statements of fact" (*id*.), much less

8   embedded facts that EY supplied. See TAC ¶ 165; *Se. Pa. Transp. v. Orrstown Fin.*, 2015 WL

9   3833849, *34 (M.D. Pa. June 22, 2015) (dismissing §11 claim against auditor because plaintiff

10   did not "point to an untrue material fact embedded in [the auditor's] opinion statement").

11                   **c.**        **Plaintiffs have no omission claim.**

12         That leaves §11's omissions clause, which applies to what the defendant's statement

13   "leaves out." *Omnicare*, 135 S. Ct. at 1323. There may be liability when the defendant "omitted

14   to state a material fact…necessary to make the statements therein not misleading." 15 U.S.C.

15   §77k(a). When opinion statements may be understood by a reasonable investor "to convey facts

16   about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for

17   holding that view," they indicate that "the opinion…fairly aligns with the information in [the

18   speaker's] possession *at the time*." *Omnicare*, 135 S. Ct. at 1328-29 (emphasis added). There may

19   be §11 liability when "the real facts are otherwise," and the defendant "omits material facts about

20   [its] inquiry into or knowledge concerning a statement of opinion." *Id*. at 1328-29. See *Velti*, 2015

21   WL 5736589, *22 (dismissing §11 claim where "plaintiffs do not allege facts plausibly indicating

22   that, *at the time* of the offerings," facts about the company's receivables "should have alerted [the

23   auditor] that those receivables were in danger of becoming uncollectible") (emphasis added).

24         For several reasons, plaintiffs have not stated an omissions claim under *Omnicare*:

25         *i.*  Plaintiffs allege no facts indicating that EY's opinion did not "fairly align[] with the

26   information in [its] possession *at the time*" it issued its audit report in March 2014. *Omnicare*,

27   135 S. Ct. at 1329 (emphasis added). See *Rubke v. Capitol Bancorp*, 551 F.3d 1156, 1162 (9th

28   Cir. 2009) (dismissing §11 claim based on a fairness opinion because there were no allegations

1   "that anyone at Capitol actually saw or assessed" a competing fairness opinion); *Tongue v.*

2   *Sanofi*, 816 F.3d 199, 213 (2d Cir. 2016) (§11 claim dismissed where defendants' opinion "did

3   not conflict with the information available to them at the time"). The *only* reasonable inference

4   from the allegations (which are based on the Audit Committee's investigation and the conclusions

5   of the SEC and the U.S. Attorney) is that EY *did not know* at the time of its audit or its report

6   expressing GAAP and GAAS opinions—just as MBI's finance department did not know—of the

7   "'unauthorized'" and "'unprecedented'" (TAC ¶¶ 319, 391) arrangements that sales personnel

8   made with some distributors, which allowed them to return unsold products or withhold payment

9   to MBI until the products were resold to end-users. Plaintiffs admit:

10   •   Those arrangements were "'*consistently not shared with* the finance department or

11   *the Company's external auditors*.'" *Id*. ¶¶ 391, 412 (emphasis added).

12   •   Sales personnel "*failed to share with* [MBI's] finance department or *external*

13   *auditors critical information*" concerning sales to some distributors. *Id*. ¶ 230 (emphasis added).

14   •   MBI's Audit Committee did not learn the truth until "well after E&Y completed its

15   audit of the 2013 Financial Statements," following an Audit Committee investigation that

16   unearthed information that EY "did not have" at the time of its audits. *Id*. ¶¶ 185-86.

17   Plaintiffs further concede that there were "'instances of management override of internal

18   controls by sales personnel related to the recognition of sales to the Company's distributors.'" *Id*.

19   ¶¶ 391, 412. Plaintiffs also admit that MBI sales personnel "'executed *inaccurate representation*

20   *letters*'" (*id*.) (emphasis added)—the very documents that were "'intended to inform the

21   Company's finance department and the external auditors of any commitments not included on a

22   customer purchase order'" (*id*. ¶ 377). The SEC and the U.S. Attorney likewise concluded that

23   key information about sales terms was hidden from EY. See pp. 4-5, *supra*; see also EY Ex. A at

24   i-iv (11/10/15 10-K) (summarizing the Audit Committee's investigation).

