1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11 | SPECIAL SITUATIONS FUND III QP, L.P., et al.,

No.  2:14-cv-02571-MCE-KJN

12
            Plaintiffs,

13

**MEMORANDUM AND ORDER**

14      v.

15 | MARRONE BIO INNOVATIONS, INC., et al.,

16            Defendants.

17

18        Plaintiffs in this consolidated class action charge Defendant Marrone Bio

19 | Innovations, Inc. ("Marrone Bio"); certain of its officers and directors; and its public

20 | auditor, Ernst & Young ("EY"), with violating federal securities laws.  According to

21 | Plaintiffs, they were defrauded of millions of investment dollars based on the financial

22 | reporting fraud of Marrone Bio and Defendant Hector Absi, its Chief Operating Officer

23 | and head of sales.  Plaintiffs reached a settlement with Marrone Bio and its officers and

24 | directors, and final judgment was entered as to that settlement on September 27, 2016.

25 | EY now moves to dismiss the claims against it pursuant to Federal Rule of Civil

26 | Procedure 12(b)(6).  ECF No. 84.  That motion is DENIED.[1]

_____

[1] Because oral argument would not be of material assistance, the Court order the matter submitted on the briefs.  E.D. Cal. Local Rule 230(g).

1

2

## BACKGROUND[2]

3

Marrone Bio is a biotech company that provides pest management and plant health products.  After completing an initial public offering in August 2013, the company's stock was traded on the NASDAQ under the ticker symbol "MBII."  At the end of 2013, Marrone Bio filed its 10-K, reporting that its revenues had doubled over the prior year.  The company continued to report strong results in the first quarter of 2014, and in June 2014 it undertook a Secondary Offering of 4.575 million shares of common stock at a price of $9.50 per share.  That offering was conducted pursuant to a Registration Statement that was filed with the Securities and Exchange Commission ("SEC"), which it declared effective on June 5, 2014.  Lead Plaintiffs purchased 140,000 shares directly out of the Secondary Offering.

On September 3, 2014, Marrone Bio issued a press release, which was also filed with the SEC, revealing that Marrone's Audit Committee had discovered documents calling into question the recognition of certain material revenue in the fourth quarter of 2013.  Following that discovery, the Audit Committee conducted an internal investigation, determining that the financials reported for 2013 and the first half of 2014 should not have been relied upon by investors.  This revelation purportedly meant that the Registration Statement under which shares had been sold was materially false.  Marrone Bio shares thereafter fell in value by at least $2.85 per share.  Relevant to the instant motion, Lead Plaintiffs suffered losses in excess of $3 million as a result of this decrease in the value of Marrone Bio's stock.

Various parties brought suit against Marrone Bio as a result of the Audit Committee's revelation, and the Court consolidated the resultant cases pending in the Eastern District of California.  Mem. & Order, ECF No. 18, at 8.  The SEC and United States Department of Justice ("DOJ") have also filed suits in connection with this fraud.

---

[2] Unless a specific citation is included, the following facts are taken, at times verbatim, from Plaintiffs' Third Amended Complaint.

1    Pls.' Mot. to Am. Compl., ECF No. 58, at 1.  The SEC brought suit against Marrone Bio

2    and Absi for securities violations, while the DOJ indicted Absi on sixteen counts,

3    including counts of securities fraud.  Id.  Plaintiffs were granted leave to amend their

4    complaint in part because documents filed in connection with the SEC's and DOJ's suits

5    provided additional bases for Plaintiffs' allegations.  Mem. & Order, ECF No. 74, at 2.

6         Relevant to the instant motion, EY provided an audit opinion as part of the

7    Registration Statement filed in connection with the Secondary Offering.  That audit

8    opinion stated, in part:  "In our opinion, the financial statements [in the Registration

9    Statement] present fairly, in all material respects, the consolidated financial position of

10   Marrone Bio Innovations, Inc. . . . in conformity with U.S. generally accepted accounting

11   principles."  EY's Req. for Judicial Notice ("RJN"), Ex. C, ECF No. 85-3, at 8.  Plaintiffs

12   allege that the audit report renders EY liable for any material misstatements of fact

13   contained in the financial statements EY audited, pursuant to § 11 of the Securities Act

14   of 1933.  EY, however, contends that the allegations in the Third Amended Complaint

15   ("TAC"), ECF No. 76, are insufficient to set out a claim against it under that section.

16

17                                    **STANDARD**

18

19        On a motion to dismiss for failure to state a claim under Federal Rule of Civil

20   Procedure 12(b)(6), all allegations of material fact must be accepted as true and

21   construed in the light most favorable to the nonmoving party.  Cahill v. Liberty Mut. Ins.

22   Co., 80 F.3d 336, 337–38 (9th Cir. 1996).  Rule 8(a)(2) "requires only 'a short and plain

23   statement of the claim showing that the pleader is entitled to relief' in order to 'give the

24   defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell

25   Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41,

26   47 (1957)).  A complaint attacked by a Rule 12(b)(6) motion to dismiss does not require

27   detailed factual allegations.  However, "a plaintiff's obligation to provide the grounds of

28   his entitlement to relief requires more than labels and conclusions, and a formulaic

1    recitation of the elements of a cause of action will not do." Id. (citation omitted).  A court

2    is not required to accept as true a "legal conclusion couched as a factual allegation."

3    Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555).

4    "Factual allegations must be enough to raise a right to relief above the speculative level."

5    Twombly, 550 U.S. at 555 (citing 5 Charles Alan Wright & Arthur R. Miller, Federal

6    Practice and Procedure § 1216 (3d ed. 2004) (stating that the pleading must contain

7    something more than "a statement of facts that merely creates a suspicion [of] a legally

8    cognizable right of action")).