25   Given all of this, the "obvious alternative explanation" (*Twombly*, 550 U.S. at 567)—the

26   *only plausible* explanation—is that EY was kept in the dark about the unauthorized arrangements

27   that sales personnel made with some distributors. Allegations "that are 'merely consistent with' a

28   defendant's liability" do not state a claim. *Iqbal*, 556 U.S. at 678. Plaintiffs do not even have that

17

—they make *no* allegations that EY knew of those arrangements "at the time," *Omnicare*, 135 S. Ct. at 1329, of its audit report. Accordingly, they have not alleged a plausible §11 claim.

*ii.*   The complaint also acknowledges that the secret arrangements with some distributors were only uncovered after MBI "'evaluat[ed] *all* distributor sales transactions…on a customer-by-customer and transaction-by transaction basis, including…seeking any details of… *undocumented* arrangements or commitments.'" TAC ¶ 184 (emphasis added). See EY Ex. B at ii (5/18/15 Form 12b-25 filing) (describing the "complex[]" process by which MBI evaluated the "relevant facts and circumstances" for "each individual transaction"). But evaluating "all" transactions is not what auditors do; auditors typically "examine sample transactions"—"an audit rarely, if ever, examines every accounting transaction in the records of a business." *Bily*, 834 P.2d at 749; see also AS 1015.11. This is another reason why the plaintiffs have alleged no facts that "call into question the [defendant's] basis for offering the opinion." *Omnicare*, 135 S. Ct. at 1332.

*iii.*   In addition, "to avoid exposure for omissions under § 11, [a defendant] need only divulge an opinion's basis, or else make clear the real tentativeness of its belief." *Id*. EY did divulge the basis for the opinions. Its report explained what it audited: the "'consolidated balance sheets'" of MBI and "'the related consolidated statements of operations, comprehensive loss, convertible preferred stock and stockholders' equity (deficit), and cash flows.'" TAC ¶ 165. EY then stated the opinions' basis: it conducted its audit in accordance with PCAOB standards, including examining evidence "'on a test basis,'" and stated that "'[w]e believe that our audits provide a reasonable basis for our opinion.'" *Id*. Having "divulge[d] [the] opinion's basis," EY "avoid[s] exposure for omissions under § 11." *Omnicare*, 135 S. Ct. at 1332. EY was not required or expected, under "the customs and practices" of the accounting industry (*id*. at 1330), to list the audit procedures it performed, just as an issuer providing a legal opinion would not list the cases its lawyers read in reaching that opinion (see *id*. at 1328-29).

### 3.      The internal controls allegations cannot be the basis for a claim.

Plaintiffs cannot state a claim against EY by alleging that MBI's internal controls were deficient because they "'were not effectively designed to indentify instances when sales personnel made unauthorized commitments with certain distributors'" (TAC ¶¶ 115, 192); "'controls were

1   not in place'" to prevent or detect "'management override of internal controls by certain sales

2   personnel'" (*id.*); and a PCAOB-compliant audit "would have uncovered these material

3   weaknesses in [MBI's] internal controls" (*id.* ¶ 194). First, these allegations are conclusory,

4   which is impermissible. *Iqbal*, 556 U.S. at 681. Second, they are derivative of plaintiffs' false

5   statement and omission allegations and fail for the same reasons that those allegations fail. *Fait v.*

6   *Regions Fin.*, 712 F. Supp. 2d 117, 125 (S.D.N.Y. 2010), *aff'd*, 655 F.3d 105, 113 (2d Cir. 2011).

7   Plaintiffs plead no facts showing that EY knew at the time that there was a problem with MBI's

8   internal controls, and they admit that an understanding of internal controls "'necessarily includes

9   knowledge of…the contractual terms by which sales are made'" (TAC ¶ 171)—the precise

10  information that was hidden from EY. The claim that there were "material weaknesses" in

11  internal controls (*id.* ¶ 194) is improper hindsight pleading based on MBI's *later* restatement of

12  its financial statements: there is a material weakness in internal controls only when there is a

13  reasonable possibility of a material misstatement in the financial statements (AS 1305.03), which

14  was not known until after the investigation by MBI's management in 2015.