9        Furthermore, "Rule 8(a)(2) . . . requires a showing, rather than a blanket

10    assertion, of entitlement to relief." Id. at 555 n.3 (citation omitted).  Thus, "[w]ithout some

11    factual allegation in the complaint, it is hard to see how a claimant could satisfy the

12    requirements of providing not only 'fair notice' of the nature of the claim, but also

13    'grounds' on which the claim rests." Id. (citing Wright & Miller, supra, at 94–95).  A

14    pleading must contain "only enough facts to state a claim to relief that is plausible on its

15    face." Id. at 570.  If the "plaintiffs . . . have not nudged their claims across the line from

16    conceivable to plausible, their complaint must be dismissed." Id.  However, "[a] well-

17    pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those

18    facts is improbable, and 'that a recovery is very remote and unlikely.'" Id. at 556 (quoting

19    Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

20        A court granting a motion to dismiss a complaint must then decide whether to

21    grant leave to amend.  Leave to amend should be "freely given" where there is no

22    "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice

23    to the opposing party by virtue of allowance of the amendment, [or] futility of the

24    amendment . . . ." Foman v. Davis, 371 U.S. 178, 182 (1962); Eminence Capital, LLC v.

25    Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the Foman factors as those to

26    be considered when deciding whether to grant leave to amend).  Not all of these factors

27    merit equal weight.  Rather, "the consideration of prejudice to the opposing party . . .

28    carries the greatest weight." Id. (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183,

1   185 (9th Cir. 1987)).  Dismissal without leave to amend is proper only if it is clear that

2   "the complaint could not be saved by any amendment."  <u>Intri-Plex Techs. v. Crest Grp.,</u>

3   <u>Inc.</u>, 499 F.3d 1048, 1056 (9th Cir. 2007) (citing <u>In re Daou Sys., Inc.</u>, 411 F.3d 1006,

4   1013 (9th Cir. 2005); <u>Ascon Props., Inc. v. Mobil Oil Co.</u>, 866 F.2d 1149, 1160 (9th Cir.

5   1989) ("Leave need not be granted where the amendment of the complaint . . .

6   constitutes an exercise in futility . . . .")).

7

8                                        **ANALYSIS**

9

10      EY seeks to dismiss the § 11 claim against it on three bases:  (1) lack of statutory

11   standing, (2) lack of liability for material misstatements in the financial statements it

12   audited, and (3) negative causation.  The Court addresses each in turn.

13      **A.      Standing under § 11 of the Securities Act of 1933**

14      Under § 11 of the Securities Act of 1933, codified at 15 U.S.C. § 77k, any person

15   who purchases a security issued under a materially false or misleading registration

16   statement has standing to sue.  For standing to attach, "the person must have

17   purchased a security issued under that, rather than some other, registration statement."

18   <u>Hertzberg v. Dignity Partners, Inc.</u>, 191 F.3d 1076, 1080 (9th Cir. 1999).  When a

19   materially false or misleading registration statement was issued in connection with a

20   secondary offering, Plaintiffs "need to prove that the shares they purchased came from

21   the pool of shares issued in the secondary offering, rather than from the pool of

22   previously issued shares."  <u>In re Century Aluminum Co. Sec. Litig.</u>, 729 F.3d 1104, 1106

23   (9th Cir. 2013).  One method for Plaintiffs to meet this requirement is to allege "that they

24   purchased their shares directly in the secondary offering itself."  <u>Id.</u>  Plaintiffs have

25   alleged exactly that.  <u>See</u> TAC, ¶¶ 25–26 (alleging that Lead Plaintiffs "purchased MBII

26   securities . . . in the secondary offering"); <u>id.</u>, Ex. A (stating that Lead Plaintiffs "directly

27   purchased" 140,000 shares in the secondary offering).

28   ///

1    Nonetheless, EY contends that Lead Plaintiffs' allegations are insufficient to

2  establish standing under § 11 because those allegations are consistent with three

3  distinct possibilities:  Lead Plaintiffs purchased their shares: (1) from dealers that held

4  stock originating from the Secondary Offering and the Initial Public Offering ("IPO");

5  (2) from underwriters that held stock originating from the Secondary offering and the

6  IPO; and (3) from underwriters that held only stock originating from the Secondary

7  Offering.[3]  EY's Mem. of P & A in Supp. of Mot. to Dismiss ("MTD"), ECF No. 84-1, at 9.

8  EY contends that Lead Plaintiffs could only have standing under the third possibility.

9  Relying on Century Aluminum, EY claims it "is merely possible rather than plausible" that

10  Lead Plaintiffs bought stock issued under the relevant registration statement, and

11  accordingly, that their allegations are insufficient to establish § 11 standing.  Id. at 10

12  (quoting Century Aluminum, 729 F.3d at 1108).

13    EY, however, misapplies Century Aluminum, which addressed the purchase of

14  shares on the open market.  None of the plaintiffs in that case alleged that they

15  purchased the relevant shares directly from the secondary offering.  Century Aluminum,

16  729 F.3d at 1106 ("Plaintiffs are not arguing here . . . that they bought directly in the

17  secondary offering; they concede that they purchased in the aftermarket.").  Moreover,

18  Lead Plaintiffs' allegations go even further because they also allege that they purchased

19  their shares on the date of the Secondary Offering at the offering price.  EY's possible

20  alternative origins of Lead Plaintiffs' stock thus do not demonstrate that the allegations

21  fail to meet the plausibility standards of Twombly and Iqbal.  Instead, they are more

22  properly characterized as attempts to negate the factual allegations set out in the TAC.

23  Of course, such attempts are inappropriate at the pleading stage since the Court must

24  accept all factual allegations as true when analyzing a motion to dismiss.  See Cahill,

25  80 F.3d at 337–38.

26  ///

27    [3] It is unclear why, under EY's logic, there would not be a fourth possibility:  purchasing shares
from dealers that held stock originating solely from the Secondary Offering.