15       More importantly, EY stated explicitly that it expressed "'no…opinion'" on the internal

16  controls. TAC ¶ 165. That being the case, there is no claim under *Omnicare*. Indeed, the Ninth

17  Circuit has specifically rejected the argument that an auditor "should have stated in its…audit

18  report that it had found deficiencies in internal controls" and that "its failure to do so was a

19  material omission actionable under § 11." *Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir. 1994).

20
21       Neither applicable professional standards, nor any legal authority of which we are aware,
         …treat deficiencies in internal controls of a company as material to the audit report.…We
         see no basis for holding that they should be regarded as material for purposes of § 11.

22  *Id.* at 775. Accord, *e.g.*, *In re Van Wagoner Funds*, 382 F. Supp. 2d 1173, 1182 (N.D. Cal. 2004).

23              **4.      There is no loss causation.**

24       Loss causation is not a *prima facie* element of a §11 claim, but there is an affirmative

25  defense (negative causation) that may be established on a motion to dismiss when it is apparent

26  from the face of the complaint and judicially noticeable facts that the defendant did not cause the

27  alleged harm as a matter of law. *Velti*, 2015 WL 5736589, *28; *Brown v. Ambow Educ. Holding*,

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ERNST & YOUNG LLP'S TO DISMISS
THE THIRD AMENDED CLASS ACTION COMPLAINT

2014 WL 523166, *14-16 (C.D. Cal. Feb. 6, 2014); 15 U.S.C. §77k(e). That is the case here.

There is loss causation when "defendant's [misconduct] was '*revealed* to the market and *caused* the resulting losses.'" *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014). An investigation into potential misconduct "can 'form the basis for a viable loss causation theory' *if* the complaint also alleges a subsequent corrective disclosure" concerning the defendant. *Lloyd v. CVB Fin.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (emphasis added; quoting *Loos*). Thus, there would be loss causation as to EY only if there was a corrective disclosure specifically *about EY's audit opinion* that "'caused the company's stock price to drop and investors to lose money.'" *Id.* at 1209-10 (because the loss must be "caused by the defendant's misrepresentations," a corrective disclosure "'must at least relate back to the misrepresentation'"). See also *In re OSG Sec. Litig.*, 2015 WL 3466094, *2-4 (S.D.N.Y. May 29, 2015).

There were no such disclosures about EY's audit opinion. To the contrary, the Audit Committee's investigation concluded that it was the information hidden from EY that caused the inaccurate MBI financial statements on which plaintiffs' claim against EY is based:

> [T]he Audit Committee principally determined that *as a result of the failure of certain employees to share with* the Company's finance department or *the external auditors important transaction terms* with distributors, including "inventory protection" arrangements that would permit the distributors to return to the Company certain unsold products, *the Company inappropriately recognized revenue for certain historical sales transactions with these distributors* ….

EY Ex. A at i (11/10/15 10-K) (emphasis added). The SEC and U.S. Attorney agree that hiding the sales terms from EY caused the incorrect financial statements. See pp. 4-5, *supra*. Moreover, the alleged corrective disclosures concern Absi's wrongdoing, not wrongful conduct by EY—those disclosures showed that key information was concealed from EY and false information was given to EY. See pp. 3-4, *supra*. Thus, the TAC shows that the disclosures about the terms with distributors do not "'relate back'" to misrepresentations *by EY*. *Lloyd*, 811 F.3d at 1210. Indeed, plaintiffs admit that the fall in MBI's stock price that allegedly damaged them (TAC ¶ 206) was not caused by *EY's* conduct, but rather by others' wrongdoing, and this alone requires dismissal.

## IV.   CONCLUSION

For the reasons stated, the §11 claim against EY should be dismissed with prejudice.

20

1

2   July 1, 2016                                Respectfully submitted,

3                                               /s/ Elizabeth Mann
                                                Elizabeth Mann
4                                               Mayer Brown LLP
                                                Attorneys for Defendant
5                                               ERNST & YOUNG LLP

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ERNST & YOUNG LLP'S TO DISMISS
THE THIRD AMENDED CLASS ACTION COMPLAINT