28

6

1    The Court notes that EY also cites <u>Thomas v. Magnachip Semiconductor Corp.</u>,

2    167 F. Supp. 3d 1029 (N.D. Cal. 2016), and claims it stands for the proposition that it is

3    insufficient to allege merely that one purchased the shares in question on the date of the

4    public offering at the offering price.  EY's Reply, ECF No. 89, at 2.  Not only does that

5    case not bind this Court, but there the "Plaintiffs d[id] not argue or allege that they

6    purchased their shares directly from defendants."  <u>Magnachip</u>, 167 F. Supp. 3d at 1055.

7    To the contrary, they alleged only that they acquired the stock "pursuant and/or

8    traceable to" the registration statement in question.  <u>Id.</u>  As Lead Plaintiffs here have

9    alleged a direct purchase in the Secondary Offering, <u>Magnachip</u>'s analysis (just like

10   <u>Century Aluminum</u>'s) is of limited value.

11   <u>Magnachip</u> does state that allegations of purchasing shares on the date of the

12   offering at the offer price "were rejected by the Ninth Circuit" in <u>Century Aluminum</u>.

13   167 F. Supp. 3d at 1055.  However, this Court is not convinced that <u>Magnachip</u>'s reading

14   of <u>Century Aluminum</u> is wholly correct.  <u>Century Aluminum</u> did not address allegations

15   that shares were purchased at the offering price.  <u>See</u> 729 F.3d at 1106 ("[N]one of the

16   plaintiffs bought shares at the offering price of $4.50 per share.").  Instead, <u>Century</u>

17   <u>Aluminum</u> only addressed "allegations regarding the dates on which and the prices at

18   which" the shares were purchased, "as well as allegations concerning the trading volume

19   of Century Aluminum stock on certain dates."  729 F.3d at 1108.  Contrary to

20   <u>Magnachip</u>, this Court finds that alleging the shares were purchased on the date of the

21   offering at the offer price bolsters the allegation that Lead Plaintiffs purchased their

22   shares directly in the Secondary Offering.

23   Accordingly, Plaintiffs' allegations are sufficient to establish § 11 standing.  <u>See In</u>

24   <u>re CytRx Corp. Sec. Litig.</u>, No. CV 14-1956-GHK (PJWx), 2015 WL 5031232, at *15

25   (C.D. Cal. July 13, 2015) (finding allegations that plaintiffs "purchased shares during the

26   offering period at the secondary offering price" sufficient to survive a motion to dismiss

27   for lack of statutory standing).

28   ///

7

1

**B.  Material Misstatements in the Registration Statement**

2        As stated above, § 11 of the Securities Act of 1933 establishes a cause of action

3  for those who purchase securities issued under a materially false or misleading

4  registration statement.  Plaintiffs allege that Marrone Bio's Chief Operating Officer and

5  head of sales Hector Absi orchestrated a fraudulent practice of improperly recognizing

6  revenue to inflate the value of Marrone Bio.  TAC, ¶¶ 181, 223.  Marrone Bio gave some

7  of its distributors "inventory protection" rights such as the ability to pay Marrone Bio only

8  after the distributor sold the product to an end user.  Id. ¶ 181.  According to Plaintiffs,

9  the revenue associated with products provided to the distributors under such terms

10  should not have been recognized until the specified contingencies were met (e.g., after

11  the product was sold to an end user and the distributor paid for the product Marrone Bio

12  provided).  Pls.' Opp'n to MTD, ECF No. 88, at 4.  Because of this scheme, the financial

13  statements issued in connection with Marrone Bio's Secondary Offering were allegedly

14  materially false.  Plaintiffs allege that EY is liable for these errors because EY "certified"

15  the financial statements.  TAC, ¶ 201.  They also allege that EY's opinion on the financial

16  statements were "materially false and misleading."  Id. ¶ 203.  Finally, Plaintiffs allege

17  that EY's "statement that it completed its audit . . . in accordance with [Public Company

18  Accounting Oversight Board (']PCAOB['] standards was materially false and

19  misleading."  Id. ¶ 204.

20        Under § 11, accountants are liable for errors in "any part of the registration

21  statement" that they "prepared or certified."  15 U.S.C. § 77k(a)(4).  Liability can also

22  attach to erroneous opinions under certain circumstances.  The Supreme Court set out

23  the framework for analyzing opinions in Omnicare, Inc. v. Laborers District Council

24  Construction Industry Pension Fund, 135 S. Ct. 1318 (2015).  Under Omnicare, liability

25  can attach to opinions when (1) the speaker did not honestly hold the stated opinion

26  when he or she said it, (2) the opinion contains "embedded statements of fact" that are

27  untrue, or (3) there are "particular (and material) facts going to the basis for the issuer's

28  ///

1  opinion . . . whose omission makes the opinion statement at issue misleading to a

2  reasonable person reading the statement fairly and in context." Id. at 1326–27, 1332.

3      EY contends that it did not certify the financial statements at issue and so is not

4  liable under § 11 for material errors in those statements.  Instead, EY maintains that it

5  can only be held liable for materially false or misleading statements made in the audit

6  report itself.  Furthermore, EY describes its statements in the audit report as opinions,

7  and argues that the audit reports are therefore subject to the opinion analysis outlined in

8  Omnicare.

9

**1. Liability for Material Misstatements in the Financial Statements EY Audited**

10

11      The Court first addresses whether EY certified the allegedly false financial

12  statements.  If EY did certify those financial statements, EY can be held liable under

13  § 11 for material errors they contain.  See 15 U.S.C. 77k(a).  Plaintiffs contend that EY's

14  audit report constitutes a certification under § 11, relying on what they describe as "[a]

15  long line of precedent applying [§ 11]'s plain language" for the proposition that "an

16  auditor which consents to serve as an accounting expert in connection with a registration

17  statement is liable . . . for the misstatements of material fact contained in the registration

18  statement's audited financial statements."  Pls.'Opp'n to MTD, at 11; see also In re

19  Lehman Bros. Sec. & ERISA Litig., 131 F. Supp. 3d 241, 260 n.108 (S.D.N.Y. 2015)

20  (collecting cases).  That is, Plaintiffs argue that the § 11's extension of auditor liability to

21  financial statements they certified means that "[a]ccountants may be found liable under

22  Section 11 for portions of registration statements that they audited."  Lehman Bros.,

23  131 F. Supp. 3d at 260.

24      EY's central arguments to the contrary are formalistic:  "EY did not certify

25  anything; the word 'certify' is not there. . . . [T]he [audit] report . . . states that EY

26  expressed an 'opinion' on the financial statements."  EY's MTD, at 11.  This argument is

27  premised on Omnicare's discussion of the definition of an "opinion."  Omnicare noted

28  that when a speaker uses words such as "I believe," he or she "admitted th[e] possibility"

9

1   that the opinion was erroneous by the use of those words.  135 S. Ct. 1326.  EY argues

2   that the audit report's prefatory clause, "In our opinion," similarly admits the possibility

3   that its conclusions were erroneous and thus is subject to Omnicare's opinion

4   framework.

5        However, Section 11 imposes special liability on those involved in a registration

6   statement, and Omnicare did nothing to upset prior caselaw holding auditors liable for

7   erroneous financial statements in registration statements.  It is not a necessary

8   implication from Omnicare's discussion of opinions that an auditor's opinion no longer

9   constitutes a certification.  Furthermore, audit opinions are not of the same substance as

10  those discussed in Omnicare.  The Supreme Court in that case keeps a running

11  hypothetical of a CEO who opines, "I believe . . . the TVs we manufacture have the

12  highest resolution available on the market."  Id. at 1326.  These sorts of opinions are

13  qualitatively different from an auditor's professional opinion about the soundness of a

14  company's financial statements.[4]  Thus, no amount of couching an audit report as an

15  opinion obviates the certification effect of those reports when made part of a registration

16  statement.

17       Regardless of Omnicare's definition of "opinion," EY also argues that PCAOB

18  standards preclude EY (and all public company auditors) from ever certifying financial

19  statements.  Id. at 12 ("[A]uditors cannot certify a company's financial statements.").  In

20  support, EY cites PCAOB Auditing Standards that state "the auditor's responsibility for

21  the financial statements he or she has audited is confined to the expression of his or her

22  opinion on them."  EY's Reply, at 4 (quoting PCAOB Auditing Standards, AS 1001.03[5]).

23

24       [4] Omnicare relied primarily on commonsense understanding of the difference between facts and
    opinions, not the formalism advocated by EY.  135 S. Ct. at 1325 ("[The] difference between [facts and
    opinions] is so ingrained in our everyday ways of speaking and thinking as to make resort to old

25  dictionaries seem a mite silly.").  This Court similarly relies on the commonsense understanding of the
    difference between a more ordinary opinion and a professional opinion.  Cf. In re Petrobras Sec. Litig., 14-
26  cv-9662 (JSR), 2016 WL 1533553, at *3 (S.D.N.Y. Feb. 18, 2016) ("[A]n auditor's 'opinion' is a term of art,
    the meaning of which may not be entirely synonymous with the more everyday use of the word discussed

27  in Omnicare . . . .").

        [5] PCAOB Auditing Standards are available at https://pcaobus.org/Standards/Auditing/Pages/
28  default.aspx and were also provided by EY in their Request for Judicial Notice, Ex. F, ECF No. 85-6.

However, as Plaintiffs point out, registration statements are required by statute to include both "a balance sheet" and "a profit and loss statement . . . showing earnings and income . . . and the expenses and fixed charges" that have been "certified by an independent public or certified accountant." 15 U.S.C. § 77aa(25)–(26). The only audit report that the parties have identified in the registration statement is EY's. The necessary implication is, of course, that EY's audit report certified the disputed financial statements. "[I]t is difficult to imagine what Congress might have meant by an accountant's certification if not an audit affirming the accuracy of the documents in question." Lehman Bros., 131 F. Supp. 3d at 260 (quoting In re OSG Sec. Litig., 971 F. Supp. 2d 387, 399 (S.D.N.Y. 2013)).

EY explains this apparent contradiction by contending the Security Act of 1933's references to auditors certifying financials are relics of a bygone era. See EY's MTD, at 13 n.5 ("In 1933, . . . auditors sometimes did certify financial figures. . . . Current professional standards bar auditors from certifying financial statements . . . ."). Taken to its logical conclusions, EY's argument proves too much. If auditors can never certify the financial statements due to contemporary professional standards, then the SEC has improperly declared effective every public offering filed since those professional standards came into effect. Alternatively, EY's argument could be construed as contending that the PCAOB has the authority to override federal statutes through the promulgation of accounting standards. Either of these conclusions is untenable and runs contrary to the purposes of both the Securities Act of 1933 and the PCAOB. See Omnicare, 135 S. Ct. at 1323 ("The Securities Act of 1933 protects investors by ensuring companies issuing securities . . . make a 'full and fair disclosure of information' relevant to a public offering." (citation omitted)); Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 484 (2010) ("After a series of celebrated accounting debacles, Congress enacted the Sarbanes–Oxley Act of 2002 . . . . Among other measures, the Act introduced tighter regulation of the accounting industry under a new Public Company Accounting Oversight Board." (emphasis added)).

1        EY also relies on cases explaining the relationship between auditors and the

2   companies they audit.  See EY's MTD, at 12–13.  Those cases explain that auditors do

3   not "by virtue of auditing a company's financial statements, somehow make, own[,] or

4   adopt the assertions contained therein."  Special Situations Fund III QP v. Deloitte

5   Touche Tohmatsu CPA, Ltd., 33 F. Supp. 3d 401, 443 (S.D.N.Y. 2014).  While it may be

6   generally true that auditors are not liable for errors in financial statements merely by

7   auditing them, none of the cases cited by EY for that proposition consider the strict

8   liability imposed by § 11.  For example, the court in Special Situations v. Deloitte

9   considered auditor liability under § 18, which only imposes liability on when "the

10  defendant 'made or caused to be made' a false or misleading statement."  Id. at 440

11  (quoting In re Alstom SA, 406 F. Supp. 2d 433, 478 (S.D.N.Y. 2005)).  Thus, at issue

12  was whether an auditor "caused" a misleading financial statement to be made by

13  auditing it.  Id. at 443.  There was no discussion of certification because the context of

14  the audit reports in question was wholly different from the situation here where EY

15  provided an audit report in connection with a registration statement.

16       Finally, EY argues that the line of cases Plaintiffs rely on was rejected by the

17  Second Circuit in the wake of Omnicare.  EY's MTD, at 11–12.  In Querub v. Moore

18  Stevens H.K., 649 F. App'x 55 (2d Cir. 2016) (summary order), the Second Circuit

19  stated, "Audit reports, labeled 'opinions' and involving considerable subjective judgment,

20  are statements of opinion subject to the Omnicare standard for Section 11 claims," id. at

21  58.  This Court does not find Querub determinative of whether audit reports constitute

22  certifications under § 11 for a number of reasons.

23       First, Querub is a summary order without precedential value.  Second, even if

24  Querub had precedential value, that decision would not be binding on this Court.  Thus,

25  Querub's analysis would still only be persuasive authority if it were not a summary order

26  (as are the cases cited by Plaintiffs from the Southern District of New York).  Third, and

27  most importantly, Querub did not consider the pertinent question here:  whether an audit

28  report included in a registration statement constitutes a certification of the audited

12

1  financial statements.  Though the parties addressed such an argument in their briefing

2  before the Second Circuit, see Brief for Plaintiff–Appellants at 45–48, Querub, 649 F.

3  App'x 55 (2d Cir. 2016) (No. 15-2100-cv), the Second Circuit did not.  Finally, Querub

4  does not counsel granting EY's MTD because, as described below, Plaintiffs' § 11 claim

5  against EY is adequately pleaded even if analyzed under Omnicare's opinion

6  framework.[6]

7        Accordingly, Plaintiffs have adequately pleaded a claim against EY under § 11.

8  Plaintiffs allege the financial statements included in Marrone Bio's secondary offering

9  registration statement were materially false, and § 11 liability attaches to EY because it

10  certified those financial statements.

11  **2.  Liability for Material Misstatements in EY's Audit Reports**

12        As described above, Plaintiffs do not allege that EY is liable under § 11 solely on

13  the basis of its audit report serving as a certification of Marrone Bio's financial

14  statements.  It also alleges that the audit opinion itself was materially false or misleading.

15  Plaintiffs, by analyzing the audit opinion under Omnicare's framework, implicitly concede

16  that the audit reports themselves are opinions.[7]  Accordingly, the Court does not need to

17  determine exactly the nature of audit opinions in relation to the kinds of opinions

18  addressed in Omnicare and will analyze the audit report under Omnicare's guidance.

19        In relevant part, EY's audit report reads:

20          We conducted our audits in accordance with the
21  standards of the Public Company Accounting Oversight
   Board (United States).  Those standards require that we plan
22  and perform the audit to obtain reasonable assurance about
   whether the financial statements are free of material
23  misstatement.  We were not engaged to perform an audit of

24        [6] One court in the Southern District of Texas has adopted EY's view of Querub, stating that "the holding in that case directly contradicts" the contention that auditors certify financial statements and are
25  therefore liable for material misstatements they contain.  Johnson v. CBD Energy Ltd., No. H-15-1668, 2016 WL 3654657, at * 11 (S.D. Tex. July 6, 2016) (citing Querub, 649 F. App'x at 58).  For the reasons
26  provided, however, this Court disagrees.

27        [7] The Court notes that this is not inconsistent with holding EY liable for certifying the registration statement's financial statements.  Regardless of the qualitative difference between the opinions discussed in Omnicare and the professional opinion expressed by an audit report, opinions can still serve as
28  certifications under the Securities Act of 1933.

the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements . . . present fairly, in all material respects, the consolidated financial position of Marrone Bio Innovations, Inc. . . . in conformity with U.S. generally accepted accounting principles.

Marrone Bio Innovations, Inc., Form S-1 Registration Statement, Report of Independent Registered Public Accounting Firm ("Audit Report"), Req. for Judicial Not., Ex. D, F-2, ECF No. 85-4.

Under Omnicare, EY can be held liable pursuant to § 11 if (1) it did not honestly hold the opinions set out in the report, (2) the report contains "embedded statements of fact" that are false, or (3) the report omits facts such that the report is misleading. 135 S. Ct. at 1326–27, 1332. Plaintiffs allege liability under the second and third of these.

Plaintiffs first argue "EY is . . . liable under Omnicare because the 'facts of [the] financial statements are embedded in [EY's] audit opinions.'" Pls.' Opn'n to MTD, at 15 (third alteration in original) (quoting In re Petrogras Sec. Litig., 14-cv-9662 (JSR), 2016 WL 1533553, at *3–4 (S.D.N.Y. Feb. 18, 2016)). As Plaintiffs note, at least one court has taken this position. This Court, however, disagrees that financial statements are embedded in audit opinions under Omnicare. Here, EY's audit opinion provides an opinion on the accuracy of the financial statements; it did not use the facts of the financial statements to opine on something else. See Audit Report ("In our opinion, the financial statements . . . present fairly, in all material respects, the consolidated position of Marrone Bio Innovations, Inc."). Treating the financial statements as embedded facts commits the Sixth Circuit's error that Omnicare reversed, "conflat[ing] facts and

1    opinions." Omnicare, 135 S. Ct. at 1325 (rejecting a § 11 analysis resting on the idea

2    that "[t]o say 'we believe X is true' is often to indicate that 'X is in fact true'").  Thus, the

3    audit report does not contain the financial statements as "embedded facts" and EY is not

4    liable for errors in the financial statements separate from the liability that attached due to

5    certification described above.

6         Plaintiffs next argue that EY's statement that it "conducted [its] audits in

7    accordance with the standards of the Public Company Accounting Oversight Board

8    (United States)" is an embedded fact, which was materially false.  Specifically, they

9    allege that EY did not adhere to PCAOB standards because it did not "(i) have sufficient

10   information to determine whether or not the terms of the Company's transactions with its

11   limited number of distributors supported immediate revenue recognition, and (ii) had not

12   acquired sufficient information to accurately state that [Marrone Bio]'s financial

13   statements were prepared in accordance with [generally accepted accounting

14   principles]."  TAC, ¶ 190.  In support of their allegation that EY did not obtain sufficient

15   information, they also allege that "EY verified [Marrone Bio]'s sales with the Company's

16   head salesperson as opposed to its handful of customers."  Pls.' Opp'n to MTD, at 16.

17   EY, for its part, argues that such allegations are "purely conclusory."  EY's Reply, at 7.

18   EY claims that the SEC complaint forms the sole basis of the relevant allegations, but

19   that the SEC complaint does not support EY's allegations.  Accordingly, EY argues

20   Plaintiffs' pleading is improper since they "identify no basis for making th[eir] assertion

21   about what EY did or did not do."  EY's Reply, at 7.

22        EY is incorrect that the SEC's complaint forms the sole basis of these allegations.

23   Plaintiffs' TAC states the allegations it contains are based on not just the SEC, but

24   several other sources including "interviews with former [Marrone Bio] employees and

25   other individuals with relevant personal knowledge."  TAC, ¶ 2.  Furthermore, Plaintiffs

26   specifically reference the SEC complaint regarding these allegations only by stating that

27   "[t]he SEC has confirmed" them.  Id. ¶ 182.  EY's opposition, taken properly, merely

28   contends that Plaintiffs' allegations are false.  See EY's Reply, at 7 (describing the

1   allegation that EY verified sales figures only with Marrone Bio's head of sales as "wholly

2   untrue").  Again, it is inappropriate to address the truth or falsity of Plaintiffs' allegations

3   at this stage of the litigation.  For purposes of the instant motion, the Court assumes that

4   EY did in fact only rely on Absi's representations in forming its audit opinion.

5   Accordingly, the relevant question is whether doing so violated PCAOB standards.

6        In their TAC, Plaintiffs cite PCAOB Auditing Standard 2110,[8] which, among other

7   things, requires auditors to "[o]btain[] an understanding of the nature of the company."

8   PCAOB Auditing Standard 2110.10; see also TAC ¶ 170.  Plaintiffs also cite Staff Audit

9   Practice Alert No. 12 (Sept. 9, 2014), https://pcaobus.org/Standards/QandA/9-9-

10  14_SAPA_12.pdf, which provides a more detailed explanation of the standard.  The

11  portion cited by Plaintiffs reads:

12              Gaining an understanding of the company, its
              environment, and its internal control over financial reporting
13            includes gaining an understanding of the business, the
              different types of sales contracts, and the controls over
14            revenue, including the company's development of accounting
              estimates for revenue. Such an understanding necessarily
15            includes knowledge of the company's key products and
              services and the contractual terms by which sales are made,
16            such as the key provisions of contractual arrangements and
              the extent to which contractual terms are standardized across
17            the company.

18  Id. at 8; see also TAC, ¶ 171.  Plaintiffs allege that EY failed to "gain[] an understanding

19  of . . . the different types of sales contracts" employed by Marrone Bio because its audit

20  failed to take into account the fact that several sales contracts contained "inventory

21  protection" rights.  TAC, ¶¶ 179–81.

22        These allegations are sufficient to state a claim that the audit report contained a

23  material misstatement in stating EY's audit comported with PCAOB standards.  Plaintiffs

24        [8] Plaintiffs' TAC refers to this standard as "AU 12."  This is, in part, because the PCAOB Auditing
25  Standards were reorganized on March 31, 2015.  See PCAOB, PCOAB Auditing Standards Reorganized
    and Pre-Reorganized Numbering (Jan. 2017), https://pcaobus.org/Standards/Auditing/Documents/
26  ReorganizedandPreReorganizedNumbering.pdf (cross-referencing the numbering of PCAOB Auditing
    Standards under the newer and older systems).  The Court also notes that the section "setting forth risk
27  assessment procedures" that Plaintiffs' intended to cite was previously known as "AS No. 12," not "AU 12."
    See id. (describing the new AS 2110 and old AS No. 12 as "Identifying and Assessing Risks of Material
28  Misstatement").

1    allege that EY failed to adequately gain an understanding of Marrone Bio's sales

2    contracts because EY only relied on Absi to confirm the terms of Marrone Bio's

3    contracts.  Whether these allegations are true or not, they are sufficient to state a claim.

4              **3.  Liability for Omissions of Material Facts in EY's Audit Reports**

5              Plaintiffs finally allege that EY is liable for omitting the fact that EY "lacked the

6    basis for making [EY's statements in the audit report] that a reasonable investor would

7    expect."  Pls.' Opp'n, at 16 (quoting <u>Omnicare</u>, 135 S. Ct. at 1333).  <u>Omnicare</u> directly

8    addressed what a plaintiff must allege in stating such a claim:

9
> The investor must identify particular (and material) facts
> going to the basis for the issuer's opinion—facts about the
10                inquiry the issuer did or did not conduct or the knowledge it
> did or did not have—whose omission makes the opinion
11               statement at issue misleading to a reasonable person reading
> the statement fairly and in context.
12

13    135 S. Ct. at 1332.

14             EY argues that Plaintiffs must allege facts "indicating the EY's opinion did not

15    'fairly align[] with the information in [its] possession <u>at the time</u>' it issued its audit report."

16    EY's MTD, at 16 (alterations in original) (quoting <u>Omnicare</u>, 135 S. Ct. at 1329).  That is,

17    EY argues that its report did not omit any material facts because it did not know that Absi

18    perpetrated fraud.  <u>See</u> EY's MTD, at 17  In essence, EY contends that it cannot be held

19    liable for omitting the fact that its audit was inadequate because its audit was not

20    sufficiently adequate to discover the alleged fraud committed by Absi.  Once again, EY's

21    arguments prove too much.

22             EY's selective quoting of <u>Omnicare</u> wholly misconstrues the language it cites.

23    <u>Omnicare</u> explicitly states that omission liability can attach due to both "facts about the

24    inquiry the issuer <u>did or did not</u> conduct or the knowledge it did <u>or did not</u> have."

25    <u>Omnicare</u>, 135 S. Ct. at 1332.  The language quoted by EY is properly understood to

26    mean that an investor "expects . . . that [the issuer's opinion] fairly aligns with the

27    information in the issuer's possession at the time" and therefore, "if a registration

28    statement omits material facts about the issuer's inquiry" that show the inquiry was

                                                   17

1   inadequate, "then § 11's omissions clause creates liability." Id. at 1329.  That is, the

2   language quoted by EY stands for almost the exact opposite proposition than EY claims.

3       Plaintiffs identify three alleged failures of EY's audit that they claim create § 11

4   omissions liability—that is, Plaintiffs allege EY failed to disclose that its audit was

5   inadequate.  Plaintiffs allege (1) that EY relied only on Absi to verify the sales terms

6   between Marrone Bio and its distributors; (2) that EY improperly failed to scrutinize a

7   suspicious spike in revenue in winter when there were fewer crops to benefit from

8   Marrone Bio's products; and (3) that EY failed to take into account Marrone Bio's internal

9   control environment.[9]  Pls.' Opp'n, at 17–18.  Taken together, Plaintiffs have alleged

10  sufficient "facts about the inquiry [EY] . . . did not conduct" and "the knowledge it . . . did

11  not have" for omissions liability to attach.  Omnicare, 135 S. Ct. at 1332; see also

12  Lehman Bros., 131 F. Supp. 3d at 258–59 (relying on the identification of six "red flags"

13  ignored by EY as creating omission liability under § 11).

14      Despite this, EY claims that no § 11 omissions liability can attach because they

15  "divulge[d] the basis for [its] opinion."  EY's MTD, at 18 (citing Omnicare, 135 S. Ct. at

16  1332).  In support, EY states that it divulged the following bases for its audit report:  that

17  "it conducted its audit in accordance with PCAOB standards," that it "examin[ed]

18  evidence 'on a test basis,'" and that EY "believe[d] that [its] audits provide a reasonable

19  basis for [its] opinion."  Id.  While EY is correct that "to avoid exposure for omissions

20  under § 11 an issuer need only divulge an opinion's basis," Omnicare, 135 S. Ct. at

21  1332, EY's divulgations are here insufficient to escape liability.

22      First, as stated above, Plaintiffs have alleged sufficient facts to state a claim that

23  EY did not conduct its audit in accordance with PCAOB standards and that EY did not

24  examine evidence aside from seeking confirmation from Absi.  Second, an auditor

25      [9] The Court notes that EY cites to Monroe v. Hughes, 31 F.3d 772 (9th Cir. 1994), for the

26  proposition that no § 11 liability occurs on the basis that an auditor "should have stated in its audit . . .
    report that it had found deficiencies in internal controls," id. at 774.  EY misreads that case.  In Monroe, the

27  auditor did find deficiencies in the company's internal controls and took those deficiencies into account in
    performing its audit, but did not disclose the deficiencies.  Id.  Plaintiffs here do not allege that EY found
    deficiencies and failed to reveal them; Plaintiffs allege that EY did not take into account the deficiencies of

28  Marrone Bio's internal controls.  Thus, Monroe is inapposite.

1    cannot inoculate itself from liability by stating its opinion was based on another opinion.

2    As was aptly stated in Lehman Brothers, "Like philosophy's apocryphal turtles, EY's view

3    of auditing is that 'it's opinions all the way down.'" 131 F. Supp. 3d at 258.  The

4    gravamen of Plaintiffs' argument is that § 11 omissions liability attaches because EY

5    failed to disclose that it performed an inadequate audit.  To escape such liability by

6    divulging the basis for its audit opinion, EY would have had to divulge that it performed a

7    less-than-thorough audit when it opined that Marrone Bio's financial statements

8    accurately reflected its financial position.

9          **C. Negative Causation**

10        Lastly, EY seeks to dismiss the claims against it on the basis of an affirmative

11   defense, negative causation.  "[A] plaintiff need not demonstrate reliance on a

12   misleading registration statement in order to prevail on a Section 11 claim . . . ." Hildes

13   v. Arthur Andersen LLP, 734 F.3d 854, 860 (9th Cir. 2013).  However, "[t]he affirmative

14   defense of negative causation prevents recovery for losses that the defendant proves

15   are not attributable to the alleged misrepresentation or omission in the registration

16   statement."  Id.  "As is the case with any affirmative defense, if the facts as alleged by

17   plaintiffs, and documents which the court may take judicial notice of, establish the

18   affirmative defense as a matter of law then the motion to dismiss may be granted."  In re

19   Shoretel Inc. Sec. Litig., No. C 08-00271 CRB, 2009 WL 248326, at *5 (N.D. Cal. Feb. 2,

20   2009).

21        EY argues that negative causation is "apparent from the face of the complaint and

22   judicially noticeable facts."  EY's MTD, at 19.  EY contends that § 11 liability can only

23   result when the revelation of the defendant's misconduct caused the plaintiff's losses.

24   Id. at 20 (citing Loos v. Immersion Corp., 762 F.3d 880, 887 (9th Cir. 2014)).

25   Accordingly, EY argues that because the revelation of Absi's and Marrone Bio's

26   misconduct caused Plaintiffs' losses, not the revelation of EY's deficient audit, EY cannot

27   be held liable for Plaintiffs' losses.  Once again, EY misconstrues the applicable law.

28   ///

1     Most of the cases cited by EY address loss causation in the context of § 10(b)

2   cases, in which plaintiffs have the burden of establishing loss causation, and therefore

3   have limited applicability here.  See, e.g., Loos, 762 F.3d at 886–887 (listing loss

4   causation as one of the six elements of § 10(b) claims).  Furthermore, EY's view of loss

5   causation is far too narrow.  Loss in a § 11 case need not be tied to "a corrective

6   disclosure specifically about EY's audit opinion."  EY's MTD, at 20 (emphasis removed).

7   Instead, "[i]f a disclosure reveals adverse information . . . that the misrepresentation had

8   concealed, and this causes a drop in stock price, then the misstatement and the stock

9   decline are causally related and loss causation exists."  In re Wash. Mut., Inc. Sec.,

10  Derivative & ERISA Litig., 259 F.R.D. 490, 508 (W.D. Wash. 2009).  None of the § 11

11  cases cited by EY are to the contrary.  For example, in In re Veltri PLC Securities

12  Litigation, No. 13-cv-03889-WHO, 2015 WL 5736589 (N.D. Cal. Oct. 1, 2015), a

13  negative causation defense was appropriate because the relevant plaintiff sold its shares

14  prior to the corrective disclosures that caused the shares' value to drop, id. at *29.

15     First, as alleged, because EY certified the financial statements in question, it is

16  responsible for the alleged material misstatements in those financial statements.  Thus,

17  negative causation cannot be applicable to liability stemming from material

18  misstatements in those financial statements.  Regardless of EY's liability for material

19  misstatements in the financial statements themselves, negative causation does not bar

20  liability for material misstatements in EY's audit opinion.  When Marrone Bio revealed

21  that it misreported revenue, EY's opinion that its financial statements accurately

22  represented Marrone Bio's financial health was proven incorrect.  Plaintiffs allege that

23  Marrone Bio's stock lost value because it was revealed that the financial statements

24  were incorrect—that is, it was revealed that EY's audit opinion was incorrect.  Section 11

25  liability does not require revelation of the specific faults of the false opinion in question

26  as EY urges.

27     The absurdity of EY's excessively narrow view of loss causation becomes

28  apparent considering the examples of liability given by the Supreme Court in Omnicare.

1    Omnicare continues its hypothetical about a CEO that states an opinion that her

2    company's TV has the highest resolution available.  The Court writes that she could be

3    liable under § 11's omissions provision if "she had recently received information from

4    industry analysts indicating that a new product had surpassed her company's on this

5    metric" and failed to take that information into account when forming her opinion.

6    Omnicare, 135 S. Ct. at 1329 n.6.  Under EY's interpretation of negative causation, the

7    TV CEO could only be liable if loss were connected to the revelation that she ignored the

8    "recently received information from industry analysts" but not if loss flowed from the

9    revelation that her TVs in fact did not have the highest resolution on the market.

10          A similar absurdity would occur under the Supreme Court's hypothetical of the TV

11   CEO stating an opinion that her TV had the highest resolution available, when she did

12   not actually hold that belief.  See Omnicare, 135 S. Ct. at 1326.  Under EY's

13   interpretation of loss causation, the CEO could only be held liable if loss were connected

14   to a revelation that she did not believe the opinion she gave, but not for loss attributable

15   to a revelation that another TV on the market has a higher resolution.  In both these

16   scenarios, EY's interpretation of loss causation misses the fundamental point.  Loss will

17   occur because the opinions were incorrect—the TV did not have the highest resolution

18   on the market—and investors purchased shares in reliance of that incorrect, misleading

19   opinion.  Loss causation does not depend on why the opinion was incorrect.

20          Under EY's version of negative causation, Omnicare's analysis of opinions would

21   be rendered almost a complete nullity.  Companies do not typically lose value because it

22   is revealed that an opinion contained a material misstatement.  Companies lose value

23   because it is revealed that an opinion was incorrect.  And § 11 imposes liability when the

24   opinion was incorrect because of a material misstatement or omission.

25          Here, the heart of Plaintiffs' allegations is that Marron Bio's financial statements

26   were incorrect.  The revelation that Marrone Bio improperly recognized revenue

27   allegedly demonstrated that EY's audit opinion was incorrect.  Therefore, EY is liable for

28   ///

1  the resulting losses if its opinion contained material misstatements or omissions that led

2  it to incorrectly opine that Marrone Bio's financial statements were accurate.

**CONCLUSION**

6      For the foregoing reasons, EY's Motion to Dismiss, ECF No. 84, is DENIED.

Plaintiffs have adequately pleaded § 11 standing, and so EY's motion premised on that

issue fails.  Furthermore, EY is liable under § 11 for any material misstatements in the

registration statement's financial statements because it certified those financial

statements.  Finally, Plaintiffs have adequately pleaded that EY's audit report contains

material misstatements and material omissions under § 11.

      IT IS SO ORDERED.

Dated:  March 20, 2017

_____
MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE